# 23-8020-cv

## United States Court of Appeals

*for the*

## Second Circuit

ANTHEM, INC.,

*Plaintiff-Appellant,*

— v. —

EXPRESS SCRIPTS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

GLENN M. KURTZ
CLAUDINE COLUMBRES
WHITE & CASE LLP
*Attorneys for Plaintiff-Appellant*
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellant states as follows: Anthem, Inc. (n/k/a Elevance Health, Inc.) does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock.

*/s/ Glenn M. Kurtz*
Glenn M. Kurtz

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.................................................. ii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE .............................................................3

    A.    The Parties And The Agreement ...........................................4

    B.    ESI's Acquisition Of NextRx...............................................4

    C.    ESI Promised To Provide Anthem With Competitive Pricing Through The Term Of The Agreement .................................6

    D.    Market Pricing Changed Dramatically..................................8

    E.    ESI Breached Section 5.6 By Failing To Negotiate In Good Faith ....10

    F.    ESI Overcharged Anthem By Billions Of Dollars.............................11

    G.    Procedural History.................................................................12

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW .................................................................15

ARGUMENT ......................................................................................16

I.    The District Court Erred In Resolving Core Issues Of Material Fact Against The Non-Moving Party .................................................16

    A.    ESI Provided Anthem With Competitive Pricing In 2009.................18

    B.    Anthem Did Not Trade-Off Competitive Pricing For The Upfront Payment .................................................................21

II.    The District Court Erred In Ruling That Anthem Could Not Recover Damages, Allowing ESI To Keep Billions Of Dollars In Ill-Gotten Gains ..23

    A.    The District Court Erred In Ruling That Anthem Did Not Seek Out-Of-Pocket Damages .................................................23

    B.    The District Court Erred In Limiting Expectation Damages .............24

    C.    The District Court Erred In Resolving The Question Of Fact As To Damages .................................................28

1.    The District Court Erred In Relying On An Alleged Potential For Impasse Between Non-Breaching Parties .......... 29

2.    The District Court Erred In Making The Ultimate Finding of Fact About What Would Have Happened Had ESI Not Breached .................................................................................. 30

3.    The Breaching Party Bears The Risk Of Uncertainty As To Damages, Which Do Not Have To Be Proven With Mathematical Certainty ............................................................ 31

4.    The Record Evidence Proves Damages With Mathematical Certainty ................................................................................. 34

5.    ESI's Repudiation Of Its Obligation Did Not Establish A Defense, It Proved Breach ...................................................... 36

6.    The District Court's Factual Findings Are Contrary To The Record Evidence ..................................................................... 38

        a.    The District Court Erred In Finding That The Parties Did Not Agree On The Meaning Of Competitive Benchmark Pricing ...................................................... 38

        b.    The District Court Erred In Finding That Anthem's Proposal Would Have Required ESI To Accept Unprofitable Pricing ...................................................... 39

        c.    The Relevance Of The First Market Check Was A Question Of Fact For The Jury ..................................... 40

        d.    The District Court Erred In Finding That Negotiations Between The Parties Ended Due To Anthem's Initiation Of This Lawsuit ............................................. 41

        e.    ESI Was Not Allowed To Take Into Account The Upfront Payment In The Market Check, Which, At Best, Raised A Question Of Fact .................................... 41

D.    The District Court Erred In Ruling That Restitution Damages Are Unavailable For ESI's Breach ............................................... 43

III.    The District Court Erred In Granting Summary Judgment That ESI Was Not Required To Negotiate In Good Faith For Competitive Pricing To Anthem ............................................................................................ 44

A.    The District Court Erred In Finding And Then Resolving A Factual Dispute About The Objective Of The Good Faith Negotiation Requirement, And Without Supporting Evidence .......... 45

B.    The District Court Erred In Ruling That The Objective Of Section 5.6 Does Not Apply To ESI .................................................................49

C.    The District Court Erred In Granting Summary Judgment, Alternatively, By Resolving Genuine Issues Of Material Fact...........52

    1.    The Bid Solicitation Process Demonstrates That ESI Was Required To Negotiate In Good Faith To Provide Competitive Pricing, And Anthem Seeks The Same Level Of Pricing Received In 2009....................................................52

    2.    The Drafting History Confirms ESI Could Not Rely On The Upfront Payment To Not Provide Anthem With Competitive Pricing ...................................................................53

    3.    The First Market Check Is Not A Course Of Conduct, But Demonstrates That The Second Market Check Would Require ESI To Negotiate In Good Faith For Competitive Pricing ...................................................................55

D.    The District Court's Ruling Violates Rules Of Construction By Rendering Section 5.6 Superfluous And Commercially Unreasonable ........................................................................58

CONCLUSION ........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adjustrite Sys. Inc. v. GAB Bus. Servs., Inc.*,
145 F.3d 543 (2d Cir. 1998) ................................................49

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
2007 U.S. Dist. LEXIS 49643 (S.D.N.Y. July 9, 2007)....................................16

*Best Payphones, Inc. v. Manhattan Telecomms. Corp. (In re Best Payphones, Inc.)*, 450 F. Appx. 8 (2d Cir. 2011) ................................37

*Boyce v. Soundview Tech. Grp., Inc.*,
464 F.3d 376 (2d Cir. 2006) ................................................31

*Brod v. Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011) ................................................15

*Chen v. Hiko Energy, LLC*,
2014 U.S. Dist. LEXIS 181846 (S.D.N.Y. Dec. 29, 2014) ................................24

*CP III Rincon Towes, Inc. v. Cohen*,
666 F. Appx. 46 (2d Cir. 2016) ................................................15, 58

*Davis-Garett v. Urban Outfitters, Inc.*,
921 F.3d 30 (2d Cir. 2019) ................................................17

*Endurance Am. Specialty Ins. Co. v. Century Sur. Co.*,
46 F. Supp. 3d 398 (S.D.N.Y. 2014) ................................................59

*Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*,
519 F.3d 421 (8th Cir. 2008) ................................................28

*First Mercury Ins. Co. v. 613 N.Y. Inc.*,
609 F. Appx. 664 (2d Cir. 2015) ................................................49

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992) ...............................................51

*Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*,
92 F. Supp. 2d 249 (S.D.N.Y.) ...........................................26

*Green v. Town of E. Haven*,
952 F.3d 394 (2d Cir. 2020) ........................................16, 21

*Halberstam v. Allianz Life Ins. Co. of N. Am.*,
349 F. Supp. 3d 164 (E.D.N.Y. 2018) ................................38

*Hampton v. Ontario (In re Hamption)*,
2020 Bankr. LEXIS 447 (Bankr. W.D.N.Y. Feb. 19, 2020) ...........................34

*Heyman v. Commerce & Industry Ins. Co*,
524 F.2d 1317 (2d Cir. 1975) .............................................52

*Impax Labs., Inc. v. Turing Pharm. AG*,
2017 U.S. Dist. LEXIS 164133 (S.D.N.Y. Sep. 28, 2017) ...............................42

*Indu Craft v. Bank of Baroda*,
47 F.3d 490 (2d Cir. 1995) ................................................24

*Kessler v. Westchester Cnty. Dep't of Soc. Servs.*,
461 F.3d 199 (2d Cir. 2006) ........................................15, 40

*King v. Paradise Auto Sales I, Inc.*,
2015 U.S. Dist. LEXIS 187668 (E.D.N.Y. Nov. 12, 2015) ...............................23

*Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc.*,
603 F. Supp. 2d 735 (S.D.N.Y. 2009) ................................59

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) .............................................49

*Landmark Ventures, Inc. v. Wave Sys. Corp.*,
2012 U.S. Dist. LEXIS 125341 (S.D.N.Y. Sept. 4, 2012) ...............................59

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) ..................................................................46

*Learning Annex Holding, LLC v. Whitney Edu. Grp. Inc.*,
765 F. Supp. 2d 403 (S.D.N.Y. 2011) ....................................................26

*LG Capital Funding, LLC v. PositiveID Corp.*,
2019 U.S. Dist. LEXIS 126991 (E.D.N.Y. July 29, 2019)................................36

*Living the Dream Films, Inc. v. Aloris Entm't, LLC*,
2021 U.S. Dist. LEXIS 182751 (S.D.N.Y. Sep. 24, 2021) ...............................43

*MAFCO Elec. Contrs., Inc. v. Turner Constr. Co.*,
357 F. Appx. 395 (2d Cir. 2009) ..........................................................57

*Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*,
103 F. Supp. 3d 244 (N.D.N.Y. 2015)..................................................25

*Mgmt. Recruiters v. Nat'l Econ. Rsch. Assocs.*,
2005 U.S. Dist. LEXIS 494 (S.D.N.Y. Jan. 11, 2005) ......................................58

*Mon Chong Long Trading v. Travelers Excess & Surplus Lines Co.*,
2013 U.S. Dist. LEXIS 92096 (S.D.N.Y. June 27, 2013) ...................................51

*N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*,
2010 U.S. Dist. LEXIS 99643 (S.D.N.Y. Sept. 2, 2010) ...................................31

*Natixis Real Estate Capital Trust 2007-HE2 v. Natixis Real Estate Holdings,
LLC*, 149 A.D.3d 127 (1st Dept. 2017) ..............................................59

*Potelco, Inc. v. Dep't of Labor & Indus.*,
2018 Wash. App. LEXIS 31 (Wash. Ct. App. Jan. 9, 2018) .............................46

*Randolph v. Griffin*,
816 F. Appx. 520 (2d Cir. 2020) ........................................................16

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
643 F. Supp. 925 (S.D.N.Y. 1986) ..............................................38, 39

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001) ............................................................15, 39, 51, 58

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ..............................................................34

*Seabury Constr. Corp. v. Jeffrey Chain Corp.*,
    289 F.3d 63 (2d Cir. 2002) ...............................................................51

*Seduka, LLC v. Street Moda, LLC*,
    2017 U.S. Dist. LEXIS 54212, (S.D.N.Y. Mar. 23, 2017)................37

*SIGA Techs. Inc. v. Pharmathene, Inc.*,
    132 A.3d 1108 (Del. 2015) .............................................................31, 32

*SIGA Techs., Inc. v. Pharmathene, Inc.*,
    67 A.3d 330 (Del. 2013) .................................................................28, 30

*SPI Communs. v. WTZA-TV Assocs. Ltd. Pshp.*,
    229 A.D.2d 644 (3d Dep't 1996)......................................................37

*Springwood Assocs. v. Lumpkin*,
    606 N.E.2d 733 (Ill. Ct. App. 1992) ................................................46

*Starr Indem. & Liab. Co. v. Brightstar Corp.*,
    388 F. Supp. 3d 304 (S.D.N.Y. 2019) ..............................................46

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*,
    993 F. Supp. 2d 379 (S.D.N.Y. 2014) ..............................................46

*Tractebel Energy Mktg., v. AEP Power Mktg.*,
    487 F.3d 89 (2d Cir. 2007) ........................................................passim

*Trs. Of the United Health & Welfare Fund v. N. Kofsky & Son, Inc.*,
    2013 U.S. Dist. LEXIS 138610 (S.D.N.Y. Sept. 26, 2013) ..............31

*United States Bank N.A. v. Xxx*,
    2021 N.Y. Misc. LEXIS 3747 (N.Y. Sup. Ct. June 28, 2021) ..........58

*United States v. Costello*,
    666 F.3d 1040 (7th Cir. 2012) ................................................................48

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    887 F. Supp. 1014 (N.D. Ill. 1995) ......................................................30

*Wright v. Coughlin*,
    132 F.3d 133 (2d Cir. 1998) ..................................................................21

## STATUTES AND RULES

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1332 ........................................................................................2

28 U.S.C. § 2107 ........................................................................................3

Fed. R. App. P. 4(a)(1)(A) ........................................................................3

Fed. R. Civ. P. 26(a) ..........................................................................14, 43

Restatement (Second) of Contracts § 250 Comment d ...........................38

## MISCELLANEOUS

14 Williston on Contracts § 43:5 (4th ed.) ..............................................37

# INTRODUCTION

Plaintiff-Appellant Anthem Inc. ("Anthem") brought this breach of contract action to recover overcharges for prescriptions supplied by its pharmacy benefit manager ("PBM"), Defendant-Appellee Express Scripts Inc. ("Express Scripts" or "ESI"). In 2009, Anthem sold its in-house PBM companies to ESI for $4.675 billion, and entered into a 10-year PBM Agreement (the "Agreement") for ESI to act as Anthem's exclusive PBM (the "Transaction"). ESI agreed to provide Anthem with competitive pricing through the term of the Agreement. Although ESI was providing competitive pricing at the start of the Agreement, pricing in the market can change. Accordingly, the parties agreed to a "market check provision," Section 5.6, requiring ESI periodically to negotiate in good faith "to ensure that [Anthem] was receiving competitive benchmark pricing" if market pricing changed during the Agreement. Market check provisions are an important and standard industry provision for protecting customers in long-term contracts from being overcharged by PBMs where market pricing changes. There is no dispute here that market pricing changed dramatically, but ESI did not negotiate for competitive pricing or change Anthem's pricing during the market check. From 2015 into 2019, ESI overcharged Anthem by approximately $10 billion.

1

ESI moved for partial summary judgment. Given the obvious genuine disputes of material fact, ESI did not move on the issue of breach. ESI likewise did not challenge that it charged Anthem billions of dollars more than competitive pricing. Indeed, ESI itself concluded during the market check that it was charging billions of dollars more than it was "entitled to" under the Agreement. Nonetheless, the district court granted summary judgment to ESI, allowing ESI to keep the billions of dollars it overcharged in breach of the Agreement. Allowing the breaching party to keep its ill-gotten gains is unprecedented and plainly erroneous. The district court also erred in resolving core and highly contested questions of fact in the light most favorable to ESI, the moving party, and doing so without addressing or acknowledging Anthem's contrary evidence.

The decision should be vacated, and the case remanded for trial.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the action under 28 U.S.C. § 1332. On March 31, 2022, the district court issued a Decision and Order that, *inter alia*, granted summary judgment dismissing Counts I and II of Anthem's Complaint and in favor of ESI on Count III of ESI's Amended Answer and Counterclaims. On November 13, 2023, a Final Judgment was entered. Anthem

filed a timely notice of appeal on December 12, 2023. *See* 28 U.S.C. § 2107; Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in resolving genuine disputes of material fact on summary judgment in favor of the moving party, and doing so based solely on ESI's arguments and disputed evidence, without addressing or acknowledging Anthem's contrary evidence?

2.  Whether the district court erred in its unprecedented ruling that Anthem could not recover damages resulting from ESI's breach of the Agreement, allowing ESI to keep its ill-gotten overcharges?

3.  Whether the district court erred in ruling that the objective of the good faith negotiation—"to ensure that [Anthem] was receiving competitive benchmark pricing"—did not apply to ESI, the party providing the pricing, and, alternatively, by resolving genuine disputes of material fact against Anthem, the non-moving party, based solely on ESI's evidence, and without addressing or acknowledging Anthem's contrary evidence?

## STATEMENT OF THE CASE

The parties litigated this case for eight years, producing millions of pages of documents, and taking 93 fact and 7 expert depositions related to this appeal. The

resulting summary judgment record was substantial. Anthem alone submitted a 203 page Rule 56.1(b) counter-statement, supported by 230 exhibits, which included contemporaneous records and sworn testimony from both parties supporting Anthem's claims. As addressed throughout this brief, the district court resolved highly contested issues of fact reserved for a jury, and did so based on ESI's arguments and contested evidence, without addressing or acknowledging Anthem's overwhelming contrary evidence.

## A. The Parties And The Agreement

Anthem[1] is a health benefits company that offers health-care plans to employers and individuals, and also contracts with self-funded plans to administer their plans. ESI is a PBM that, among other things, serves as an intermediary between health plans and the pharmacies that plan members use.

## B. ESI's Acquisition Of NextRx

In 2009, Anthem decided to sell its three in-house PBMs (collectively, "NextRx"). Anthem demanded from bidders "upfront" value through the purchase price for NextRx and "[d]ownstream" value through a PBM agreement with the

---

[1] In 2004, Anthem and WellPoint Health Networks, Inc., merged and adopted the name WellPoint, Inc. ("Wellpoint" or "WLP"), which was changed to Anthem, Inc. in 2014. Anthem is now known as Elevance Health, Inc.

purchaser that provided "competitive pricing" for medications "throughout the term of the agreement." CA-1168; CA-722 (Schaefer Dep.) at 106:23-107:6. Bidders were informed that in addition to paying a significant acquisition price, "[Anthem] would expect to receive [PBM] pricing and terms at least as favorable as the most favorable terms granted by the purchaser to its other clients." A-332, 333; *see also* CA-521 (Schlegel Dep.) at 137:15-25; CA-522 at 147:3-148:5. ESI admitted that its "number one goal in the process" was to "provide a price and a proposal from a pricing perspective that met the expectations of Anthem…that was the key focus. Anything else was secondary." CA-637 (Hogan Dep.) at 42:25-43:54.

Ultimately, ESI agreed to pay $4.675 billion for NextRx, and to provide Anthem with competitive pricing through the term of the Agreement. *See infra* at *pp.* 18-22. The sale was consummated under the stock purchase agreement dated April 9, 2009 (the "Stock Purchase Agreement"). *See* CA-138, 139. The $4.675 billion purchase price is often referred to as the "upfront payment." The parties simultaneously entered into the Agreement.

ESI purchased NextRx because it would "be a defining event in [its] corporate history" and "position[] ESI to capture synergies on [its] own book of business through greater leverage." CA-754 (Wentworth Dep.) at 213:19-24; CA-124, 125. NextRx was a "transformative" "game changer" for ESI. CA-637 (Hogan Dep.) at

44:4-45:6; *see also id.* at 45:7-19.  ESI's bankers calculated that the Transaction was worth $5.275–$5.625 billion, almost $1 billion more than what ESI paid.  CA-628. ESI also obtained certain tax benefits valued at up to $1 billion.  CA-129; A-607.

### C.  ESI Promised To Provide Anthem With Competitive Pricing Through The Term Of The Agreement

ESI provided Anthem with competitive pricing in 2009.  To ensure that Anthem would receive competitive pricing if pricing in the market changed, the parties agreed to a "market check" provision. *See infra* at *p.* 7.  A market check is a common industry provision used in longer term contracts for reducing pricing to reflect market changes.  CA-557 (Borden Report) ¶ 23 ("Pricing for prescription drugs can vary greatly with time.  Thus, multi-year PBM agreements generally contain market check provisions to ensure the PBM provides competitive pricing to the client throughout the term of the contract.").

ESI admits that a market check requires the PBM to reduce pricing to remain competitive.  CA-761, 762 (Schlett Jan. 9, 2019 Dep.) at 21:14-22:3 ("Q: Is a 'market check' a process for changing pricing in order to make it competitive in the marketplace?...  A: Fundamentally, that's the purpose."); CA-978 (Sackett Dep.) at 79:18-80:18 ("Q: [D]id you have a general understanding as to what Express Scripts' obligations were in relation to market checks that they were doing with clients?

6

[A]:…So, if…a client could prove that…their pricing is…more expensive than the mark—the market, quote/unquote, say it's one, two, three, four, five percent, whatever it is, the—then the PBM would need to kind of negotiate with the client or and/or their consultant to get within a reasonable range of -- of where they are versus where the market is….)"; CA-972, 973 (King Dep.) at 33:23-34:3 ("Q: Is it fair to say that generally speaking, market checks result in more favorable pricing to clients?...A: You can say that."); CA-756 (Wentworth Dep.) at 338:16-339:2 (admitting that a market check "is to adjust the pricing of a client…to validate that the pricing remains fresh in the context of their overall arrangement.").

The market check provision, Section 5.6, explicitly states that it is "to ensure that [Anthem] is receiving competitive benchmark pricing," and required ESI to negotiate in good faith over Anthem's pricing proposal for competitive pricing:

> **5.6 Periodic Pricing Review**. [Anthem] or a third party consultant retained by [Anthem] will conduct a *market analysis* every three (3) years during the Term of this Agreement **to ensure that [Anthem] is receiving competitive benchmark pricing.** In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to PBM and [Anthem] and **PBM agrees to negotiate in good faith over the proposed new pricing terms**. Notwithstanding

7

the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.  CA-479 (emphasis added).[2]

ESI admits that it understood that, if market pricing changed, its pricing to Anthem would change because of Section 5.6.  *See* CA-657 (Mergenthaler Dep.) at 130:4-25; CA-108 (ESI 2009 Memorandum).  Anthem would not have agreed to the Transaction without a market check provision that ensured Anthem's pricing remained competitive through the term of the Agreement.  CA-529 (Hill Dep.) at 121:6-8; *see also* CA-721 (Schaefer Dep.) at 98:6-9; CA-449 ¶ 10.

### D.  Market Pricing Changed Dramatically

PBM pricing is determined through a formula of "average wholesale price" ("AWP") less a specified discount by category (*e.g.*, brand or generic), channel (*e.g.*, retail or mail), and line of business (*e.g.*, commercial or Medicare).  CA-554 (Borden Report) ¶ 36-37.  AWP is not the actual cost of the drug, but rather a publicly reported industry number.  *Id.*

By the time of the second market check, pricing in the marketplace had changed dramatically.  CA-455 ¶ 32; CA-561 (Borden Report) ¶¶ 31-49.  The AWP for medications had increased substantially, but actual drug costs had not.  CA-560

---

[2] ESI admits that part of its good faith negotiation obligation was to reduce the new pricing terms to a writing.  CA-537 (CEO Paz Dep.) at 376:10-377:25; CA-755 (Wentworth Dep.) at 222:24-223:1; *see also* CA-144.

8

(Borden Report) ¶ 30. For example, in 2009, an AWP of $100 with a discount of 70% would yield a price of $30. If the PBM's drug cost was $28, the PBM would make a profit of $2 ($100 – 70% (or x .3) ($30) - $28=$2). If AWP moved to $150 and cost remained at $28, then the price would be $45 and the PBM's profit would be $17—750% more than before the market change ($150 – 70% (or x .3) ($45) - $28=$17). To account for the increase in AWP, while maintaining its profit, the PBM would increase the discount to 80% ($150 – 80% (or x .2) ($30) - $28=$2). CA-563 (Borden Report) ¶ 38-39.

To account for the change in the market, ESI and other PBMs provided larger discounts off of AWP to its customers—other than to Anthem. CA-562 (Borden Report) ¶ 37-38; CA-749 (Wentworth Dep.) at 12:14-16 ("[T]here was a lot of [AWP] inflation and therefore you saw AWP discounting going deeper during that period of time [from 2009 to 2012]."); *id.* at 13:15-19 ("Q: Would you say that the discounts got deeper…between 2009 and 2012…? A: I would say generally so."); *id.* at 13:20-24 ("Q: And did the discounts also get deeper between 2012 and 2015 when you were at ESI?...A: Yeah, I would say they did."); CA-763 (Schlett Jan. 9, 2019 Dep.) at 129:2-7 ("Q: [D]id ESI offer deeper discounts after 2009 to customers?...A: The discounts in the industry have increased from 2009.").

**E.    ESI Breached Section 5.6 By Failing To Negotiate In Good Faith**

ESI did not dispute its breach of Section 5.6 for purposes of its summary judgment motion.  SPA-15 (SJ Dec.) ("The issue of whether Express Scripts did in fact breach its obligation to negotiate in good faith has not been explicitly addressed in Express Scripts' motion[.]").  Additionally, Anthem introduced substantial evidence that ESI engaged in bad faith, including by, among other things:

(i)    repudiating its obligation to negotiate in good faith for competitive pricing (CA-462, 463, 465, 467 ¶¶ 72, 75, 81-83, 91-92);

(ii)   calculating competitive pricing for Anthem, then never making an offer for anything close to it (CA-590 (Borden Report) ¶ 81 and Figure 5);

(iii)  not accounting for the dramatic industry-wide change in market pricing that rendered Anthem's pricing uncompetitive by billions of dollars (CA-455 ¶¶ 32-33; CA-576, 590 (Borden Report) ¶¶ 61, 81);

(iv)   falsely asserting it had a veto right to block any agreement (CA-463 ¶ 75);

(v)    claiming the upfront payment had to be taken into account, but refusing to say how, and failing to then take it into account (CA-461 ¶¶ 68-74);

(vi)   changing its proposal only to *increase* pricing by $1 billion, according to its own calculations (CA-457 ¶ 46; *compare* CA-157 (ESI's First Proposal) *with* CA-173 (ESI's Second Proposal);

(vii)  misrepresenting the time to start the market check, in order to delay changing pricing (*compare* CA-153 *with* CA-172 (changing market check timeline relative to December 2015);

(viii) misrepresenting that Anthem's pricing proposals were "exorbitant" and unjustified "by reference to any reasonable notion of competitive

10

pricing," while concealing its pricing information that demonstrated that its representations were false (CA-460 ¶¶ 64-66);

(ix) calculating that if Anthem's pricing remained unchanged, ESI would earn approximately $5.2 billion more than it was "entitled to," but never offering pricing based on or near that $5.2 billion "surplus" (CA-464 ¶¶ 78-81);

(x) negotiating for upsells, which benefited ESI, instead of negotiating for competitive pricing (CA-466 ¶¶ 88-89);

(xi) mispresenting that it was offering $3 billion of rebate guarantee value, when ESI had not calculated a single dollar of value, and there was none (CA-393 ¶¶ 212-215);

(xii) conditioning its proposals on an extension of the Agreement and a free release of claims for its admitted breaches (CA-457, 467 ¶¶ 42, 91-92; CA-158); and

(xiii) surreptitiously executing a "do nothing" scenario, under which ESI would not negotiate with Anthem for competitive pricing, with or without taking into account the upfront payment (*see* CA-826 (hand-drawn chart by Mr. Totterdale) (modeling $16.1 billion EBIT under "do nothing" scenario); CA-1151 (e-mail dated December 4, 2014 from A. Adler to M. Totterdale, *et al.*) (noting T. Wentworth requested "'strat plan' if we do nothing")).

## F. ESI Overcharged Anthem By Billions Of Dollars

ESI's failure to adjust Anthem's pricing to account for the admitted market change resulted in huge overcharges to Anthem, and an unjust windfall to ESI. Indeed, by the time of the second market check, ESI calculated that its profit margin on Anthem was over 100 times higher than it would having been with competitive pricing. *See* CA-1000 (indicating that ESI's "EBIT/Adj Rx" on Anthem's

11

commercial business was over 100 times more profitable than ESI's "EBIT/Adj Rx" on "Market Competitive" commercial business); CA-456 ¶¶ 33-34. ESI calculated in the second market check that it would make $5.2 billion more than it had projected to earn with 2009 pricing. CA-1145; *see also* CA-931 (Lehn Dep.) at 168:5-13.

### G. Procedural History

By Opinion and Order dated March 23, 2017, the district court dismissed with prejudice Counterclaims II and VI of ESI's Amended Answer and Counterclaims. By Opinion and Order dated March 31, 2022, the district court (i) granted summary judgment dismissing Counts I and II of Anthem's Complaint and in favor of ESI on Counterclaim III of ESI's Amended Answer and Counterclaims, and granted in part and denied in part summary judgment dismissing Count III of Anthem's Complaint. As set forth in the Final Judgment entered on November 13, 2023, the remaining claims and counterclaims were resolved by stipulation between the parties. Anthem timely filed a notice of appeal on December 12, 2023.

## SUMMARY OF ARGUMENT

There was no dispute in the underlying motion that ESI breached the Agreement and overcharged Anthem by billions of dollars. The district court erred in finding that ESI could keep those overcharges. The court reached this remarkable

and unprecedented result of allowing the breaching party to keep its ill-gotten gains through seven errors.

*One*, the court erred in resolving core issues of fact against the non-moving party, Anthem, and in the light most favorable to the movant, ESI, and doing so without addressing or acknowledging the volume of evidence disputing, indeed disproving, the findings, including ESI's contemporaneous records and testimony. *Infra* at *pp.* 16-22.

*Two*, the court erred in ruling that Anthem could recover out-of-pocket damages for ESI's breach, but did not seek them. Anthem is seeking a return of the money it paid out-of-pocket to ESI. *Id.* at *pp.* 23-24.

*Three*, the court erred in holding that Anthem could not recover expectation damages for ESI's breach, unless the new pricing terms under Section 5.6 were "reasonably discernible," by applying cases governing non-binding Type II agreements. The Agreement is a fully executed, binding, 10-year agreement, and Type II cases do not apply to it. Expectation damages are available as the standard damages measure for breach of contract. *Id.* at *pp.* 24-28.

*Four*, the court erred in making the ultimate finding of fact that the pricing terms were not reasonably discernible because ESI disputed its obligations under Section 5.6. ESI's repudiation of its obligations proved a breach, not a defense.

13

Moreover, the court not only resolved highly contested issues of material fact, but it again did so in the light most favorable to ESI, without addressing or acknowledging Anthem's overwhelming contrary evidence proving appropriate pricing terms, including ESI's own calculation. *Id.* at *pp.* 28-43. As the breaching party, ESI bears the risk of any uncertainty as to damages. *Id.* at *pp.* 31-33.

*Five*, the court erred in ruling that Anthem could not seek restitution damages because Anthem did not disclose such damages in its Rule 26(a) initial disclosures, or otherwise plead or provide discovery about such damages. But the court ordered early in the case that the Rule 26(a) initial disclosures would not require damages computations. Moreover, Anthem pled and provided complete fact and expert discovery with respect to its damages, including precise computations. The court found that Anthem had pled only expectation damages because it never used the word "restitution" in its Complaint, discovery responses and expert reports, but Anthem also did not use the phrase "expectation" damages. *Id.* at *pp.* 43-44.

*Six*, the court erred in ruling that Section 5.6 did not require ESI to negotiate in good faith to provide competitive benchmark pricing to Anthem, notwithstanding that Section 5.6 uses precisely those words. *Id.* at *pp.* 50-52.

*Seven*, the court erred in granting summary judgment, alternatively, by explicitly resolving genuine disputes of material fact against the non-moving party,

14

Anthem, based solely on ESI's extrinsic evidence.  The court again did not address or acknowledge Anthem's overwhelming evidence to the contrary.  *Id.* at *pp.* 52-58.

## STANDARD OF REVIEW

This Court reviews "the district court's grant of summary judgment *de novo*, drawing all factual inferences against the party seeking summary judgment[.]" *CP III Rincon Towes, Inc. v. Cohen*, 666 F. Appx. 46, 50–51 (2d Cir. 2016).  The court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). "Summary judgment is only warranted upon a showing [by movant] 'that there is no genuine issue of as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001).

For the non-moving party to defeat a motion for summary judgment, "[a]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)(citations and quotations omitted).  "If…there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." *Bear, Stearns Funding, Inc. v.*

*Interface Group-Nevada, Inc.*, 2007 U.S. Dist. LEXIS 49643, at *26 (S.D.N.Y. July 9, 2007) (cleaned up).

## ARGUMENT

## I.

### THE DISTRICT COURT ERRED IN RESOLVING CORE ISSUES OF MATERIAL FACT AGAINST THE NON-MOVING PARTY

The district court erred in resolving a host of highly contested issues of fact, and doing so based solely on ESI's arguments and disputed evidence, without addressing or acknowledging the overwhelming evidence submitted by Anthem contesting, indeed disproving, those findings.  *See Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…ruling on a motion for summary judgment") (citations and quotations omitted); *Randolph v. Griffin*, 816 F. Appx 520, 524 (2d Cir. 2020) ("By weighing the conflicting evidence, the district court improperly engaged in fact finding in violation of well-settled summary judgment standards.").

Among its many factual findings, the court started with an issue that was effectively dispositive to it.  Anthem's case is that ESI breached its obligation under Section 5.6 to negotiate in good faith for competitive pricing after market pricing changed, leaving Anthem with pricing billions of dollars more than the pricing level

16

ESI provided to Anthem in 2009. As its primary defense, ESI offered an incorrect factual argument that it did not have to negotiate for competitive pricing because, in 2009, Anthem traded-off competitive pricing for the "upfront" payment.

The district court improperly resolved this key dispute of material fact in favor of ESI, finding that "[i]n light of the large $4.675 billion upfront payment, Anthem agreed to prescription pricing terms that were better than their previous NextRx pricing terms, but 'still short of market competitiveness.' Anthem did so 'knowingly,' 'trad[ing] discounts versus the one-time payment.'" SPA-2, 3. Thus, the district court found that Section 5.6 did not require ESI to negotiate in good faith to ensure competitive pricing (*id.* at 13-15, 21-22), and that Anthem could not recover its damages, in part, because ESI did not agree that it was required to negotiate for competitive pricing, (*id.* at 19-21).

Notably, the court denied Anthem discovery concerning ESI's 2009 pricing to customers, which would show that ESI's pricing to Anthem in 2009 was competitive (A-192, 193, 199), yet then made a factual finding against Anthem on the matter. In any case, the court erred in relying on only ESI's evidence, without addressing or acknowledging any of Anthem's contrary evidence. *See Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and

17

determine the truth of the matter but to determine whether there is a genuine issue for trial….In determining whether there are genuine issues of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'").

### A.    ESI Provided Anthem With Competitive Pricing In 2009

The record is that Anthem did not trade away competitive pricing for the upfront payment.   ESI repeatedly recorded in its contemporaneous records that it provided Anthem with competitive pricing in 2009. CA-966 (ESI-R-02389873) (Memorandum dated March 2, 2017 from T. Wentworth to ESI's Board of Directors) ("The original PBM [NextRx] acquisition and 10-year service contract **provided Anthem** with $4.7B in cash and **a compliant, industry-leading competitive PBM offering**.") (emphasis added); CA-121, 122 (defining "Competitive Confidence" to include "market check"); *see also* CA-723-724 (Schaeffer Dep.) at 165:22-166:18; CA-527 (Hill Dep.) at 109:10-110:15.

ESI also admitted that it provided competitive pricing to Anthem in 2009 in its contemporaneous representations to the Securities Exchange Commission ("SEC").  The SEC reviewed ESI's disclosure of the Transaction in ESI's securities filings and asked ESI for clarification of whether it obtained a "favorable" asset

18

"related to contract pricing of the PBM Agreement." ESI informed the SEC that **"We believe that we have provided [Anthem] with pricing that is competitive in the markets in which the business competes. Providing [Anthem] with competitive pricing** is critical to the success of the transaction for both parties. Overly favorable pricing for ESI could limit the ability to successfully sell the PBM offering to [Anthem's] clients. Overly unfavorable pricing for Express Scripts could result in an economically unattractive transaction for Express Scripts." A-583 (June 14, 2010 correspondence from J. Hall to J. Rosenberg of the SEC) (emphasis added).

ESI's contemporaneous accounting likewise records its admission that it provided Anthem with competitive pricing in 2009. Specifically, if ESI provided uncompetitive pricing to Anthem, as the district court found, such pricing would have been part of ESI's purchase price allocation as a separate intangible asset. CA-1173 (Chiang Dep.) at 38:1-7. But ESI made no such allocation. CA-958; *see also* CA-1178 (Yerges Dep.) at 207:3-13.

Additionally, ESI's executives testified that ESI provided competitive pricing in 2009. CA-536 (CEO Paz Dep.) at 203:6-17. ("**We gave them rates to keep them competitive.** Q: Right. And under proposing rates to keep Anthem competitive **over the full 10 years**, right?... A: I answered the question *yes*.") (emphasis added); CA-700 (Ignaczak Dep.) at 148:17-25 (Q: And the ... PBM

19

Agreement that they entered into with Anthem **provided Anthem with competitive pricing**. Correct? A: Correct."); CA-693 (Ebling Dep.) at 200:5-25 ("Q: So your understanding is that it was ESI's intent to provide Anthem with competitive pricing?... A: Yes, **I think we intended to, and did provide them with what we considered to be competitive pricing**.") (emphasis added); *id.* at 202:15-203:6 ("Q: You testified earlier that it was your understanding that ESI, at the time of entering into the PBM Agreement, was providing Anthem with competitive PBM pricing, right?... Q: Is that a fair summary of your testimony?... A: **Yeah, competitive pricing....** Q: Competitive in the PBM market, right?.... A: I think we were providing them with—**we were providing Anthem with competitive pricing**.") (emphasis added).

Further, ESI produced very limited pricing information from 2009, but what it produced proves that Anthem was receiving pricing terms at least comparable to the terms being provided as competitive pricing to other large health plans. *See*, *e.g.*, CA-460 ¶¶ 64-67; CA-707 ("ESI [Managed Care Division] Landscape" slide) (showing Anthem received pricing consistent with the pricing ESI provided to other large health plans).

The court did not address or otherwise acknowledge any of this evidence, instead relying on a few sentences from two documents by Anthem witnesses. SPA-

20

14 at n.6. The court cited a 2012 e-mail where an Anthem executive noted that pricing in the multi-year Agreement was "short of market competitiveness," but omitted that the executive testified that this e-mail was discussing pricing as of 2012, the date of the statement, not 2009. SPA-3; CA-711 (Goulet Dep.) at 427:11-428:2. The other document cited has one sentence that "we do not have the best pricing in [the] industry," which is a concept ("best pricing") that is not even the issue here, which is for pricing consistent with what Anthem received in 2009, adjusted for changes in the market. In any case, disputed evidentiary statements—and the above-cited evidence that ESI provided competitive pricing in 2009 is overwhelming—are not subject to resolution on summary judgment. *Green*, 952 F.3d at 406; *Wright v. Coughlin*, 132 F.3d 133, 138 (2d Cir. 1998).

## B. Anthem Did Not Trade-Off Competitive Pricing For The Upfront Payment

The court relied on an initial bid by ESI outlining two options to acquire NextRx in incorrectly finding that Anthem traded off competitive pricing for the upfront payment. SPA-2, 3. Option 1 included $4 billion for NextRx and one set of drug pricing, and Option 2 included $500 million and better drug pricing. But the court ignored that Anthem rejected both proposals, demanding better pricing (and a higher stock price). A-604; CA-730 (Garverick Dep.) at 98:13-99:18; CA-104; CA-

535 (CEO Paz Dep.); *id.* at 192:14-25 ("Q: And ESI ultimately offered even better rates and even more money after [the January 2009 initial] proposal, right?... A: Yes. I've never offered up a proposal that we got accepted the first time. Q: Right. So you emphasized competitive rates and then provided even better rates after that, right?... A: Yes."). The district court likewise disregarded that ESI then changed its bid to provide competitive pricing. Indeed, Anthem negotiated pricing terms that were approximately $8 billion more favorable to Anthem than what was in ESI's initial $4 billion proposal before accepting ESI as the winning bidder. CA-282 ¶ 25; CA-542 (MacDonald Opening Expert Report Working Paper 3, demonstrative extract of tab "WP3") at Column W, Row 100 and Column AE, Row 100.

*          *          *

The district court's errors in making further findings of fact resolving the issue of Anthem's damages are addressed in Section II below. The court's errors in making further findings of fact that ESI was not required to negotiate for competitive pricing under Section 5.6 are addressed in Section III below. *Infra* at *pp.* 44-61.

22

## II.

## THE DISTRICT COURT ERRED IN RULING THAT ANTHEM COULD NOT RECOVER DAMAGES, ALLOWING ESI TO KEEP BILLIONS OF DOLLARS IN ILL-GOTTEN GAINS

The court made four errors in ruling that Anthem could not recover the overcharges resulting from ESI's assumed breach: (i) ruling that Anthem did not seek out-of-pocket damages; (ii) ruling that expectation damages are not available for ESI's breach of contract, unless Anthem proved that the new pricing terms were reasonably discernible; (iii) resolving the factual question of whether pricing terms were reasonably discernible, and doing so based on the fact that ESI denied its obligation to negotiate in good faith for competitive pricing, the very breach here at issue; and (iv) ruling that Anthem could not recover restitution damages based on the court's misunderstanding that Anthem was seeking different damages than what it had disclosed in fact and expert discovery.

### A.  The District Court Erred In Ruling That Anthem Did Not Seek Out-Of-Pocket Damages

The court ruled that out-of-pocket damages were available for ESI's breach, but that Anthem had not sought them.  SPA-15, 18.  Anthem sought to recover the approximately $10 billion in overcharges that it paid to ESI, which are out-of-pocket damages because that money came out of Anthem's pocket, and ESI has kept it.  *See King v. Paradise Auto Sales I, Inc.*, 2015 U.S. Dist. LEXIS 187668, at *12 (E.D.N.Y.

23

Nov. 12, 2015) (defendants' breach of contract by "overcharging [p]laintiff…is the direct cause of [plaintiff's] injury"); *Chen v. Hiko Energy, LLC*, 2014 U.S. Dist. LEXIS 181846, at *13 (S.D.N.Y. Dec. 29, 2014) (plaintiffs' breach of contract damages are "the difference between the amount defendant actually charged plaintiffs and the amount defendant should have charged them had it based its prices on the factors identified in plaintiffs' contracts").

Even ESI's counsel admitted to the district court that the appropriate damages measure is ESI's overcharges:

> [I]t knows the pricing under the contract, and **so it knows how much it's paying Express Scripts**. I mean, they can run that calc. They then say the pricing should be X instead…The pricing is whatever it is. **That's how much [they have] paid Express Scripts. But the pricing should be something less, and so it's a simple delta for them to come up with a breach of contract damages of what they think their harm is**.

A-621 (Dec. 6, 2019 Hearing Tr.) at 50:12-22 (emphasis added).

## B.    The District Court Erred In Limiting Expectation Damages

It is axiomatic that expectation damages are available, indeed they are the standard measure of recovery, for breach of contract.  *Tractebel Energy Mktg., v. AEP Power Mktg.*, 487 F.3d 89, 98 (2d Cir. 2007)*; Indu Craft v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995).  And to the extent that ESI's overcharges constitute expectation damages, as noted above, ESI's counsel admitted that Anthem could

recover them. The court erroneously ruled that expectation damages are not available, "unless the ultimate agreement that would have been reached at the end of those negotiations is reasonably discernible." SPA-21.

The court erroneously limited expectation damages by applying Type II preliminary agreement cases to the Agreement. Type II agreements are not enforceable, and typically include letters of intent and other documents where the parties did not intend to be bound. *See Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 257 (N.D.N.Y. 2015). The Agreement here is a fully executed and binding 157-page agreement that Anthem performed under for the almost ten years, paying ESI over $100 billion. The court applied Type II cases because the Agreement included a provision requiring future good faith negotiations in the event the Agreement's pricing terms needed to be reset to stay at market, but did not cite a single case supporting its novel ruling that a fully executed, long-term agreement can be treated like a Type II agreement. Indeed, given the plain fact that the Agreement is fully executed and was enforced for nearly ten years, ESI never argued that the Agreement was a Type II agreement.

This Court's decision in *Tractebel* is on point that the law concerning Type II agreements does not apply to future negotiation provisions in binding agreements. 487 F.3d at 98, n.4 (holding agreement with provision requiring good faith

negotiations "was not merely a preliminary agreement but an enforceable contract. The preliminary agreement dichotomy [Type I and Type II agreements] is inapposite."). In *Tractebel,* this Court held that "even where parties explicitly designate a material term 'to be mutually agreed upon' in the future," the contract may still find "a binding contractual relationship" where a party's "conduct in the years after it signed" the contract demonstrates that it "understood the [agreement] to be binding and enforceable." *Id.* at 96-97. This Court held that expectation damages are then recoverable. *Id.* at 109-112. Here, there is no dispute that the parties intended to, and did, "enter into a binding contractual relationship," and performed under that contract for years, so expectation damages are recoverable.

The district court disregarded the on-point authority in favor of certain inapposite Type II cases.[3] SPA-18. Expectation damages are not available for certain Type II agreements because they are non-binding and do not result in any contractual relationship. That fundamental principle is inapposite to a binding agreement, as here, that includes an ongoing obligation to negotiate in good faith for purposes of maintaining the key consideration provided to Anthem under the

---

[3] *See*, *e.g.*, *Learning Annex Holding, LLC v. Whitney Edu. Grp. Inc.*, 765 F. Supp. 2d 403, 417 (S.D.N.Y. 2011); *Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 255 n.2 (S.D.N.Y.); *aff'd*, 242 F.3d 365 (2d Cir. 2000).

Agreement, competitive pricing.  Anthem could not walk away, like under a Type II agreement, because the Agreement is admittedly binding.

Additionally, because the parties in those Type II cases did not commit to contract, no consideration was exchanged.  Consequently, when an agreement was not reached, even due to one party's bad faith, the parties returned to the *status quo ante* with no damages, other than their costs in wasting time in a bad faith negotiation, which are recoverable.  Thus, unlike here, the non-breaching party was not seeking overcharges from a breach of a binding contract, but rather "lost profits"[4] from an unconsummated, potential transaction that each party was free to walk away from and which involved no payments or transfer of other consideration.  Here, in contrast, when ESI breached Section 5.6 by negotiating in bad faith, the parties did not return to the *status quo ante* because they were party to a fully enforceable contract.  Rather, Anthem paid, and ESI received, $10 billion in overcharges.  Even ESI calculated that it was receiving $5.2 billion more than it was "entitled to" under the Agreement.  *See supra* at *p.* 11; *infra* at *pp.* 35-36.

---

[4]  The court referred to "lost profits" nine times in its decision, but Anthem long ago withdrew its claim for lost profits.  ECF No. 354 (ESI Br.) 34, n.3.

The court did not cite any case that denied expectation damages where the non-breaching party sued for amounts paid to the breaching party, and research has uncovered none.

### C. The District Court Erred In Resolving The Question Of Fact As To Damages

Expectation damages are available for breach of a duty to negotiate in good faith, even for Type II agreements. In *SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 350-51 (Del. 2013) ("SIGA I"), the Delaware Supreme Court, under New York law, addressed a writing that contained a footer on each page stating "Non Binding Terms." *Id.* at 346. The court found that, for a preliminary agreement, expectation damages are available based on a showing "that the parties would have reached an agreement but for the defendant's bad faith negotiations…." *Id.* at 350-51. The district court here ruled that Anthem had to show that the terms were readily discernible, relying on Eighth Circuit authority, which is a different standard. But even where that is the law, the Eighth Circuit ruled that the terms are reasonably discernible where there is "'objective criteria…found in the agreement itself,

commercial practice or other usage and custom.'" *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 429 (8th Cir. 2008).

The court erred in resolving the factual question it erroneously imposed through application of Type II agreement cases about whether good faith pricing terms were reasonably discernible, and doing so by relying exclusively on ESI's position disputing (and repudiating) its obligations under Section 5.6. There was overwhelming evidence of objective criteria to reasonably discern good faith pricing terms. Indeed, the court determined that "a factfinder could parse Anthem's various suggested methods for calculating damages and arrive at a number," but then found that "the facts do not suggest" that an agreement ultimately would have been reached. SPA-19. It is for the jury to determine what the facts suggest.

### 1. The District Court Erred In Relying On An Alleged Potential For Impasse Between Non-Breaching Parties

The district court erred in finding that there would have been an impasse because negotiations "can come to an end without a breach by either party. There is such a thing as a good faith impasse; not every good faith negotiation bears fruit." SPA-19. The claim and evidence here is not that there were good faith negotiations and a good faith impasse, but rather that ESI breached its obligation to negotiate in

good faith, a breach that was assumed for purposes of summary judgment. *See supra* at *p.* 10.

### 2. The District Court Erred In Making The Ultimate Finding of Fact About What Would Have Happened Had ESI Not Breached

The district court further erred in resolving that ultimate factual determination in favor of ESI and against Anthem, the non-moving party. *See* SPA-19 ("[ESI] believes that the most probable outcome of continued hypothetical good faith negotiations would have been an impasse[.]"). It is for a jury to determine whether an agreement would have been reached had ESI negotiated in good faith. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 887 F. Supp. 1014, 1018 (N.D. Ill. 1995) (denying summary judgment where damages would be available "if [plaintiff] could prove that, absent the defendant's bad faith in negotiation, the parties would have reached an agreement."); *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 351 (Del. 2013) (noting "key factual finding[]" that "but for SIGA's bad faith negotiations, the parties would have consummated a[n]…agreement."); *see also Tractebel*, 487 F.3d at 98 ("whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.").

Additionally, the only contract term here at issue is pricing, which is Anthem's damages, and the issue of damages is a quintessential question of fact for a jury. *See Trs. Of the United Health & Welfare Fund v. N. Kofsky & Son, Inc.*, 2013 U.S. Dist. LEXIS 138610, at *28 (S.D.N.Y. Sept. 26, 2013) ("[A] genuine dispute of material fact exists with respect to the amount of damages, thus precluding summary judgment"); *N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, 2010 U.S. Dist. LEXIS 99643, at *20 (S.D.N.Y. Sept. 2, 2010) (same).

### 3. The Breaching Party Bears The Risk Of Uncertainty As To Damages, Which Do Not Have To Be Proven With Mathematical Certainty

The court adopted ESI's argument that the pricing terms—Anthem's damages—were speculative, but under the "wrongdoer rule" it is the breaching party that bears the risk of uncertainty as to damages. "'A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain.' Thus, '[t]he wrongdoer must shoulder the burden of the uncertainty regarding the amount of damages.'" *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006) (citations omitted); *see also Tractebel*, 487 F.3d at 110 (same).

As the Delaware Supreme Court explained in *SIGA Techs. Inc. v. Pharmathene, Inc.* ("SIGA II"): "[w]hen a party breaches a contract, that party often

31

creates a course of events that is different from those that would have transpired absent a breach. The breaching party cannot avoid responsibility for making the other party whole simply by arguing that expectation damages...are speculative because they come from an uncertain world created by the wrongdoer." 132 A.3d 1108, 1111, 1132 (Del. 2015) (uncertainties in damages resolved against the breaching party because "there would have been no uncertainty" if the breaching party had negotiated in good faith). "A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred." *Id.* at 1133, n.138.

When a party breaches its contractual duty to negotiate in good faith, "expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate." *Id.* at 1111 (emphasis in original). There is no dispute here about the fact of damages—overpaying for prescription drugs is damages. And juries enjoy significant flexibility in estimating damages, and are free to assume variables. *See Tractebel*, 487 F.3d at 111-12. Indeed, juries routinely determine damages based on unknown matters, oftentimes called speculative by defendants, including future earnings, future medical expenses, pain and suffering, and lost future wages. None

of those matters are knowable, as no one can know how long the plaintiff will live or work, or how much the plaintiff will earn or spend on medical care, nor can someone know how long pain will last or scientifically quantify the monetary value of physical and emotional pain. Likewise, factfinders routinely value businesses based on long-term projections, which are merely predictions of the future, typically including for pricing.

This Court's decision in *Tractebel* powerfully demonstrates this principle. There, this Court reversed the district court's determination that damages over a future 20-year period were "inherently speculative" because virtually every variable would be unknown, including the price of electricity, the cost of operations, competing forms of energy (such as coal and nuclear energy), regulatory developments, population growth and technological advances. *Id.* at 111. This Court noted that uncertainty exists in long-term contracts, but held that:

> contracts may [not] be breached with impunity because of the difficulty of accurately calculating damages. New York courts have significant flexibility in estimating damages once the fact of liability is established. To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented that undermines the basis for the assumption....The risk that the future might reveal the district court's assumptions to be false is appropriately borne by...the breaching party.

*Id.* at 111-12 ("[C]ertainty of amount is not an element of general damages in New York[.]").

### 4. The Record Evidence Proves Damages With Mathematical Certainty

There was a volume of record evidence here to allow a jury to "reasonably discern" the pricing terms based on objective criteria. Indeed, evidence of competitive pricing, the ultimate agreement, is irrefutable. ESI agreed that competitive benchmark pricing is "commercially available in the marketplace." CA-260 (ESI's Further Resps. And Objs. to Anthem's Int. No. 7) at CA-263. Anthem introduced evidence of pricing that would be "commercially available in the marketplace" to Anthem through two independent third party offers from CVS and Optum for pricing to Anthem. *See* CA-1011 (CVS offer); CA-1032 (Optum offer). *See*, *e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 180 (2d Cir. 2000) (finding offer was "the best evidence" of "market value"); *Hampton v. Ontario (In re Hampton)*, 2020 Bankr. LEXIS 447, at *10 (Bankr. W.D.N.Y. Feb. 19, 2020) (finding bid was "best evidence of the Property's value").

Anthem introduced further evidence of what the terms would have been in a good faith negotiation through: (i) ESI's own calculation of competitive PBM pricing for Anthem, (ii) ESI's pricing to customers that ESI concluded were comparables for Anthem, (iii) ESI's "pricing guidelines" that identify pricing terms by size of customers, (iv) the expert opinion of the leading PBM consultant involved

in the market check, (v) the expert opinion of another leading PBM pricing consultant, and (vi) the expert opinion of a leading economist. *See supra* at *p.* 10-11; CA-463 ¶¶ 35-36; CA-1073. Anthem also submitted evidence of the pricing ESI provided to a rival "big four" health plan, Cigna Corporation ("Cigna"). *See* CA-572, 573 (Borden Report) ¶ 54; CA-1034 (Cigna PBM Agreement) at CA-1038. Additionally, ESI made proposals during the market check that showed its position on an ultimate agreement when it was not negotiating in good faith, providing a reference point (and floor) for pricing terms. CA-157, 172, 235, 244.

Even under ESI's theory that it could account for the upfront payment under Section 5.6, there was ample evidence of objective criteria for determining what an agreement on pricing would have been had ESI negotiated in good faith. ESI calculated a $5.2 billion "surplus" in excess of the return that ESI believed "it was entitled to" if it took into account the upfront payment. *See, e.g.*, CA-1145 (2014 ESI e-mail attaching "[Anthem] Market Check" presentation). Additionally, expert witnesses calculated the pricing to Anthem taking into account the upfront payment. *See* CA-920, 921 (Borden Rebuttal Report) at ¶ 74.

The district court did not address or acknowledge any of this evidence.

### 5. ESI's Repudiation Of Its Obligation Did Not Establish A Defense, It Proved Breach

The district court resolved the ultimate issue of fact about damages because "the parties disagreed on many complex and fundamental issues and were billions of dollars apart when the negotiations ended due to Anthem's initiation of this lawsuit….In particular, the parties could not agree on whether the $4.675 billion Express Scripts paid up front as part of the initial agreement could be considered in negotiating its new pricing terms." SPA-19.

The fact that ESI disputed its contractual obligations, and offered pricing that was billions of dollars in excess of competitive pricing—even after concluding that it was charging Anthem over $5 billion more than "what it was entitled to"—is the breach here. All defendants can articulate a position for refusing to comply with an agreement, but doing so does not insulate them from liability for their breaches; to the contrary, repudiation establishes the breach. *LG Capital Funding, LLC v. PositiveID Corp.*, 2019 U.S. Dist. LEXIS 126991, at *46 (E.D.N.Y. July 29, 2019) ("repudiation entitles the nonrepudiating party to claim damages for total breach.") (quoting *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998)). A defendant cannot avoid liability for breach simply by disputing, and then not complying with, its contractual obligations. The district

court did not cite any case to the contrary. And it was for a jury to decide whether ESI's positions constituted repudiation of its contractual obligations. *See Seduka, LLC v. Street Moda, LLC*, 2017 U.S. Dist. LEXIS 54212, at *8 (S.D.N.Y. Mar. 23, 2017) ("A jury is…needed to determine whether (and at what point) the [parties' communications] amounted to an anticipatory repudiation.") (citing *Briarwood Farms, Inc. v. Toll Bros., Inc.* 452 F. Appx. 59, 61 (2d Cir. 2011)).

Additionally, ESI's proffered interpretation was untenable, further proving the claim, not a defense.

> An anticipatory repudiation, entitling the nonrepudiating party to recover damages for total breach and excusing it from further performance, can be grounded upon a finding that the other party has attempted to avoid its obligations by advancing an 'untenable' interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions; similar conduct could also support the conclusion that the defendant acted in bad faith.

*SPI Communs. v. WTZA-TV Assocs. Ltd. Pshp.*, 229 A.D.2d 644, 645 (3d Dep't 1996) (citations omitted); *see Best Payphones, Inc. v. Manhattan Telecomms. Corp. (In re Best Payphones, Inc.)*, 450 F. Appx. 8, 11 (2d Cir. 2011) (same).

Although ESI's positions were not taken in good faith, even "good-faith differences between the parties as to the scope of their contractual undertakings do not relieve either party of his or her duty of performance." 14 Williston on Contracts

§ 43:5 (4th ed.). "Generally a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." Restatement (Second) of Contracts § 250 comment d.

> The test for an anticipatory repudiation is an objective one and good faith is immaterial. An anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason.… Although this rule may seem harsh, there is good reason for it. Whatever the breaching party's state of mind, the impact on the innocent party is the same—he faces total loss of the repudiator's performance, to which the contract entitled him.

*Halberstam v. Allianz Life Ins. Co. of N. Am.*, 349 F. Supp. 3d 164, 175 (E.D.N.Y. 2018) (citations omitted); *see also Record Club of Am., Inc. v. United Artists Records, Inc.*, 643 F. Supp. 925, 939 (S.D.N.Y. 1986) ("[E]ven assuming that UAR was acting in good faith, that would not excuse its repudiation.").

### 6. The District Court's Factual Findings Are Contrary To The Record Evidence

The district court erred not only in resolving genuine issues of material fact, but also in doing so without supporting evidence and without considering the volume of contrary evidence.

#### a. The District Court Erred In Finding That The Parties Did Not Agree On The Meaning Of Competitive Benchmark Pricing

The court erred in finding that "according to [ESI]," the parties "could not agree on the meaning of 'competitive benchmark pricing.'" SPA-3 & n.1, SPA-19.

38

ESI agreed in the motion with Anthem's definition that competitive benchmark pricing "means market competitive PBM pricing, which is the competitive PBM pricing that would be available to Anthem in the PBM marketplace. The benchmark for Anthem is pricing for other very large PBM clients." SPA-3 at n.1. ESI also agreed that "[g]enerally, PBM clients with large script volumes are provided the largest average wholesale price ("AWP") discounts, and therefore the most favorable pricing, in the PBM marketplace." *Id.* Further, any reasonable differences as to the meaning of the contract term "competitive benchmark pricing" would raise a fact question for the jury. *See, e.g.*, *Scholastic, Inc.*, 259 F.3d at 83.

### b. The District Court Erred In Finding That Anthem's Proposal Would Have Required ESI To Accept Unprofitable Pricing

The court erred in adopting ESI's incorrect factual position that Anthem's proposals would have "required [ESI] to accept unprofitable pricing demands in order to grant Anthem competitive pricing." SPA-19. The evidence is undisputed that ESI would have profited under Anthem's last proposal, indeed it would have earned a higher profit than it was earning on comparable customers. CA-850 (Apr. 16, 2020 Schlett Dep.) at 293:2-292:21.

Further, Anthem introduced evidence that it is standard for PBMs to offer negative profit pricing to large clients, like Anthem, because the large prescription

39

volumes allow PBMs to increase its profits on its other customers. CA-570, 571, 572, 573 (Borden Report) ¶¶ 51-54; *see also* CA-752 (Wentworth Dep.) at 84:8-87:9; CA-1071. Anthem's business allowed ESI "to increase the profitability of its entire business," as Anthem's approximately 200 million annual prescriptions were roughly 80 times the threshold size of ESI's largest client category. CA-567 (Borden Report) ¶ 53. Consequently, although ESI would have profited directly and indirectly, ESI would not be entitled to summary judgment, even if Anthem's proposals had contemplated ESI providing pricing that was not directly profitable.

The court did not address or acknowledge any of this evidence.

### c. The Relevance Of The First Market Check Was A Question Of Fact For The Jury

The court erred in relying on ESI's argument that the parties did not agree on "the relevance of the first pricing review [in 2012.]." SPA-19. The evidence is that both parties understood that the first market check was not a "real market check" and that the second market check would require "market competitive pricing." *See infra* Section III(C)(3). Nonetheless, any factual disputes on this subject must be resolved by a jury. *See Kessler*, 461 F.3d at 206. The court did not address or acknowledge any of this evidence.

        **d.     The District Court Erred In Finding That Negotiations Between The Parties Ended Due To Anthem's Initiation Of This Lawsuit**

The court erred in finding that "negotiations ended due to Anthem's initiation of this lawsuit." SPA-19. There is no evidence supporting that factual finding. Indeed, pricing negotiations continued even after this action was commenced. CA-610, 611 (Borden Report) ¶ 109 (citing July 28, 2017 Letter from T. Wentworth to J. Swedish). And the district court's suggestion that ESI was negotiating by making a fifth proposal, ignores that ESI's fifth pricing proposal was identical to its second, third and fourth proposals, and offered pricing that was even more inflated than its first proposal. CA-610, 611, 612, 613 (Borden Report) ¶¶ 108, 110, 112 and Figure 9.

        **e.     ESI Was Not Allowed To Take Into Account The Upfront Payment In The Market Check, Which, At Best, Raised A Question Of Fact**

The district court's finding that "the parties could not agree on whether the $4.675 billion [ESI] paid up front as part of the initial agreement could be considered in negotiating the pricing terms" includes an incorrect finding, and ESI's position that it could take into account the upfront payment is not only irrelevant, as addressed in Section I, it is wrong. The $4.675 billion was not paid "as part of the initial agreement." To the contrary, the $4.675 billion was paid for the outstanding stock

of NextRx which is conclusively proven by the governing document, the Stock Purchase Agreement. CA-139, 140. That purchase price is not even mentioned in the Agreement.

Additionally, ESI's position that it could take into account the upfront payment in the market check is unsupported by a single word in the Agreement. *See Impax Labs., Inc. v. Turing Pharm. AG,* 2017 U.S. Dist. LEXIS 164133, at *29 (S.D.N.Y. Sep. 28, 2017) (rejecting "unconvincing" argument that a contract covered transactions that "are simply nowhere to be found in the relevant provisions."). To the contrary, Section 5.6 provides for "competitive benchmark pricing," not uncompetitive pricing increased to account for the upfront payment. If ESI was correct, Section 5.6 would have stated that Anthem would *not* receive competitive pricing, but rather would receive pricing increased by some stated amount to account for the upfront payment.

Moreover, it is black letter law that an agreement requires a meeting of the minds. *Tractebel*, 487 F.3d at 95. ESI never even asked Anthem to agree to allow it to take into account the upfront payment in the market check, much less obtained an agreement to do so. *Infra* at *p.* 55. And when ESI asked Anthem to allow it to take into account the upfront payment in a different pricing provision, Anthem rejected the proposal—explaining why ESI did not ask Anthem to allow it to take

42

into account the upfront payment in the market check. *Id.* ESI's lead negotiator for the Transaction testified that there was no agreement for ESI to take into account the upfront payment. *See* CA-736 (Hall Dep.) at 379:16-22 ("Q: Do you have any understanding ESI was entitled to take into account the upfront payment for NextRx in connection with the market check set forth in Section 5.6? A: Not that I remember."). Anthem instead agreed to account for the upfront payment through purchasing volume requirements in Exhibit O. *Infra* at *pp.* 55-56. The district court did not address or acknowledge the textual flaws in ESI's position, Exhibit O, or any of this evidence.

### D. The District Court Erred In Ruling That Restitution Damages Are Unavailable For ESI's Breach

Anthem is entitled to restitution for paying ESI overcharges. *Living the Dream Films, Inc. v. Aloris Entm't, LLC*, 2021 U.S. Dist. LEXIS 182751, at *26-27 (S.D.N.Y. Sep. 24, 2021) ("Upon a demonstration that a defendant is liable for material breach, the plaintiff may recover the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him.") (cleaned up). The court ruled that Anthem failed to comply with FRCP 26(a), which required Anthem to disclose initial damages computations. SPA-20, 21. But the court entered an order omitting that requirement

in this case. ECF No. 30 (Rule "26(a) Initial Disclosures shall be limited to disclosures required by Rule 26(a)(1)(A)(i) and (iv)…."). In any event, the court simply misunderstood Anthem's damages in finding that Anthem could not recover restitution because it had not pled or provided information about its damage calculations. SPA-20-21. Anthem seeks the amount that ESI overcharged it, by any name, and Anthem pled and provided full fact and expert discovery with respect to such damages, including the precise computations. CA-579 (Borden Report) ¶ 65. The court relied on the fact that Anthem did not use the word "restitution" in describing its damages, but Anthem also did not use the phrase "expectation damages."

## III.

### THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT THAT ESI WAS NOT REQUIRED TO NEGOTIATE IN GOOD FAITH FOR COMPETITIVE PRICING TO ANTHEM

The court correctly ruled that Section 5.6 imposed on ESI an obligation to negotiate in good faith (SPA-13), and that ESI did not dispute its breach for purposes of the motion (SPA-15). But after making the incorrect factual finding that Anthem traded away competitive pricing, the district court granted summary judgment that Section 5.6 did not require ESI to negotiate in good faith "[t]o ensure that [Anthem] is receiving competitive benchmark pricing." SPA-13. The court's interpretation of

Section 5.6 is erroneous. The court also erred, alternatively, in resolving questions of fact based on extrinsic evidence, and doing so without addressing or acknowledging the volume of contrary evidence.

### A. The District Court Erred In Finding And Then Resolving A Factual Dispute About The Objective Of The Good Faith Negotiation Requirement, And Without Supporting Evidence

The district court correctly determined that the first sentence of Section 5.6—"to ensure that [Anthem] is receiving competitive benchmark pricing"—"sets forth…the purpose of" the market check. SPA-13 (the "provision has a clear purpose—to require ESI to negotiate in good faith"). The court also correctly determined that a plain dictionary definition of "ensure" means "to make sure, certain or safe: GUARANTEED." SPA-14. The court then erred in finding that Section 5.6 did not require ESI to provide competitive benchmark pricing, through good faith negotiations, "because as [ESI] points out by reference to the Oxford Dictionary and Thesaurus, 2d Ed. 2007, the word ensure can mean 'check' instead of 'guarantee'." SPA-14.

When interpreting a contract, "[w]ords and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions in order to determine that meaning." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014) (citation

omitted); *see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases…should be given their plain meaning'"). As the court found, the Merriam-Webster dictionary defines "ensure" as "to make sure, certain, or safe: GUARANTEE." SPA-13, 14. Courts have likewise interpreted "ensure" to mean "make certain" or "guarantee." *See Springwood Assocs. v. Lumpkin*, 606 N.E.2d 733, 740 (Ill. Ct. App. 1992) (citing the American Heritage Dictionary to define "ensure" as "to make certain or sure"); *Potelco, Inc. v. Dep't of Labor & Indus.*, 2018 Wash. App. LEXIS 31, at *23 (Wash. Ct. App. Jan. 9, 2018) (same).

The word "ensure" is also used throughout the Agreement, each time to mean "make certain of" or "guarantee." *See, e.g.*, CA-478 at 3.9(f), CA-480 at 6.4(a), CA-481 at 7.2, CA-482 at 10.3(b). Words used in the same contract are deemed to have the same meaning. *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 339 (S.D.N.Y. 2019); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (under the Presumption of Consistent Usage, "[a] word or phrase is presumed to bear the same meaning throughout a text…it has long been considered 'a sound rule of construction that where a word has a clear and definite meaning when used in one part of a…document, but has not when used in another, the presumption is that the word is intended to have the same meaning in the latter

46

as in the former part.'") (quoting H. Broom, A Selection of Legal Maxims 443 (8th ed. 1911)). Additionally, ESI's then-CFO and a primary negotiator of the Transaction testified that the word "ensure" means "to make sure." CA-735 (Hall Dep.) at 321:15-16.

The context for this provision—providing for reduced pricing if market pricing changes, so as to maintain competitive pricing—also makes obvious that "ensure" means guarantee. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means. . . . Of course, words are given meaning by their context, and context includes the purpose of the text."). ESI admits that the purpose of a market check is to reduce pricing. *See supra* at *pp.* 6-7. And the semantics of the sentence confirms that "ensure" means "guarantee." It would not make sense "to [check] [Anthem] is receiving competitive benchmark pricing" because that would presume that Anthem is receiving competitive benchmark pricing, when the very purpose of the provision is to address a circumstance where Anthem is *not* receiving competitive benchmark pricing.[5]

---

[5] Even if Anthem was to hire third-party consultants to "[check] [whether] [Anthem] is receiving competitive benchmark pricing," the Agreement would still require ESI to negotiate in good faith over Anthem's proposals for competitive pricing.

47

In finding that the word "can mean 'check' instead of 'guarantee,'" the district court relied on the fourth synonym in the Oxford Dictionary and Thesaurus. The court ignored that the same dictionary *defines* "ensure" as "to make certain something will occur or be so" (CA-256, 257, 258, 259), and that the first three synonyms in the same dictionary are: to "make sure, make certain, see to it." *Id.* Further, there was no evidence that any party intended to set aside the primary definition of "ensure" in favor of ESI's litigation construction. *See United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) ("Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings."); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 418 (2012) Appendix A: A Note on the Use of Dictionaries ("Because common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense."). To the contrary, as noted, ESI's CFO testified that "ensure" means "to make sure." CA-735 (Hall Dep.) at 321:15-16.

Even Cigna, ESI's current owner, concluded that ESI's litigation position about the word "ensure" is wrong:

> ESI wants a declaratory judgment that they have no obligation to provide competitive pricing, only to receive proposed rates from Anthem when timely and negotiated in good faith. If that's right, I can't

see how ESI let the nuclear word 'ensure' slip into Section 5.6.... The purpose of the market check is to ***ensure*** Anthem is receiving competitive benchmark pricing--not to check, determine it's not competitive, and then move on when ESI doesn't agree in writing.

A-611-614 (emphasis in original).

In any case, by finding that Anthem's dictionary definition is correct, and then citing to a fourth synonym for another meaning, the court, at most, identified an alleged ambiguity in Section 5.6, not subject to resolution on summary judgment. *First Mercury Ins. Co. v. 613 N.Y. Inc.*, 609 F. Appx. 664, 666 (2d Cir. 2015) ("Where, however, 'the terms of a contract could suggest 'more than one meaning when viewed objectively'…ambiguity exists…. 'and determination of the intent of the parties depends on…a determination [] to be made by the jury.'") (citations omitted).

## B. The District Court Erred In Ruling That The Objective Of Section 5.6 Does Not Apply To ESI

Anthem's interpretation is straightforward and correct. Indeed, the court found that Anthem's reading "might have substantial force" if the first sentence had read "Express Scripts shall ensure competitive benchmark pricing, but that the provision applies only to Anthem." SPA-13, 14. Good faith negotiations under New York law do not occur in a vacuum, but rather are governed by an objective. *L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419,* 430 (2d Cir. 2011); *Adjustrite Sys.*

49

*Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). The court erred in finding that ESI had an obligation to negotiate in good faith over Anthem's proposals for competitive pricing, but that the objective of such negotiation did not apply to it. Indeed, there would be nothing to negotiate without an objective.

The objective of Section 5.6 clearly is to obtain competitive pricing *from ESI*. The admitted purpose of a market check is to obtain reduced pricing from the PBM. *See supra* at *pp.* 6-7; CA-725 (Schaefer Dep.) at 184:8-184:15 ("Again, this whole paragraph and the whole proposition, the whole agreement assumes that [Anthem] is going to get competitive pricing. That's why this section 5.6 is in here, periodic pricing review. It wants to make sure we get -- why would you have a pricing review if [Anthem]—I mean, if ESI is never going to comply with it? You wouldn't have this in here at all, would you?"). And, by definition, the objective of Section 5.6 applies to ESI because *ESI* is the only party that was providing pricing to Anthem, so only ESI could ensure that Anthem "was receiving competitive benchmark pricing."

Thus, Section 5.6 provides for Anthem to make its pricing proposal for competitive pricing *to ESI,* and *for ESI* to negotiate in good faith over that proposal for competitive pricing. Section 5.6 did not have to name ESI in every sentence for the bilateral obligation to apply to it. *See Seabury Constr. Corp. v. Jeffrey Chain*

50

*Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) (contract provisions must be harmonized and read as a whole); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[W]hen interpreting this contract we must consider the entire contract and choose the interpretation ...which best accords with the sense of the remainder of the contract."); *Mon Chong Long Trading v. Travelers Excess & Surplus Lines Co.*, 2013 U.S. Dist. LEXIS 92096, at *14-15 (S.D.N.Y. June 27, 2013) ("Plaintiffs essentially ask this Court to read the first sentence of the [provision] in isolation….But there is a second sentence in the [provision] and the [contract] must be read as a whole.").  Even ESI did not argue that the objective of Section 5.6 did not apply to it.  To the contrary, ESI argued (incorrectly) that the objective of Section 5.6 was to provide competitive pricing after taking into account the upfront payment.  CA-263.  *See supra at pp.* 16-22.

Once correctly interpreted, the court agrees that Anthem's position has "substantial force," which presumably means that the court would not have granted summary judgment against Anthem.  SPA-13, 14.  Nonetheless, if there is any ambiguity, then the interpretation of Section 5.6 would be a question of fact for the jury.  *See, e.g., Scholastic, Inc.*, 259 F.3d at 83 ("When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding

summary judgment."); *Heyman v. Commerce & Industry Ins. Co*, 524 F.2d 1317, 1320 (2d Cir. 1975) (same).

### C.     The District Court Erred In Granting Summary Judgment, Alternatively, By Resolving Genuine Issues Of Material Fact

The court erred in ruling that "if the extrinsic evidence were to be considered, the Court would reach the same conclusion" because the "circumstances of the bid solicitation process, statements from Anthem's executives, rejected draft language for the section, and the parties' course of conduct regarding the first market check in 2012, all demonstrate that the provision at issue was not a requirement to provide competitive benchmark pricing." SPA-14, 15 (footnotes omitted). Courts are not allowed to weigh extrinsic evidence to resolve genuine issues of material fact on summary judgment against the non-movant. *Supra* at *pp.* 51-52. As addressed below, the court did not address or even acknowledge the volume of record evidence strongly contesting each of the court's findings of fact.

#### 1.     The Bid Solicitation Process Demonstrates That ESI Was Required To Negotiate In Good Faith To Provide Competitive Pricing, And Anthem Seeks The Same Level Of Pricing Received In 2009

The court erred in finding that Anthem agreed to pricing that was "'short of market competitiveness….knowingly, trad[ing] discounts versus the one-time payment.'" SPA-2, 3. As addressed above, the record is conclusive that ESI

52

provided Anthem with competitive pricing in 2009, as recorded in ESI's contemporaneous records and testimony. *See supra* at *p.* 18-21.

Additionally, Anthem is not seeking a level of pricing that is better than what it received in 2009. Rather, Anthem is seeking an adjustment to put Anthem back to the level of competitive pricing it had in 2009, but lost when market pricing changed. It is ESI that is seeking to retrade the deal, not Anthem. Indeed, as noted, ESI has concluded that it charged Anthem an excess of $5 billion more than it "was entitled to" receive under its own model, taking into account upfront payment. CA-464 ¶¶ 78-81; CA-1145 (e-mail dated October 6, 2014 from Ms. Li to Mr. Lee and Ms. Adler); CA-931 (Lehn Dep.) at 168:5-13.

### 2. The Drafting History Confirms ESI Could Not Rely On The Upfront Payment To Not Provide Anthem With Competitive Pricing

In making a factual finding that the drafting history demonstrated Section 5.6 does not provide for competitive benchmark pricing, the court relied on the fact that ESI objected to certain draft market check language, and that Anthem responded that ESI's concern about modeling pricing "with any certainty" was a "valid point." SPA-14 at n. 6. But Section 5.6 has stronger language than what ESI initially "objected to." What the drafting history proves is that ESI repeatedly objected to

including a market check provision, but Anthem insisted on having it, and ESI relented.[6]

The drafting history further proves that ESI could not take into account the upfront payment in market check. Specifically, ESI proposed a right to take into account the upfront payment in pricing, through the Most Favored Nations:

10.1   10.1   **Most Favored Pricing.** PBM represents and warrants that during the Term of this Agreement, none of its comparable clients shall receive more favorable financial terms in the aggregate, taking into account the consideration paid by PBM to WellPoint pursuant to the Purchase Agreement, and the , including Rebate guarantees and prescription drug pricing , than the pricing terms set forth in Section 5 and Exhibit A of to this Agreement. For purposes of this Section 10.1, comparable client shall mean a client that receives services substantially similar to those pharmacy benefit management services provided by PBM to WellPoint, taking into account plan design, retail Pharmacy and Mail Order Pharmacy utilization, Brand/Generic utilization mix, pricing structure, demographics and other relevant factors.

CA-984 (highlights added).

Anthem rejected ESI's proposal. CA-452 ¶¶ 16-17. Thus, ESI admits that it never even asked Anthem to agree to allow it to take into account the upfront payment in the market check, much less discussed or obtained an agreement to be

---

[6] ESI objected to a draft market check provision which provided Anthem with the ability "to renegotiate the pricing terms" every three years and proposed that the provision be deleted. CA-106, CA-112, 113. ESI's complaint was that "[m]arket checks every 3 years makes any pricing agreed to up-front short term and puts any return on the up-front consideration at risk." CA-108. Anthem did not delete the market check and instead revised it to add the key requirement that ESI negotiate in good faith for competitive pricing, to which ESI agreed. CA-115, 116-117.

allowed to do so. CA-452 ¶ 17. And ESI's lead negotiator testified that ESI's position is wrong. *See* CA-736 (Hall Dep.) at 379:16-22.

Although Anthem did not agree to allow ESI to take into account the upfront payment in the market check, something admittedly not requested or discussed, it did agree to protect the upfront payment through Exhibit O of the Agreement. CA-131; CA-534 (Paz Dep.) at 102:16-18 ("the clawback payment [was] tied to volumes, not pricing"). Specifically, Exhibit O allowed ESI to "claw back" up to $4.23 billion of the upfront payment if Anthem's prescription volume did not meet specified annual claims volume thresholds. *See* CA-500.

The court did not address or otherwise acknowledge this evidence.

### 3. The First Market Check Is Not A Course Of Conduct, But Demonstrates That The Second Market Check Would Require ESI To Negotiate In Good Faith For Competitive Pricing

The court erred in disregarding record evidence that the first market check was not a course of conduct, and that the parties understood that the second market check would require competitive pricing. During the first market check, Anthem understood it had a right to competitive pricing under Section 5.6, but did not press its right because the parties had just resolved a number of disputes in a broad settlement. CA-768 (Gibbs Dep.) at 224:24-225:9 ("[A]nd based on coming out on

the heels of a very tenuous settlement, we chose the scope of our market check to focus on certain items….I do know there was not an explicit push to reset Exhibit A [pricing] because of what had just gone on and the companies had been, you know, just business had been really tough.").

Anthem repeatedly communicated to ESI that it was entitled to competitive pricing under Section 5.6, and that the second market check would be for market competitive pricing. *See* CA-772 (Mr. Gibbs noting to Mr. Totterdale during the 2012 market check that "**there is still the obligation under the [m]arket check for market competitive rates[.]**") (emphasis added). Anthem told ESI that "[t]he next Market Check won't be as forgiving…." CA-776. "This [first market check] was a tempered exercise, but the next market check, we're coming for it." CA-769 (Gibbs Dep.) at 352:25-353:3. Mr. Wentworth, an ESI executive involved in the second market check, was also told that "for the next market check **[Anthem is] expecting market rates.**" CA-791 (emphasis added).

None of ESI's contemporaneous records dispute that the second market check would be "a real market check" for competitive pricing. To the contrary, ESI executives acknowledged that, "by all measures, this [first market check] was easy….**Next time will likely be a true market check**, focused on extracting value **based on market competitive rates**." CA-782 (emphasis added); *see also* CA-795

("**When [Anthem] delivers the next market check the rates they will compare us to will be actual 'market rates.'**"); CA-789 ("**[Anthem] expects significant rate relief in 2016 market check to be on par with market competitive pricing[.]**"). Thus, ESI contemporaneous records show that ESI expected the second market check to "be a significant challenge" to growth and a "headwind" for 2016, which would only be true if ESI was obligated to improve Anthem's rates. CA-803 ("2016 represents significant challenge to [year over year] growth target due to market check"); CA-812 (listing "[m]arket check" as a "[h]eadwind[]" for 2016).

The court did not address or acknowledge any this evidence in resolving the issue of fact. The import of the parties' conduct in 2012, at best, raised a disputed question of fact that was not subject to resolution on summary judgment. *Mgmt. Recruiters v. Nat'l Econ. Rsch. Assocs.*, 2005 U.S. Dist. LEXIS 494, *9 (S.D.N.Y. Jan. 11, 2005) ("[T]he parties' course of conduct is [a] question for the trier of fact."); *Tractebel*, 487 F.3d at 98-99.

In addition to the fact that the parties specifically agreed that the first market check was not relevant to the second one, a single exercise does not qualify as a course of conduct. *MAFCO Elec. Contrs., Inc. v. Turner Constr. Co.*, 357 F. Appx. 395, 397 (2d Cir. 2009) (noting that a party's "willingness to settle one batch of

claims cannot be construed as a course of conduct barring contractual defenses to subsequent claims"); *United States Bank N.A. v. Xxx*, 2021 N.Y. Misc. LEXIS 3747, at *26 (N.Y. Sup. Ct. June 28, 2021) ("[A] single event is insufficient to establish a course of conduct....").

### D. The District Court's Ruling Violates Rules Of Construction By Rendering Section 5.6 Superfluous And Commercially Unreasonable

The court's interpretation of Section 5.6 is also erroneous because it renders the provision superfluous in violation of a long-standing rule of construction. *See CP III Rincon Towes, Inc.*, 666 F. Appx. At 51-52; *Scholastic, Inc.*, 259 F.3d at 82. Section 5.6 serves no purpose if ESI does not have to negotiate to ensure that Anthem is receiving competitive benchmark pricing. And the court's interpretation ignores the undisputed purpose of the market check, and eliminates a customary and critically important contract provision in the industry for protecting customers in long-term PBM agreements where market pricing changes, as it did here. *See supra* at *pp.* 6-9.

The court's interpretation of Section 5.6 also violates the rule of construction that contracts must be read as being commercially reasonable, meaning that the parties were trying to accomplish something rational and consistent with the parties' expectations and industry practice. *See Landmark Ventures, Inc. v. Wave Sys. Corp.*,

2012 U.S. Dist. LEXIS 125341, at *8 (S.D.N.Y. Sept. 4, 2012); *Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc.*, 603 F. Supp. 2d 735, 739 (S.D.N.Y. 2009); *Natixis Real Estate Capital Trust 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 149 A.D.3d 127, 139 (1st Dep't 2017).

It would be commercially unreasonable to provide for an expensive, year-long market check process every three years, where Anthem retains third-party consultants at substantial cost to evaluate whether its pricing was competitive, then assembles detailed pricing proposals with the assistance of PBM consultants, attorneys and internal personnel, then prepares a pricing proposal, and then negotiates the pricing proposal, if Anthem then had no right to competitive benchmark pricing. It likewise would make no sense for ESI to provide for a process for its largest customer to uncover that it was being overcharged, but could do nothing about it. The court's reading is also wrong because Anthem would not need a contractual provision to conduct an analysis of market pricing and make a proposal to ESI, with no corresponding obligation for ESI to negotiate in good faith to provide competitive pricing. The court's interpretation is also commercially unreasonable because it ignores that the admitted purpose of a market check is to reduce pricing where market pricing changes, as here. *See Endurance Am. Specialty Ins. Co. v. Century Sur. Co.*, 46 F. Supp. 3d 398, 420-21 (S.D.N.Y. 2014) (finding "plaintiffs'

interpretation is the only reasonable construction in light of the typical intent of these provisions as applied in the industry").

The court found that Section 5.6 "has value and meaning, as it bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" SPA-13. But ESI, in fact, committed each of those prohibited acts. *See supra* at *pp.* 10-11.

## CONCLUSION

Anthem respectfully asks the Court to vacate the summary judgment order, and remand the case for trial.

Dated: New York, New York
     April 24, 2024

*/s/ Glenn M. Kurtz*
GLENN M. KURTZ
CLAUDINE COLUMBRES
WHITE & CASE LLP
*Attorneys for Plaintiff-Appellant*
1221 Avenue of the Americas
New York, New York 10020

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13, 377 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
      April 24, 2024

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Edgardo
    Ramos, dated March 31, 2022 ............................ SPA-1

Final Judgment of the Honorable Edgardo Ramos,
    dated November 13, 2023, Appealed From .......... SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHEM, INC.,

                              Plaintiff,

              – against –

EXPRESS SCRIPTS, INC.,

                              Defendant.

**OPINION & ORDER**

16 Civ. 2048 (ER)

RAMOS, D.J.:

## I.      Background

Anthem, Inc. brought this action against Express Scripts, Inc. in March of 2016 for breach of contract and declaratory judgment related to a deal whereby Express Scripts acquired NextRx and contractually agreed to serve as the pharmacy benefit manager ("PBM") for Anthem.  Doc. 3.  Express Scripts brought counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, declaratory judgment, and unjust enrichment.  Doc. 33.  Express Scripts now moves for summary judgment to (1) dismiss Counts I and II of the complaint; (2) grant declaratory judgment as to Express Scripts' third cause of action on its counterclaim; and (3) dismiss parts of Count III of the complaint.  For the reasons set forth below, Express Scripts' partial motion for summary judgment is GRANTED in part and DENIED in part.

## II.     Statement of Facts

Anthem is a health care plan provider.  Doc. 355 at 11.  Express Scripts provides the PBM services by serving as an intermediary between health plans and pharmacies.  *Id.* at 12.  Once a plan member fills a prescription at a pharmacy and pays a copay, the PBM reimburses the

pharmacy for the remaining cost of the prescription.  *Id.*  The health plan, or Anthem in this case,

then reimburses the PBM at a contractually agreed amount, which may exceed the PBM's

payment to a pharmacy, generating profit for the PBM.  *Id.*

In 2008, Anthem retained Bank of America to advise it on how to address NextRx,

Anthem's then-PBM that had lost millions of customers and was struggling to compete with

other larger PBMs.  Doc. 357 ¶¶ 10–11.  One of the options Bank of America presented to

Anthem was to enter into a long-term contract with a new PBM who would also buy NextRx.  *Id.*

¶ 14.  Anthem saw it as a positive that this plan would allow it to receive a large upfront payment

"to reinvest or buyback stock."  *Id.* ¶ 15.  Anthem thus began to solicit bids from PBMs in

December 2008 and specifically requested that bids include (1) an upfront payment, and (2)

prescription drug prices under a long-term contract.  *Id.* ¶¶ 21–22.  In January 2009, four PBMs,

including Express Scripts, CVS, Medco, and Walgreens, submitted bids that included both an

upfront payment amount for NextRx as well as the prices Anthem would pay the PBM for

prescription drugs under a "long-term commercial contract."  Doc. 355 at 13; Doc. 358-20 at 2.

Express Scripts' bid included two options:  one offer of a higher upfront payment of $4 billion

and lower discounts on prescription-drug prices, and one offer of a lower upfront payment of

$500 million and higher discounts on prescription-drug prices.  Doc. 357 ¶ 25.  Bank of America

noted during the bid evaluation process that "[a]ll bidders have highlighted the interplay between

the terms of the commercial contract (especially duration and pricing) and the upfront purchase

price."  *Id.* ¶ 34.

In April of 2009, after further negotiations, Anthem selected Express Scripts as the

winning bid.  *Id.* ¶ 59.  The parties entered into a deal compromised of two contracts whereby

Express Scripts purchased NextRx and became Anthem's exclusive PBM for 10 years (2009–

2019).  Doc. 355 at 12; Doc. 381-225.  As the winning bid, Express Scripts ultimately paid

Anthem $4.675 billion upfront and agreed to pricing terms for prescriptions over ten years.  Doc.

365-6 at 29; Doc. 359-3 at 62.  In light of the large $4.675 billion upfront payment, Anthem

agreed to prescription pricing terms that were better than their previous NextRx pricing terms,

but "still short of market competitiveness."  Doc. 365-14 at 2.  Anthem did so "knowingly,"

"trad[ing] discounts versus the one-time payment."  *Id.*  The parties eventually signed the two

contracts on the same day, December 1, 2009.  Doc. 357 ¶¶ 60–61.  Thus, the purchase of

NextRx and the discounts on prescription prices were jointly discussed during the bid

solicitation, negotiation, and contract execution processes.  Accordingly, it appears clear that the

two contracts were conceived as being interconnected.

   A.  **Pricing Review**

   The PBM contract included a provision, Section 5.6, titled "Periodic Pricing Review."

Section 5.6 reads:

> [Anthem] . . . will conduct a market analysis every three (3) years during the Term of this
> Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.[1]  In the
> event [Anthem] . . . determines that such pricing terms are not competitive, [Anthem]
> shall have the ability to propose renegotiated pricing terms to [Express Scripts] and
> [Anthem] and [Express Scripts] agree[ ] to negotiate in good faith over the proposed new
> pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must
> be agreed to by [Express Scripts] in writing.

---

[1] While the parties dispute the definition of "competitive benchmark pricing," for the purposes of this motion,
Express Scripts has adopted Anthem's definition as articulated in its sworn interrogatory responses:

> 'Competitive Benchmark Pricing' . . . means market competitive PBM pricing, which is the competitive
> PBM pricing that would be available to Anthem in the PBM marketplace.  The benchmark for Anthem is
> pricing for other very large PBM clients.  Generally, PBM clients with large script volumes are provided
> the largest average wholesale price ('AWP') discounts, and therefore the most favorable pricing, in the
> PBM marketplace.

Doc. 359-5 at 6.

3

Doc. 381-4 at 40.  Negotiations for the first pricing review took place in 2013 for terms that were

effective December 2012.  Doc. 385 at 67.  Negotiations for the second pricing review, the

precipitating cause of this lawsuit, took place up until March 21, 2016, when Anthem ended

negotiations by filing this lawsuit four days after Express Scripts sent its fifth pricing proposal.

*Id.* at 176.

   **B.  Operational Claims**

   Anthem also provides services through Medicare, called Medicare Part D services.

Sections 3.2(a)(ii), 3.21, and Exhibit I Section 4.0 of the Agreement require Express Scripts to

perform the Medicare Part D functions in accordance with the Centers for Medicare & Medicaid

Services (CMS) regulations.  Section 3.2(a)(i) states:  "During the Term of this Agreement,

[Express Scripts] shall . . . obtain and maintain all federal, state, and local licenses, permits,

certificates, and other regulatory approvals that are necessary for [Express Scripts] to perform its

obligations under this Agreement."  Doc. 359-1 at 24 § 3.2(a)(i).  Section 3.21 states:

> "[Express Scripts] agrees to . . . provide [Anthem] any information and services provided
> for under this Agreement necessary to support [Anthem]'s continued participation and
> future applications to participate as a sponsor of drug benefits for Medicare and
> Medicaid. . . . All services performed by PBM for [Anthem] under this Section 3.21 shall
> be in accordance with those requirements adopted by the Centers for Medicare &
> Medicaid Services ("CMS") and any other Law."

*Id.* at 47 § 3.21.  Exhibit I Section 4.0 states:  "[Express Scripts] agrees to provide the delegated

activities and reporting responsibilities listed below . . . in accordance with . . . the Part D and

Medicare Advantage regulations . . . ."  Doc. 381-2 at 206 § 4.0.  Lastly, Section 4.1 requires,

among other things, that Express Scripts "perform the Claims administration services . . . in

accordance with the requirements and time frames required by CMS and the Part D regulations."

Doc. 381-2 at 206 § 4.1.

4

### 1.  Prescription Drug Event (PDE) Data

Sponsors of Medicare Part D prescription drug plans such as Anthem are required to submit "prescription drug event" data ("PDE data") to the CMS.  Doc. 3 ¶ 60.  PDE data contains information regarding each claim for a prescription drug paid by the sponsor under a given plan.  *Id.*  Failure to submit PDE data can result in financial losses to the sponsor as part of CMS's financial reconciliation with sponsors as well as CMS compliance actions.  *Id.*

Section 4.11 states that Express Scripts is "responsible for collecting, creating and submitting [PDE] files to CMS containing claims data as required by CMS in the format and time frame specified by CMS" and spelling out additional PDE responsibilities.  Doc. 381-2 at 212–215 § 4.11.

### 2.  Prior Authorization Turnaround Times ("TATs")

CMS requires coverage determinations for Medicare Part D to be processed within certain timeframes.  Doc. 3 ¶ 71.  If an entity fails to process determinations within the specified timeframes, it must forward the applicable case to a CMS-designated Independent Review Entity for a determination.  *Id.*  Noncompliance places the entity at risk of enforcement actions by CMS and can delay plan members from receiving medications on a timely basis.  *Id.* ¶ 73.

### 3.  WRIT Log

As part of the agreement, the parties established a joint database called WellPoint[2] Rx Issues Tracking System ("WRIT Log") to track issues that arose during Express Scripts' performance of PBM services, including its performance of Medicare Part D Services.  *Id.* ¶ 80. Anthem would submit issues to Express Scripts, and Express Scripts was required to research and resolve those issues in a timely manner.  *Id.* ¶ 80–81.

---

[2] Anthem was previously known as WellPoint.

SPA-6

**C.  Prior Authorization Performance Guarantees**

Health plans sometimes require members or their doctors to submit requests for prior authorization for certain drug costs to be covered by the plan.  Doc. 355 at 28.  As part of the contract, Express Scripts agreed to process Anthem's prior authorization requests.  *Id.*  The contract specified "performance guarantees" that Express Scripts was required to meet in delivering this service.  These performance guarantees set required percentages for issuing correct determinations and contain corresponding monetary penalties if the percentage is not reached.  Doc. 359-1 at 136, 184.  There are separate performance guarantees for different categories of prior authorizations, including for non-specialty medications, specialty medications, and for Medicare recipients, with each requiring 98% accuracy in making determinations on prior authorization requests.  *Id.*  The contract reads in relevant part as follows:  "PBM agrees that the performance standards and guarantees are a contractual obligation of PBM and PBM shall meet or exceed the performance standards and guarantees as set forth in Exhibit D and, if it fails to do so, shall pay to [Anthem] the penalty amount . . . ."  *Id.* at 84 § 8.1.

6

**SPA-7**

| Service Description | PG # | Performance Standard | Guarantee/Penalty |
|---|---|---|---|
| Prior Authorization – Issue Correct determinations | UM5 | Measure overall accuracy of PBM's application of Defined Criteria and if PBM correctly or incorrectly issued a prior authorization.<br><br>Using a random sampling method that yields a 95% confidence ratio, PBM guarantees 98% accuracy with regard to quantity of fills, dates approved and application of Defined Criteria. This specific guarantee will exclude specialty medications.<br><br>Measurement = number of cases processed accurately / total number of cases | $50,000 penalty per quarter. With an annual maximum of $200,000 |
| Prior Authorization Issue Correct Determination - Specialty | UM6 | Measure overall accuracy of PBM's application of Defined Criteria and if PBM correctly or incorrectly issued a prior authorization. Using a random sampling method within the population of Specialty Drugs that yields a 95% confidence ratio, PBM guarantees 98% accuracy with regard to quantity of fills, dates approved and application of Defined Criteria.<br><br>Measurement Specialty = number of Specialty Drug cases processed accurately / total number of Specialty Drug cases | $187,500 penalty per quarter with an annual maximum of $750,000 |

*Id.* at 136.[3]

---

[3] The chart has not been copied in its entirety.  Only the relevant portions are included here.

| Performance Standard | PG# | Agreement Definition | Measurement | Penalty |
|---|---|---|---|---|
| **CLAIMS** | | | | |
| | | | cases | |
| **Prior Authorization – Issue Correction Determinations** | M17 | Using a random sampling method that yields a 95% confidence ratio, Express Scripts guarantees 98% accuracy with regard to quantity of fills, dates approved and responsiveness to defined criteria as provided by the prescriber. This Medicare specific guarantee will exclude specialty medications | Penalties shall apply when ESI drops below 98% with a penalty of cap of $100,000. Measurement = number of cases processed accurately / total number of cases | $25,000 penalty per quarter. With an annual maximum of $100,000 |

*Id.* at 184.[4]

The contract also required Express Scripts to "provide the administrative services . . . in a prudent and expert manner in accordance with this Agreement and all Laws." Doc. 381-2 at 24 § 3.1(a). Further, the contract makes clear that the monetary penalties for non-compliance with the performance guarantees are "in addition to any other remedies available to [Anthem] and shall in no way limit [Anthem's] ability to seek damages, remedies, or payments to make [Anthem] whole for losses for failure by PBM to fulfill its obligations under this Agreement." *Id.* at 84 § 8.2.

As relevant to this motion, several other provisions also generally reference performance guarantees and responsibilities regarding incorrect determinations. Sections 3.7(f)–(g), in a section titled Claims Processing Services, state:

> (f) [Express Scripts] will perform electronic, telephone, and on-site audits of Network Pharmacies to determine compliance with their pharmacy agreements. [Express Scripts] will attempt recovery of identified overpayments to Network Pharmacies through offset, demand or other reasonable means; provided that [Express Scripts] will not be required to institute litigation. Recovered overpayments shall be credited to [Anthem].

---

[4] The chart has not been copied in its entirety. Only the relevant portions are included here.

(g) . . . If [Express Scripts] determines that, through its error, it has overpaid any Network Pharmacy or paid benefits not covered under the terms of a Coverage Document, [Express Scripts] shall, at its own expense, recover the overpayment or incorrect payment and credit [Anthem] accordingly. . . . One hundred percent (100%) of recovered overpayments for [Anthem]'s Commercial, Medicaid, and Medicare Advantage/Medicare Part D business shall be credited to [Anthem] and fees in the amount of 20% of such recoveries will be billed for [Anthem]'s Commercial and Medicaid business; however, [Anthem] shall not be billed for any fees for its Medicare Advantage and Medicare Part D business.

*Id.* at 38–39 § 3.7(f)–(g).  "Claim" is defined in the agreement as "an electronic or paper request for reimbursement as a result of a Pharmacy dispensing a Covered Prescription to a Covered Individual."  Doc. 359-1 at 4 § 1.14.  Section 3.11 requires Express Scripts to conduct prior authorizations "in accordance with this Agreement[] . . . [and] in accordance with [Anthem]'s Defined Criteria . . . within the turnaround timeframes set forth in Schedule G-2."  *Id.* at 41 § 3.11.  Defined Criteria is elsewhere defined as "the entire set of formulary criteria (which includes non formulary exception criteria, quantity limit criteria, dose and formulation optimization criteria, prior authorization criteria . . . ) and all benefit components and attributes as specified and communicated by [Anthem] to [Express Scripts] in the benefit build process and the clinical edit implementation process."  Doc. 381-2 at 17 § 1.95.  Exhibit B requires Express Scripts to provide, among other things, an audit report of performance guarantees.  *Id.* at 116–17.

In its motion for partial summary judgment, Express Scripts argues that (1) Counts I and II of the complaint should be dismissed under the plain language of the PBM agreement and New York law; (2) Count III of the complaint should be partially dismissed due to abandonment of several claims and the plain language of the PBM agreement; and (3) Express Scripts is entitled to summary judgment on its third counterclaim which seeks a declaration that Section 5.6 only requires it to negotiate in good faith over any proposed new pricing terms.  Doc. 353; Doc. 355 at 7.

9

### III.   Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* (citation omitted).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

IV.   **Breach of Contract and Declaratory Judgment for Competitive Benchmark Pricing**

In Counts I and II of the complaint, Anthem alleges that Express Scripts breached Section 5.6 of the agreement

> by expressly repudiating its obligations under Section 5.6 of the Agreement, by delaying for months, by refusing to meet with Anthem to negotiate over Anthem's proposed pricing terms or for competitive benchmark pricing, by refusing to negotiate in good faith or at all over Anthem's proposed pricing terms or for competitive benchmark pricing, by failing to make any proposal for competitive benchmark pricing, by failing to agree in writing to new pricing terms, and by failing to provide competitive benchmark pricing . . . .

Doc. 3 ¶ 94.  Count I seeks a total of $14.8 billion in damages from the breach, *id.* ¶ 97, and

Count II seeks a declaration that Express Scripts:

> (i) . . . breached its obligation to negotiate in good faith and to agree to new pricing terms in writing under Section 5.6 of the Agreement, (ii) . . . is required to provide competitive benchmark pricing to Anthem . . ., and (iii) Anthem is entitled to damages measured as the difference between [Express Scripts'] pricing and competitive benchmark pricing, plus all other damages caused by [Express Scripts'] breaches . . . .

*Id.* ¶ 100.  Express Scripts moves for summary judgment to dismiss Counts I and II of the

complaint in its entirety as well as summary judgment on its third counterclaim, seeking a

declaration that Section 5.6 only requires it to negotiate in good faith.  Doc. 353.

A.  **Legal Standard**

"Under New York law, the initial interpretation of a contract is a matter of law for the

court to decide.  Included in this initial interpretation is the threshold question of whether the

terms of the contract are ambiguous."  *Alexander & Alexander Servs., Inc. v. These Certain*

*Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (internal quotation marks and citations

omitted).  "The fundamental, neutral precept of contract interpretation is that agreements are

construed in accord with the parties' intent, and that the best evidence of what parties to a written

agreement intend is what they say in their writing."  *Kasowitz, Benson, Torres & Friedman, LLP*

*v. Reade*, 950 N.Y.S.2d 8, 11 (N.Y. App. Div. 2012) (cleaned up) (internal quotation marks and citation omitted), *aff'd*, 987 N.E.2d 631 (N.Y. 2013).  Words and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions to determine that meaning.  *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988); *see also 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011).

Consistent with the focus on a contract's language, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources[.]" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).  Further, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a reasonable interpretation." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotations marks and citation omitted).  As such, a court should not find ambiguity where "the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'" *Id.* (alteration omitted) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).  If a contract is ambiguous, and determination of the intent of the parties then "depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is to be made by the jury," and the Court cannot grant summary judgment. *First Mercury Ins. Co. v. 613 N.Y. Inc.*, 609 F. App'x 664, 666 (2d Cir. 2015) (summary order) (quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973)).

**B.  Section 5.6**

The plain language of Section 5.6 is not ambiguous.  It reads:

> [Anthem] . . . will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.  In the event [Anthem] . . . determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agree[ ] to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [Express Scripts] in writing.

Doc. 381-4 at 40.  The first sentence sets forth the frequency and purpose of Anthem's market analyses.  The second sentence obligates Express Scripts to negotiate in good faith over Anthem's proposed new pricing terms in the event that the market analysis shows that pricing is not competitive.  Lastly, the third sentence requires that new pricing terms be agreed to in writing by Express Scripts to take effect.  By its terms, Express Scripts' only obligation under this section is to negotiate in good faith over any new pricing terms Anthem may propose after it conducts a market analysis.

Anthem's arguments to the contrary are unavailing.  Anthem argues that the above interpretation would render the provision meaningless, as it would allow Anthem to check whether it was receiving benchmark pricing but would not "require ESI to try to reach an actual agreement."  Doc. 387 at 22.  The Court disagrees.  The provision has a clear purpose – to require Express Scripts to negotiate in good faith.  Such a requirement has value and meaning, as it "bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'"  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

Anthem also argues that the purpose of Section 5.6 is to *guarantee* competitive benchmark pricing, as the word "ensure" is defined by Merriam-Webster as "to make sure, certain, or safe:  GUARANTEE."  Doc. 387 at 24.  While this definition is correct, it is not the

13

only definition of ensure, and it does not change the fact that the sentence in which the word is used applies only to Anthem.  If the contract read "Express Scripts shall ensure competitive benchmark pricing," Anthem's arguments might have substantial force, but a plain four-corners reading does not support its interpretation.  Further, as Express Scripts points out by reference to the Oxford Dictionary and Thesaurus, 2d ed. 2007, the word ensure can mean "check" instead of "guarantee."  *See* Doc. 369-18 at 4.

Because the plain language does not require Express Scripts to guarantee competitive benchmark pricing but only to negotiate in good faith, the last sentence of Section 5.6 is not pertinent to this motion.  Anthem admits as much because it is not alleging failure to document a verbal agreement, but rather raises claims based on the lack of agreement due to Express Scripts' failure to negotiate in good faith.  Doc. 387 at 27.  As Section 5.6 is not ambiguous, the Court need not consider extrinsic evidence.

However, even if the extrinsic evidence were to be considered, the Court would reach the same conclusion.  The circumstances of the bid solicitation process, statements from Anthem's executives,[5] rejected draft language for this section,[6] and the parties' course of conduct regarding

---

[5] For example, Jeffery Turner, Anthem's then-Vice President for Sales and Marketing, wrote in 2009 that "[Anthem] must remember that we do not have the best pricing in industry [sic] since we chose to take the deal as a package and wanted to protect the upfront."  Doc. 365-8 at 2.  Similarly, in March 2012, Anthem's then-President of Commercial Business wrote in March 2012 that "[Anthem] entered into the contract . . . with rates that were already well below the market . . . and, while the multi-year [Express Scripts] contract did improve rates from the base . . ., they were still short of market competitiveness. . . . On the other hand, we received a large $ sum for the transaction—and knowingly traded discounts versus the one-time payment."  Doc. 365-14 at 2.

[6] For example, an earlier version of the section stated that "[Anthem] shall have the ability to renegotiate the pricing terms of this Agreement."  Doc. 362-12 at 3 § 5.7.  Express Scripts objected to this language because "[m]arket checks every 3 years makes any pricing agreed to up-front short term and puts any return on up-front consideration at risk."  Doc. 362-16 at 2.  During a phone call with one of Anthem's lead negotiators, Express Scripts further "strongly objected" to the draft, stating that it "could not model or price with any certainty," to which Anthem responded that this was a "valid point."  Doc. 362-19 at 4.

14

the first market check in 2012,[7] all demonstrate that the provision at issue was not a requirement to provide competitive benchmark pricing.

Part (ii) of Count II of the complaint requests a declaration that Express Scripts "is required to provide competitive benchmark pricing to Anthem."  Doc. 3 ¶ 100.  Express Scripts' motion to dismiss this portion of Count II is thus granted.  Count II also seeks a declaration that Express Scripts "breached its obligation to negotiate in good faith and to agree to new pricing terms in writing under Section 5.6 of the Agreement" and "is entitled to damages measured as the difference between [Express Scripts'] pricing and competitive benchmark pricing, plus all other damages caused by [Express Scripts'] breaches."  *Id.*  The issue of whether Express Scripts did in fact breach its obligation to negotiate in good faith has not been explicitly addressed in Express Scripts' motion, but, even if Express Scripts did not negotiate in good faith, as discussed below, Anthem would be entitled only to "out-of-pocket costs incurred in the course of good faith partial performance."  *L-7 Designs*, 647 F.3d at 431.  Because Anthem has only sought expectancy damages and not out-of-pocket costs, it cannot sustain a claim for breach of contract for good faith negotiations.  *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (stating that damages are an element of a breach of contract claim).  Count II is thus dismissed in its entirety.

### C. Count I Damages

Count I seeks $14.8 billion in damages for the alleged breaches.  Doc. 3 ¶ 97.  Anthem argues that expectation damages are the appropriate measure of damages for breach of contract,

---

[7] For example, after receiving pricing consultations concluding that the pricing terms were not competitive, Anthem sent a formal notice to Express Scripts in January 2013 in which it indicated that although it was a "notable concern" that the rates were less competitive than comparators, Express Scripts could satisfy its contractual obligations by agreeing to continue to provide "exception pricing" for its commercial business.  Doc. 366-3 at 5.  Exception pricing is a process by which Anthem could request more favorable pricing for a particular client from Express Scripts on a one-off basis.  Doc. 357 ¶ 125.

and the "wrongdoer rule" requires that Express Scripts bear the risk of uncertainty as the

breaching party.  Doc. 387 at 40–42.  This is generally true.

> Where a party breaches a contract, that party is liable to the non-breaching party for damages and the amount of damages must put the non-breaching party in as a good a position as if the breach had not occurred. . . . Thus, a non-breaching party is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty. . . . [Additionally], where the existence of damage is certain, and the only uncertainty is as to its amount, the burden of uncertainty as to the amount of damage is upon the wrongdoer.

*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) (internal quotation marks

and citations omitted).  Reasonable certainty in amount does not require "scientific rigor" and

courts "will endeavor to make a reasonable estimate of damages."  *Lexington Prod. Ltd. v. B. D.*

*Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).

Anthem cites *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d

Cir. 2007), a case in which the Second Circuit vacated the district court's judgment denying

damages pursuant to a contract.  *Tractebel* is arguably similar to the instant case in the sense that

it dealt with breach of a complex, long-term contract for energy supply, the profitability of which

was affected by numerous variables such as "fluctuating supply and demand, changes in

operating costs, increased competition from alternatives, alterations to the relevant regulatory

regime, population increases or decreases in the targeted market, or technological advances."

*Tractebel*, 487 F.3d at 112.  Despite the fact that damages were incurred over a twenty-year

period, the Second Circuit stated:

> New York courts have significant flexibility in estimating general damages once the fact of liability is established. . . . To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented that undermines the basis for the assumption. . . . The risk that the future might reveal the district court's assumptions to be false is appropriately borne by . . . the breaching party.

*Id.*

Anthem thus argues that it only needs to provide a reasonable way to estimate its damages from breach for its claim for damages to survive.  Anthem therefore asserts that it is entitled to expectation damages of the difference between competitive benchmark pricing and the price Express Scripts charged Anthem and provides several methods by which to reach an estimate of those damages, including Express Scripts' pricing guidelines, Express Scripts' pricing terms for comparable companies, and offers made to Anthem from both CVS and Optum for competitive pricing in 2016, among other evidence.  Doc. 387 at 41, 45; Doc. 381-185; Doc. 381-186.

Express Scripts, however, argues that *Tractebel* and other cases Anthem cites in its memo are inapplicable, because they do not involve breach of a requirement to negotiate in good faith.  Doc. 392 at 21.  It argues that expectancy damages are barred by New York law as unduly speculative where damages are based on a hypothetical contract reached after good-faith negotiations.  Doc. 355 at 40.  In support, it cites *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356 (N.Y. 1992), a case in which the city of New York breached a contract to negotiate in good faith with a developer.  The Court of Appeals of New York held that expectancy damages were precluded because

> [t]o allow the profits that plaintiff might have made under the prospective [agreement] as the damages for breach of the . . . negotiating agreement[] would be basing damages not on the [agreement] but on the prospective terms of a nonexistent contract which the City was fully at liberty to reject.  It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself.

*Goodstein*, 604 N.E.2d at 1360–61.  The court further noted that

> a party's alleged failure to bargain in good faith is not a but-for cause of plaintiff's lost profits, since even with the best faith on both sides the deal might not have been closed and attributing plaintiff's lost profits to defendant's bad faith may be speculative at best . . . [I]f no agreement was reached and it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation . . . .

17

*Id.* (internal edits, quotation marks, and citations omitted).

This Court has previously explained that, although the Second Circuit has found that lost profits are not available where no agreement is reached, *see L-7 Designs*, 547 F.3d at 431; *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 n.2 (2d Cir. 1989), it is not clear whether "lost profits may *never* be recovered for a party's failure to negotiate in good faith." *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) (emphasis in original) (citing *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 429 (8th Cir. 2008) ("We are not as confident as the district court that *Goodstein II* should be read as categorically precluding benefit-of-the-bargain damages for all breaches of binding preliminary agreements to negotiate a final agreement in good faith. This is a difficult, largely unsettled question of remedies.") (applying New York law)).

Express Scripts argues that these cases and others make clear that lost profits are categorically unavailable. Doc. 355 at 42 n.4. In addition to the cases cited above, it cites *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 417 (S.D.N.Y. 2011) ("lost profits are generally not available where no agreement is reached"), *Re-Source Am., Inc. v. Corning Inc.*, No. 7 Civ. 6048 (CJS), 2009 WL 2179254, at *9 (W.D.N.Y. July 22, 2009) ("Plaintiff cannot recover 'lost profits' that it might have earned if the parties had actually negotiated a new agreement"), and *Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 255 n.2 (S.D.N.Y.) (lost profits are "unavailable for breach of a duty to negotiate in good faith"), *aff'd*, 242 F.3d 365 (2d Cir. 2000). A more recent similar case, *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, No. 15 Civ. 70 (LAK), 2015 WL 5710947, at *9 n.94 (S.D.N.Y. Sept. 29, 2015), *aff'd*, 662 F. App'x 19 (2d Cir. 2016), plainly stated that "lost profits are not

available as a remedy . . . recovery is limited to out-of-pocket costs incurred in partial performance of good faith negotiations."

Express Scripts argues that the only possible exception to this rule is "if it can be discerned what agreement would have been reached."  Doc. 355 at 42 n.4 (quoting *Fairbrook*, 519 F.3d at 429).  Thus, Express Scripts argues that the exception would not apply here because it is impossible to discern not only the prices in the agreement but also whether an agreement ultimately would have been reached.  *Id.*  It points to the fact that the parties disagreed on many complex and fundamental issues and were billions of dollars apart when negotiations ended due to Anthem's initiation of this lawsuit.  *Id.* at 43.  In particular, the parties could not agree on whether the $4.675 billion Express Scripts paid up front as part of the initial agreement could be considered in negotiating its new pricing terms.  Doc. 357 ¶¶ 177–90; Doc. 385 ¶¶ 177–90.  According to Express Scripts, the parties also could not agree on the meaning of "competitive benchmark pricing," whether Express Scripts was required to accept unprofitable pricing demands in order to grant Anthem competitive benchmark pricing, the relevance of the first pricing review,[8] and more.  Doc. 355 at 43.  It believes that the most probable outcome of continued hypothetical good faith negotiations would have been an impasse, but that in any event a hypothetical agreement is too speculative for Anthem to prove.  *Id.* at 45.

Anthem responds by arguing that the caselaw Express Scripts cites deals with Type II preliminary agreements and not binding contracts such as the one at hand.  Doc. 387 at 47.  Type

---

[8] For example, Turner noted in a 2011 email leading up to the first 2013 market check that "the survey . . . will find that [Anthem is] lacking in the overall pricing area.  [Anthem] will then take that back to [Express Scripts] and will try to negotiate a better deal but they do not have to accept that."  Doc. 365-13 at 3.  Further, Matt Totterdale, Express Scripts' then-Vice President and General Manager of the Anthem Division, frequently told Anthem that "the pricing in the PBM agreement was a function of the 4.7 billion that had been paid up front."  Doc. 359-22 at 85.  Lastly, Anthem has conceded that the pricing in the first market check was not competitive benchmark pricing.  Doc. 357 ¶ 136.  Whether Anthem could take a different position in regard to the second market check was a matter of dispute between the parties.

19

II agreements are preliminary agreements that do not "commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith." *Tractebel*, 487 F.3d at 98 n.4 (citation omitted). "A party to such a binding preliminary commitment has no right to demand performance of the transaction." *Adjustre Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). As the Court explained above, Section 5.6 only requires good faith negotiation – it does not require that the parties reach ultimate agreement. While the provision is situated within a fully binding service contract, this provision in particular does act as a Type II agreement to renegotiate new pricing terms every three years. Therefore, cases discussing Type II agreements are applicable to this provision and expectancy damages are unavailable.

Anthem's final argument is that it is entitled to restitution damages for "return of the overpayments," which it claims it can prove at trial at an amount of up to $10 billion. Doc. 387 at 50. Express Scripts argues first that restitution damages are procedurally barred, as Anthem has not plead a claim for restitution damages nor mentioned restitution throughout discovery, either in response to interrogatories requesting its bases for damages nor in its expert reports and other disclosures. Doc. 392 at 25. Rule 26(a) of the Federal Rules of Civil Procedure requires parties to provide "a computation of each category of damages claimed by the disclosing party." As discovery has closed without discovery on Anthem's restitution theory and Anthem has not properly claimed restitution damages, it would be prejudicial to Express Scripts for the Court to allow Anthem to seek a new theory of damages after five years of litigation. *See Summit Properties Int'l, LLC v. Ladies Pro. Golf Ass'n*, No. 7 Civ. 10407 (LBS), 2010 WL 4983179, at *3 (S.D.N.Y. Dec. 6, 2010) ("When a party in a contract dispute fails to raise a new theory of damages until after the close of discovery, the prejudice that results to the adversary can be

sufficient to preclude that theory from presentation at trial"); *see also Point Prods. A.G. v. Sony Music Ent., Inc.*, No. 93 Civ. 4001 (NRB), 2002 WL 31856951, at *5 (S.D.N.Y. Dec. 19, 2002) ("[T]he degree of the delay and prejudice [such as the additional discovery that would be needed] . . . is sufficient to preclude [the Plaintiff] from changing its damage theory [] years into this litigation after [the Plaintiff] adopted another theory that it could not support in fact."). Therefore, Anthem's claim for restitution damages is barred.

Ultimately, the Court agrees with Express Scripts. Although, as a general matter, expectancy damages are available for a breach of contract, the law is clear that where the breach is for failure to negotiate in good faith, expectancy damages are not available unless the ultimate agreement that would have been reached at the end of those negotiations is reasonably discernable. Negotiations "can come to an end without a breach by either party. There is such a thing as a good faith impasse; not every good faith negotiation bears fruit." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 15 N.E.3d 329, 332 (N.Y. 2014). While a factfinder could parse Anthem's various suggested methods for calculating damages and arrive at a number, the facts do not suggest that an agreement ultimately would have been reached. Therefore, as a matter of law, Anthem cannot recover the $14.8 billion in expectancy damages, and the motion to dismiss Count I is granted.

## V.   Declaratory Judgment Against Anthem

Express Scripts' third counterclaim against Anthem seeks a declaration that:

(i) [Express Scripts] has no obligation to agree to any new pricing terms proposed by Anthem under Section 5.6 of the PBM Agreement; (ii) [Express Scripts] has no obligation under Section 5.6 of the PBM Agreement to ensure that Anthem is receiving competitive benchmark pricing; and (iii) [Express Scripts'] sole obligation under Section 5.6 is to negotiate in good faith over any proposed new pricing terms submitted by Anthem pursuant to that provision.

21

Doc. 33 ¶ 229.  Express Scripts moves for summary judgment on its third counterclaim.  Doc. 353.

As explained above, Section 5.6 does not obligate Express Scripts to provide competitive benchmark pricing, but merely to negotiate in good faith in the event that Anthem's market analysis shows non-competitive pricing.  Because Express Scripts' third counterclaim is the opposite side of the same coin, its motion for summary judgment on the third counterclaim is granted.

## VI.    Count III of the Complaint

In Count III of the complaint, Anthem alleges breach of contract for operational breaches of several terms of the agreement, including failure to:

> (i) apply correct criteria in processing requests for prior authorization, (ii) satisfy its obligations concerning PDE file submission, processing, management, and reporting and member cost share reconciliation, (iii) satisfy its obligations concerning TATs for processing Medicare Part D Prior Authorization Requests and the associated submission of cases to the Medicare Part D IDE, (iv) timely correct the Super [prior authorization] defects in its claims processing system and reimburse Anthem for claims incorrectly approved by ESI, and (v) address and correct the WRIT Log issues in a timely manner.

Doc. 3 ¶ 105.  Express Scripts moves for summary judgment to dismiss the parts of Count III of the complaint alleging claims involving (1) PDE Data, TATs, and the WRIT Log; and (2) prior authorization requests.  Doc. 353.  The Court will address each issue in turn.

### A.  PDE Data, TATs, and the WRIT Log

Anthem brings a variety of breach of contract claims regarding Express Scripts' Medicare Part D obligations.  Anthem claims that Express Scripts breached Exhibit I Section 4.11 of the agreement "by failing to comply with contractual obligations and CMS requirements concerning the submission, processing, management, and reporting of PDE files, as well as those relating to member cost share reconciliation."  Doc. 3 ¶ 62.  Anthem also claims that Express Scripts has

22

failed to adhere to the required TATs for Medicare Part D and to cure the breaches of its

obligation to forward cases to a CMS-designated Independent Review Entity ("IRE") within 24

hours.  *Id.* ¶¶ 71, 76.  Anthem also alleges that it submitted numerous issues regarding Express

Scripts' failure to perform Medicare Part D obligations to the WRIT Log and that Express

Scripts failed to resolve the issues in a timely manner.  *Id.* ¶¶ 80–81.

Express Scripts argues that Anthem has abandoned its claims involving PDE data, TATs,

and the WRIT Log by not putting forward any evidence of damages.  Doc. 355 at 46.  According

to Express Scripts, Anthem did not claim any damages from TATs or the WRIT Log in response

to an interrogatory, Anthem's employees conceded in a deposition that there were no damages

from PDE data or TATs, its six expert reports do not identify damages, Anthem did not rebut

Express Scripts' expert report that Anthem suffered no damages, and Anthem's counsel told this

Court that Express Scripts' expert report only addressed "issues that are not a part of Anthem's

damages calculation at all."  *Id.*  Accordingly, it argues that the claims should be dismissed due

to failure to demonstrate evidence of damages, citing *Christina Condo. v. Lerner*, 953 N.Y.S.2d

548 (N.Y. Sup. Ct. 2012) (granting motion for summary judgment dismissing breach of contract

claim because plaintiffs failed to provide evidence of damages).

In response, Anthem argues that it sustained injury in the form of "member-abrasion" and

risk of regulatory censure which it spent time and effort to avert.  Doc. 387 at 51.  It argues that

Brit Pim, former president of Express Scripts' Government Programs, admitted in a deposition

that Anthem faced such risks.  *See* Doc. 381-159 at 5, 211:24–212:10 (testifying that Express

Scripts' "TAT misses" would result in Anthem receiving "one star" in relation to turnaround

times from CMS).  Anthem's responses to Express Scripts' Rule 56.1(b) Statement also dispute

Express Scripts' characterization of the damages evidence, as Anthem's prior discovery

responses regarding monetary damages stated that the calculations were not complete.   Doc. 385

at 167.  Anthem further cites cases holding that even where "damages are uncertain, or may not

even exist, [that] is an insufficient reason under New York law to grant Defendant's motion for

summary judgment.  It is a well-settled tenet of contract law that even if the breach of contract

caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured

party is entitled to recover as nominal damages a small sum fixed without regard to the amount

of the loss, if any."  *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, No. 9 Civ. 1796 (GBD),

2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012) (internal quotation marks omitted)

(collecting cases).

Express Scripts responds that Anthem's 56.1(b) statement is an admission that it has not

identified damages, and it cannot avoid dismissal at the summary judgment stage by pointing to

non-monetary injuries such as "member abrasion" or "risk of regulatory censure."  Doc. 392 at

28.  Express Scripts cites cases explicitly finding that "at the summary judgment stage, listing

'categories' of damages is not enough; evidence of the *amount* of such damages (or at least a fair

estimation of same) is necessary."  *New Paradigm Software Corp. v. New Era of Networks, Inc.*,

No. 99 Civ. 12409 (RMB) (AJP), 2002 WL 31749396, at *16 (S.D.N.Y. Dec. 9, 2002) (citations

omitted) (collecting cases).  Express Scripts also notes that *Acumen*, the case Anthem cites to

argue that its claim cannot be dismissed because it can receive nominal damages, is

distinguishable, because in the instant case, Anthem has not plead nominal damages.  *See* Doc. 3

¶ 107 ("As a direct and proximate result of ESI's Operational Breaches, Anthem has been

damaged in an amount to be proven at trial, but not less than $150 million.").  It argues that

Anthem cannot now seek nominal damages to avoid summary judgment.  *See Hammond v. The

Bank of New York Mellon Corp.*, No. 8 Civ. 6060 (RMB) (RLE), 2010 WL 2643307, at *11

(S.D.N.Y. June 25, 2010) (granting motion for summary judgment dismissing claim because plaintiffs did not provide evidence of damages and did not plead nominal damages).

The Court agrees with Express Scripts. Anthem has not proffered any evidence to support its claim for $150 million in damages and cannot now plead nominal damages. For this reason, Express Scripts' motion to dismiss parts of Count III involving PDE Data, TATs, and the WRIT Log is granted.

**B.  Prior Authorization Request Performance Guarantees**

Count III of Anthem's complaint also seeks damages for improperly approved prior authorization requests. Doc. 3 ¶¶ 101–07  Specifically, Anthem alleges that Express Scripts failed to reimburse Anthem for claims Express Scripts incorrectly approved. *Id.* ¶ 105.

Express Scripts moves to dismiss the part of Count III concerning reimbursements for incorrectly approved prior authorizations. Doc. 355 at 51. It argues that it does not owe Anthem reimbursements for any errors because it satisfied the 98% accuracy rate for correct prior authorization determinations that the parties agreed to in the contract. Doc. 355 at 47; Doc. 359-1 at 136, 184. It argues that the chart of performance standards are contractual obligations, and nothing in the contract obligates it to exceed those guarantees. Doc. 359-1 at 84 § 8.1.

Anthem argues that the 98% performance guarantees do not state the extent of Express Scripts' obligations regarding prior authorizations, but rather simply provide monetary penalties for quarters in which accuracy fell below 98%. Doc. 387 at 52. Instead, Anthem argues that Express Scripts' responsibilities regarding prior authorizations are contained in Section 3.7(f)– (g), Section 3.11, and Exhibit B of the contract. Section 3.7(f)–(g) requires Express Scripts to attempt to recover identified overpayments to pharmacies and to credit any recovered overpayments back to Anthem. Doc. 381-2 at 38–39 § 3.7(f)–(g). Section 3.11 is a general

provision requiring Express Scripts to conduct prior authorizations according to the guidance and timeframes that Anthem has specified. *Id.* at 40 § 3.11.  Exhibit B requires Express Scripts to submit various reports to Anthem, including audit reports for the performance guarantees. *Id.* at 116–17.  Anthem also cites to Section 3.1(a) of the contract, which requires Express Scripts to perform its services "in a prudent and expert manner in accordance with this Agreement and all Laws." *Id.* at 24 § 3.1(a).  Lastly, Anthem points to Section 8.2 which notes that the monetary penalties associated with the prior authorization accuracy rates are "in addition to any other remedies available to [Anthem.]" *Id.* at 84 § 8.2.  Anthem argues that the foregoing provisions are relevant to its damages calculation because a contract must be read as a whole, with specific clauses to be read consistently with the overall purpose of the agreement to give meaning to all of its terms. *See, e.g.*, *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, No. 12 Civ. 2897 (ALC) (GWG), 2013 WL 5366068, at *6 (S.D.N.Y. Sept. 25, 2013), *aff'd*, 581 F. App'x 72 (2d Cir. 2014).

Express Scripts argues that Section 3.1 is not applicable because it is a general provision that is not triggered when a more specific provision supplies a more precise standard.  Doc. 355 at 50 (citing *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 751 (N.Y. 2017) (A "specific provision will not be set aside in favor of a catchall clause.")).  It argues that reading Section 3.1 to require 100% accuracy would contravene the rule of construction that "a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Corhill Corp. v. S. D. Plants, Inc.*, 176 N.E.2d 37, 38 (N.Y. 1961) (cleaned up).  Even if Section 3.1 applies, Express Scripts argues that the "prudent and expert" standard only requires reasonable expectations, not perfect results. *See Milau Assocs. v. N. Ave. Dev. Corp.*, 368 N.E.2d 1247, 1250 (N.Y. 1977) (finding an ordinary negligence standard applies to the performance of experts absent an agreement of a higher standard of

performance).  The Court agrees.  In light of the performance standards charts, Doc. 359-1 at 136,

184, which expressly speak to the standards of performance Express Scripts is contractually

obligated to meet with respect to the different types of prior authorizations, Section 3.1 is not

sufficiently specific to impose an obligation relevant to this claim.

　　　Express Scripts also argues that Section 3.11 does not create liability regarding prior

authorizations, as it simply requires it to implement prior authorizations in accordance with

Anthem's Defined Criteria, Doc. 381-2 at 41 § 3.11, while the performance guarantees more

specifically require a specific accuracy rate for "application of Defined Criteria" and "responsiveness

to [D]efined [C]riteria," Doc. 359-1 at 136, 184.  It also argues that Exhibit B is irrelevant, as it

does not address the standard for prior authorization determinations but rather requires Express

Scripts to provide reports, including some related to prior authorizations and performance

guarantees, to Anthem.  Doc. 392 at 31.  The Court agrees that neither of these provisions alter

the specific performance guarantees and associated penalties.

　　　Express Scripts also argues that Section 8.2 does not support Anthem's claim.  Doc. 355 at

50.  It argues that Section 8.2 only concerns remedies and actually incorporates the 98% performance

guarantees, as evidenced by its placement right after Section 8.1, which provides that the

performance guarantees are a "contractual obligation."  *Id.* at 50–51.  Thus, it argues that the 98%

accuracy rate is not altered by Section 8.2, which simply lists additional remedies available for

violations of those 98% accuracy performance guarantees.  The Court agrees that only 98% accuracy

in prior authorizations would be required to avoid monetary penalties.  However, this is beside the

point and does not negate Anthem's claim, which does not seek recovery of monetary penalties

associated with the performance guarantees, but rather claims reimbursement of incorrectly approved

prior authorizations.  These obligations arise under Section 3.7(g).

Express Scripts argues that Section 3.7(g) does not relate to prior authorization determinations at all and instead speaks only to "Claims Processing Services," the title of Section 3.7. *See* Doc. 381-2 at 38 § 3.7(g). However, the plain language of this Section clearly requires it to credit back to Anthem 100% of recovered overpayments. *Id.* ("One hundred percent (100%) of recovered overpayments . . . shall be credited to [Anthem.]"). This is squarely what Count III seeks—"reimburse[ments] . . . for claims incorrectly approved by [Express Scripts]." Doc. 3 ¶ 105. Indeed, Count III does not even mention performance guarantees, as those contractual requirements are separate from the claim at hand. *See id.* ¶¶ 101–06. Section 3.7(g) can be read independently of the 98% accuracy performance guarantees to require Express Scripts to credit Anthem for any recovered overpayments, regardless of the prior authorization accuracy rate achieved. Sections 3.7 and the performance guarantees do not conflict – it is possible for Express Scripts to both be bound to 98% performance guarantees to avoid monetary penalties and also to credit Anthem with recovered overpayments it identified through audits. Therefore, Anthem is contractually entitled to recovered overpayments regardless of whether Express Scripts satisfied the 98% performance guarantees.

However, at this time Anthem has not shown any entitlement to *unrecovered* overpayments. Therefore, its claim would appear to be limited to credit for overpayments that Express Scripts recovered after identifying the overpayments through the audits required by Section 3.7.

For these reasons, Express Scripts' motion to dismiss this portion of Count III is denied.

**VII.** <u>**Conclusion**</u>

For all these reasons, Express Scripts' partial motion for summary judgment is GRANTED in part as to Count I, Count II, Count III's claims involving PDE Data, TATs, and the WRIT Log, and its third counterclaim, and DENIED in part as to Count III's claim for reimbursements for improperly approved prior authorizations.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 353.

SO ORDERED.

Dated:    March 31, 2022
          New York, New York

_____
    Edgardo Ramos, U.S.D.J.

SPA-30

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHEM, INC., | |
| Plaintiff, | Civil Action No. 16 Civ. 2048 |
| v. | Hon. Edgardo Ramos |
| EXPRESS SCRIPTS, INC., | **FINAL JUDGMENT** |
| Defendant. | |

On March 21, 2016, Plaintiff Anthem, Inc. ("Anthem") commenced the above-captioned action by filing a Complaint (ECF No. 3), asserting five claims against Express Scripts, Inc. ("Express Scripts," together with Anthem, "the Parties").  Express Scripts filed its Answer and Counterclaims on April 19, 2016 (ECF No. 18) and an Amended Answer and Counterclaims on June 13, 2016, asserting six claims against Anthem (ECF No. 33).

By Opinion and Order dated March 23, 2017 (ECF No. 49), the Court dismissed Counterclaims II and VI of Express Scripts' Amended Answer and Counterclaims with prejudice.

By Opinion and Order dated March 31, 2022 (ECF No. 396) (the "March 31, 2022 Decision"), the Court (i) granted summary judgment dismissing Counts I and II of Anthem's Complaint and in favor of Express Scripts on Count III of Express Scripts' Amended Answer and Counterclaims, and (ii) granted in part and denied in part summary judgment dismissing Count III of Anthem's Complaint.

Subject to certain reservations of rights reiterated below, the Parties previously stipulated to dismiss with prejudice Counts IV and V of Anthem's Complaint, and Counts I, IV, and V of Express Scripts' Amended Answer and Counterclaims.  (ECF No. 347, 451.)  On November 1, 2023, the Parties settled and stipulated to dismiss with prejudice Count III of Anthem's Complaint, the only claim in the above-captioned proceeding that had not been disposed of by Court order or by stipulation.  In

SPA-31

connection therewith, the Parties have jointly stipulated to entry of this Final Judgment to account for the disposition of each claim.

**NOW, THEREFORE,** it is hereby:

**ORDERED AND ADJUDGED** that judgment is entered in favor of Anthem and against Express Scripts on Counts II and VI of Express Scripts' Amended Answer and Counterclaims with prejudice pursuant to the Opinion and Order of this Court dated March 23, 2017 (ECF No. 49);

**FURTHER ORDERED AND ADJUDGED** that judgment is entered in favor of Express Scripts on Count III of Express Scripts' Amended Answer and Counterclaims and against Anthem on Counts I and II of Anthem's Complaint with prejudice pursuant to the March 31, 2022 Decision (ECF No. 396);

**FURTHER ORDERED AND ADJUDGED** that, pursuant to the above referenced stipulations of the parties, (i) Counts III, IV and V of Anthem's Complaint are dismissed with prejudice, and (ii) Counts I and IV of Express Scripts' Amended Answer and Counterclaims are dismissed without prejudice and Count V thereof is dismissed with prejudice (ECF No. 347, 451);

**FURTHER ORDERED AND ADJUDGED** that this judgment constitutes a final judgment as to all claims asserted in this action by Anthem against Express Scripts and by Express Scripts against Anthem, and the Parties shall pay their own respective attorneys' fees and costs;

**FURTHER ORDERED AND ADJUDGED** that this judgment is rendered subject, and without prejudice, to Anthem's right to appeal any and all orders of this Court with respect to Counts I and II of Anthem's Complaint, including, without limitation, this Court's March 31, 2022 Decision, and Count III of Express Scripts' Amended Answer and Counterclaims;

**FURTHER ORDERED AND ADJUDGED** that pursuant to this Court's March 14, 2023 Order (ECF No. 451), Express Scripts may reinstate Counts I and IV of its Amended Answer and

SPA-32

Counterclaims only if the Court's March 31, 2022 Decision is vacated or reversed on appeal.

**SO ORDERED** this 13th day of November, 2023.
New York, New York

_____

UNITED STATES DISTRICT JUDGE
HONORABLE EDGARDO RAMOS