# 23-8020-cv

## United States Court of Appeals

*for the*

## Second Circuit

ANTHEM, INC.,

*Plaintiff-Appellant,*

— v. —

EXPRESS SCRIPTS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

ELLISON WARD MERKEL
QUINN EMANUEL URQUHART
  &amp; SULLIVAN, LLP
51 Madison Avenue, 22nd floor
New York, New York 10010
(212) 849-7000

ALEX H. LOOMIS
QUINN EMANUEL URQUHART
  &amp; SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

DEREK L. SHAFFER
JONATHAN G. COOPER
MICHAEL J. LYLE
QUINN EMANUEL URQUHART
  &amp; SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellee*

 (800) 4-APPEAL • (331307)

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellee states as follows:  The sole parent of Express Scripts, Inc., is Evernorth Health, Inc. All interests in Evernorth Health, Inc., are held by The Cigna Group, a publicly traded company.  The Cigna Group has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

Dated: July 24, 2024                    */s/ Derek L. Shaffer*
                                        Derek L. Shaffer

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE...............................................................5

    A.    The Parties ...........................................................................5

    B.    The 2009 Transaction And The Upfront Payment...............6

    C.    Section 5.6 Of The Agreement And Its Drafting History ...10

    D.    The First Market Check...........................................14

    E.    The Second Market Check ......................................15

    F.    This Case And The Summary Judgment Order Below......................21

SUMMARY OF ARGUMENT .........................................................24

STANDARD OF REVIEW ...............................................................27

ARGUMENT .....................................................................................28

I.    THE DISTRICT COURT CORRECTLY RULED THAT EXPRESS SCRIPTS WAS NOT REQUIRED TO PROVIDE COMPETITIVE BENCHMARK PRICING UNDER SECTION 5.6.....................................28

    A.    Section 5.6's Plain Text Unambiguously Required Express Scripts Only To Negotiate In Good Faith. ...........................29

    B.    Anthem's Reading Of Section 5.6's Text Is Plainly Incorrect. ..........33

    C.    Even If Section 5.6 Were Ambiguous (It Is Not), The Extrinsic Evidence Proves Express Scripts' Reading As A Matter Of Law. ...........................................................................39

II.    THE DISTRICT COURT CORRECTLY RULED THAT ANTHEM COULD NOT PROVE DAMAGES. ..................................................46

    A.    Anthem Cannot Recover Expectation Damages. ................47

        1.    Expectation Damages Are Categorically Unavailable For A Breach Of A Duty To Negotiate In Good Faith....................47

2. At Minimum, Expectation Damages Were Impermissibly Speculative Here. ....................................................53

B. Anthem Cannot Recover Restitution Damages. .................................58

CONCLUSION ........................................................................................62

CERTIFICATE OF COMPLIANCE ......................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*180 Water St. Assocs., L.P. v. Lehman Bros. Holdings, Inc.*,
   7 A.D.3d 316 (1st Dep't 2004) ............................................................49

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
   145 F.3d 543 (2d Cir. 1998) ........................................................31, 32

*Am. Food & Vending Corp. v. Amazon.com, Inc.*,
   214 A.D.3d 1153 (3d Dep't 2023) ......................................................37

*In re AmTrust Fin. Corp.*,
   694 F.3d 741 (6th Cir. 2012) .............................................................34

*In re Anthem-Cigna Merger Litig.*,
   2020 WL 5106556 (Del. Ch. Aug. 31, 2020) ....................................45

*Aramony v. United Way of Am.*,
   254 F.3d 403 (2d Cir. 2001) ..............................................................38

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
   884 F.2d 69 (2d Cir. 1989) ................................................................53

*Bank of N.Y. v. First Millennium, Inc.*,
   607 F.3d 905 (2d Cir. 2010) ..............................................................31

*Bausch & Lomb Inc. v. Bressler*,
   977 F.2d 720 (2d Cir. 1992) ..............................................................61

*Cambridge Cap. LLC v. Ruby Has LLC*,
   675 F. Supp. 3d 363 (S.D.N.Y. 2023) ..................................51, 53, 54

*Design Strategy, Inc. v. Davis*,
   469 F. 3d 284 (2d Cir. 2006) .............................................................60

*Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*,
   631 F.3d 42 (2d Cir. 2011) ................................................................46

*Doe v. Express Scripts, Inc.*,
   837 F. App'x 44 (2d Cir. 2020) ............................................................9

*Endurance Am. Specialty Ins. v. Century Sur. Co.*,
    46 F. Supp. 3d 398 (S.D.N.Y. 2014) ..................................................32

*In re Express Scripts/Anthem ERISA Litig.*,
    285 F. Supp. 3d 655 (S.D.N.Y. 2018) ..........................................28, 29

*F.D.I.C. v. Nat'l Union Fire Ins. of Pittsburgh, PA*,
    205 F.3d 66 (2d Cir. 2000) ...........................................................46

*Fairbrook Leasing, Inc. v. Mesabi Aviation, Inc.*,
    519 F.3d 421 (8th Cir. 2008) ...............................................54, 56, 58

*Fairchild Corp. v. New York*,
    169 A.D.3d 643 (2d Dep't 2019) ...................................................31

*FBI v. Fikre*,
    601 U.S. 234 (2024)....................................................................35

*Fisher v. SD Prot. Inc.*,
    948 F.3d 593 (2d Cir. 2020) .........................................................34

*Futuresource L.L.C. v. Reuters Ltd.*,
    312 F.3d 281 (7th Cir. 2002) ........................................................35

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992) .........................................................38

*Goodstein Const. Corp. v. City of New York*,
    80 N.Y.2d 366 (1992)...............4, 5, 23, 26, 47, 48, 49, 50, 51, 52, 53, 54, 56, 61

*High Point SARL v. Sprint Nextel Corp.*,
    2012 WL 3202696 (D. Kan. Aug. 3, 2012) ......................................34

*IDT Corp. v. Tyco Grp., S.A.R.L.*,
    23 N.Y.3d 497 (2014) .......................................................2, 23, 24, 31

*Jordan Panel Sys., Corp. v. Turner Constr. Co.*,
    45 A.D.3d 165 (1st Dep't 2007) ...................................................30

*L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ....................................................27, 37

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011) 2, 4, 5, 23, 26, 31, 32, 48, 49, 51, 52, 54, 56, 61, 62

*La Chemise Lacoste v. Alligator Co.*,
  59 F.R.D. 332 (D. Del. 1973) ...................................................45

*LaSalle Talman Bank, F.S.B. v. United States*,
  317 F.3d 1363 (Fed. Cir. 2003) ..............................................61

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
  639 F.3d 63 (2d Cir. 2011) .....................................................28

*Mgmt. Recruiters of Boulder v. Nat'l Econ. Rsch. Assocs., Inc.*,
  2005 WL 77059 (S.D.N.Y. Jan. 13, 2005) .............................44

*Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines Co.*,
  2013 WL 3326662 (S.D.N.Y. June 27, 2013) ...................38, 39

*Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*,
  348 F.2d 693 (2d Cir. 1965) ...................................................52

*Northern Shipping Funds I, L.L.C. v. Icon Cap. Corp.*,
  998 F. Supp. 2d 301 (S.D.N.Y. 2014) ....................................59

*Omni Quartz, Ltd. v. CVS Corp.*,
  287 F.3d 61 (2d Cir. 2002) .....................................................28

*Outlet Embroidery Co. v. Derwent Mills, Ltd.*,
  254 N.Y. 179 (1930) ...............................................................35

*P.A. Bergner & Co. v. Martinez*,
  823 F. Supp. 151 (S.D.N.Y. 1993) .........................................32

*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006) ...................................................59

*Point Prods. A.G. v. Sony Music Ent., Inc.*,
  2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) ......................60

*Potelco, Inc. v. Washington State Dep't of Lab. & Indus.*,
  2018 WL 332972 (Wash. App. 2018) .....................................36

*Prot. & Advoc. For Persons With Disabilities, Conn. v. Mental Health*
   *& Addiction Servs.*,
   448 F.3d 119 (2d Cir. 2006) ................................................... 37

*Quadrant Structured Products Co. v. Vertin*,
   23 N.Y.3d 549 (2014) .............................................................. 42

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
   751 F.2d 69 (2d Cir. 1984) ..................................................... 30

*Red Tree Invs., LLC v. Petroleos de Venez., S.A.*,
   82 F.4th 161 (2d Cir. 2023) ................................................... 27

*Reilly v. Reem Contracting Corp.*,
   380 F. App'x 16 (2d Cir. 2010) ............................................... 44

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
   7 F.3d 1091 (2d Cir. 1993) ..................................................... 28

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) ................................................... 58

*SCS Comms., Inc. v. Herrick Co.*,
   360 F.3d 329 (2d Cir. 2004) ................................................... 39

*Seabury Const. Corp. v. Jeffrey Chain Corp.*,
   289 F.3d 63 (2d Cir. 2002) ..................................................... 38

*Sewkarran v. DeBellis*,
   11 A.D.3d 446 (2d Dep't 2004) ............................................... 46

*SIGA Techs., Inc. v. PharmAthene, Inc.*,
   132 A.3d 1108 (Del. 2015) ..................................................... 51

*SIGA Techs., Inc. v. Pharmathene, Inc.*,
   67 A.3d 330 (Del. 2013) ......................................................... 51

*Springwood Assocs. v. Lumpkin*,
   606 N.E.2d 733 (Ill. Ct. App. 1992) ....................................... 36

*Summit Properties Int'l, LLC v. Ladies Pro. Golf Ass'n*,
   2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010) ........................... 60

*Teachers Ins. & Annuity Assn. of Am. v. Tribune Co.*,
    670 F. Supp. 491 (S.D.N.Y. 1987) ....................................................32

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) .................................................44, 52, 58

*United States v. Hamdi*,
    432 F.3d 115 (2d Cir. 2005) .........................................................38

*United States v. Massey*,
    2024 WL 1266347 (2d Cir. Mar. 26, 2024).....................................35

*Villetti v. Guidepoint Glob. LLC*,
    2022 WL 2525662 (2d Cir. July 7, 2022).......................................41

*Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*,
    423 F.3d 145 (2d Cir. 2005) .........................................................38

*Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*,
    112 A.D.3d 78 (1st Dep't 2013) ...................................................30

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*,
    2006 WL 236818 (S.D.N.Y. Jan. 17, 2006) ..................................61

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ...........................................................57

*Westerbeke Corp. v. Daihatsu Motor Co.*,
    304 F.3d 200 (2d Cir. 2002) .........................................................49

## <u>Rules</u>

Fed. R. Civ. P. 26(e)...........................................................................60

Fed. R. Civ. P. 37(c)(1).......................................................................59

Fed. R. Civ. P. 56(a)...........................................................................27

Fed. R. Civ. P. 56(c)(2).......................................................................45

Southern District of New York L.R. 56.1 .......................................40, 55

## <u>Other Authorities</u>

Antonin Scalia & Bryan Garner, Reading Law:  The Interpretation of
Legal Texts (2012) ...................................................................................37

Restatement (Third) of Restitution and Unjust Enrichment § 38(1) &
cmt. a (2011) ..........................................................................................61

## PRELIMINARY STATEMENT

In 2009, Anthem and Express Scripts struck a deal in which Express Scripts paid Anthem $4.675 billion in exchange for (1) NextRx, Anthem's troubled in-house pharmacy benefit manager (**PBM**), and (2) a 10-year agreement to be Anthem's exclusive PBM (**Agreement**). To obtain $4.675 billion upfront, Anthem made the calculated decision to pay higher prices for prescription drugs throughout the Agreement's 10-year term than it would have with a smaller upfront payment.

Anthem brought this lawsuit to rewrite the deal, claiming entitlement to *both* the $4.675 billion upfront payment *and* billions of dollars in lower prescription drug prices under the Agreement. It contends (Br. 1) that Section 5.6 of the Agreement required Express Scripts "to provide Anthem with competitive pricing through the term of the Agreement." It then seeks expectation damages equal to the difference between (1) the pricing terms in the Agreement and (2) its own estimate of the "competitive benchmark pricing" that, it claims, Express Scripts had to provide.

After years of litigation, the district court (Ramos, J.) concluded at summary judgment that Anthem's claims fail as a matter of law, based on the Agreement's plain text and longstanding New York law. This Court should affirm.

*First*, as the district court held, the plain terms of Section 5.6 unambiguously provide that Express Scripts' one—and only—obligation was *to negotiate in good faith* over new pricing terms proposed by Anthem. The parties extensively

1

negotiated over new pricing terms, but they did not reach agreement—and there was no obligation to do so. A duty to negotiate in good faith does "not commit the parties to reach their ultimate contractual objective." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "There is such a thing as a good faith impasse." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 23 N.Y.3d 497, 503 (2014). Anthem's contrary interpretation—that Section 5.6 guaranteed it new pricing terms—is fabricated out of whole cloth to reap a windfall.

Because the text of Section 5.6 is clear, the district court correctly concluded that there is no reason to examine extrinsic evidence. But, as the district court also observed, if the extrinsic evidence is considered, it overwhelmingly confirms that the only obligation Section 5.6 imposed on Express Scripts was to negotiate in good faith over new pricing terms. Anthem knew that Express Scripts would pay $4.675 billion upfront only if it believed it could make enough money back through the Agreement's pricing terms to earn a return on its significant upfront payment. That tradeoff—between the upfront payment and the pricing terms—that Anthem eagerly made to get its hands on $4.675 billion in 2009, was central to the deal and baked into the structure of the entire transaction.

The initial drafts of Section 5.6 that Anthem proposed would have entitled it to new pricing terms every 3 years and would even have entitled Anthem to make unilateral changes to the pricing terms. Express Scripts flatly rejected this approach.

It explained that such a provision would make it impossible to model its expected return—and therefore make it impossible for Express Scripts to pay $4.675 billion upfront.  Accordingly, the parties agreed on a version of Section 5.6 that allowed Anthem to propose new pricing terms, which the parties had to negotiate over in good faith.  But Anthem had no right to impose new pricing terms.  To the contrary, the plain language of Section 5.6 expressly provided that it would be up to Express Scripts alone whether any proposed new pricing terms took effect.  In this way, the structure of Section 5.6 aligned with the transaction's structure; it enabled Express Scripts to have sufficient certainty about pricing over the deal's 10-year term to be able to model its expected return and agree to a colossal $4.675 billion upfront payment.

Besides the unambiguous plain language and the drafting history, the parties' course of conduct also confirms that Express Scripts' only obligation under Section 5.6 was to negotiate in good faith.  Between 2009 and 2013, Anthem personnel consistently acknowledged that Section 5.6 did not obligate Express Scripts to agree to new pricing terms.  All that changed in 2014, when Anthem hired new executives who concluded that Section 5.6 had no "teeth."  They proposed drastic revisions to Section 5.6 that would enable Anthem to terminate the Agreement if Express Scripts did not capitulate to Anthem's pricing demands.  Only after Express Scripts rejected these proposed revisions did Anthem begin to argue that Section 5.6 entitled it to

3

new pricing terms anyway. The district court correctly rejected Anthem's newfound interpretation as contrary to the unambiguous text of Section 5.6 and (though it was unnecessary to consider) to the undisputed extrinsic evidence.

*Second*, as the district court held, New York law (which governs the Agreement) forecloses the expectation damages Anthem seeks. Even assuming Express Scripts negotiated in bad faith (which Express Scripts vigorously disputes), the New York Court of Appeals has squarely held that it is impermissibly speculative for a plaintiff to claim damages based on what it expects to have earned under a non-existent contract that the parties hypothetically would have agreed to had they negotiated in good faith. *Goodstein Const. Corp. v. City of New York*, 80 N.Y.2d 366, 372-75 (1992); *accord, e.g.*, *L-7 Designs*, 647 F.3d at 431. This is so because it cannot be known whether, in a hypothetical good-faith negotiation, the parties would have reached agreement and, if so, on what terms. Despite *Goodstein* being the controlling authority on this issue, and despite the district court's express reliance on *Goodstein*, Anthem does not even mention *Goodstein* in its appellate brief.

The *Goodstein* rule is especially applicable here. Myriad disputes, and billions of dollars on hundreds of pricing terms, *undisputedly* divided Anthem and Express Scripts when the parties negotiated new pricing terms in 2015-2016. *Goodstein* precludes Anthem from prophesizing that good-faith negotiations were destined to bridge this divide and yield an ascertainable agreement.

4

Anthem's repeated claim on appeal that the district court improperly resolved genuine issues of disputed fact is thus incorrect and a sideshow. The district court ruled as it did based on the unambiguous language of Section 5.6 and longstanding precedent, such as *Goodstein* and *L-7 Designs*. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether Section 5.6 required Express Scripts to guarantee Anthem competitive benchmark pricing or instead required Express Scripts to negotiate in good faith over Anthem's proposed pricing terms.

2. Whether New York law bars expectation damages for an alleged breach of a duty to negotiate in good faith over new contract terms.

## STATEMENT OF THE CASE

### A. The Parties

Plaintiff-Appellant Anthem, Inc. (sometimes called **WellPoint**, its prior name, or **WLP**), offers health care plans to employers and individuals, and it also contracts with self-funded plans to administer their plans and negotiate prices with health care providers. CA-272(¶¶1-2).[1]

Defendant-Appellee Express Scripts, Inc. (sometimes called **ESI**), provides PBM services. CA-273(¶5). PBMs serve as intermediaries between health plans

---

[1] "CA-##" refers to Anthem's Confidential Appendix; "A-##" refers to Anthem's Appendix; "SA-##" refers to Express Scripts' Confidential Supplemental Appendix; and "SPA-##" refers to the Special Appendix.

and pharmacies. CA-273(¶6). When a plan member fills a prescription at a pharmacy, the PBM reimburses the pharmacy for the prescription, less the amount of the member's copayment. CA-273-74(¶7). The plan then reimburses the PBM. *Id.* The amount that a plan pays a PBM for prescription drugs is a matter of contract between a plan and a PBM, and it may exceed a PBM's payment to a pharmacy. *Id.* That difference generates a profit for PBMs. *Id.*

### B. The 2009 Transaction And The Upfront Payment

Before 2009, Anthem relied on NextRx, its in-house PBM, to provide PBM services to Anthem's plan members. CA-272-73(¶¶3-4).

In 2009, Express Scripts and Anthem completed a transaction (the **Transaction**) in which (1) Express Scripts purchased NextRx, and (2) the parties executed the Agreement by which Express Scripts became Anthem's exclusive PBM for 10 years (2009-2019). CA-274(¶8). As part of the Transaction, Express Scripts paid Anthem $4.675 billion. *Id.*(¶9).

The Transaction originated in 2008, when Anthem retained Bank of America to advise on what to do with the struggling NextRx. CA-275-76(¶¶10-13). One of the options Bank of America presented was to sell NextRx to a PBM and sign a long-term contract with that PBM. CA-277(¶14). Anthem gravitated towards this option because it wanted a large "all cash" upfront payment "during the great recession," allowing Anthem to "buy back a bunch of [its] shares." SA-228; *see* SA-1035; SA-

1124; CA-278-280(¶¶17-20). In turn, the purchaser would take on the risk of trying to recover its upfront payment over the span of a long-term deal. CA-330(¶104).

In December 2008, Anthem solicited bids from CVS, Express Scripts, Medco, and Walgreens to purchase NextRx. CA-280(¶21). Anthem requested that each bid include (1) an upfront payment and (2) the prices Anthem would pay for prescription drugs under a "long-term commercial contract." A-332-33. Anthem told the bidders that it "*understands that the Purchase Price will be dependent on the terms of the Commercial Contract*." A-332 (emphasis added); CA-281(¶23).

Express Scripts' opening bid included two options for a 10-year deal. SA-981. As the chart below shows, Option 1 offered a higher upfront payment ($4 billion) than Option 2 ($500 million); correspondingly, Option 1 offered lower discounts on prescription-drug prices (*e.g.*, a 19.2% discount on retail branded drugs) than Option 2 (a 20.8% discount), which meant Anthem would pay higher prices under Option 1:

**Key Financial Considerations**

The following table summarizes certain key financial terms for each option:

| | Option 1: Higher Up-Front Consideration | Option 2: Lower Up-Front Consideration |
|---|---|---|
| Up-Front Consideration | $4 Billion | $500 Million |
| Retail Brand Discount | 19.2% | 20.8% |
| Retail Generic Discount | 64.6% | 72.0% |
| Retail Dispensing Fee | $1.25 | $1.00 |
| Mail Brand Discount | 27.7% | 30.1% |
| Mail Generic Discount | 68.3% | 76.8% |
| Mail Dispensing Fee | $0.00 | $0.00 |
| CuraScript/Specialty Discount | Average 19.0% | Average 20.0% |
| Medicare Admin Fee (pass through) | $0.80 | $0.80 |

Notes:
Pricing reflects average for 10-year contract, which includes annual price improvements.
Retail discounts based on 10-year average commercial pricing as provided in Pricing Exhibits.
Rebates estimated based on Express Scripts National Preferred Formulary as detailed in Pricing Exhibits.

*Id.* (highlights added). Express Scripts' proposals reflected its view that the larger the upfront payment, the higher the prices it had to charge Anthem to earn a reasonable return on its investment. *See id.*

Anthem likewise knew in 2009 that the larger the upfront payment, "the more [it would] have to pay for prescription drugs." SA-305. Ken Goulet, Anthem's President of Commercial Business, testified "there was a trade" between "up-front payment and discounts." SA-577; *see* SA-567. Bank of America also recognized this "inverse[]" relationship between upfront payment and drug prices. SA-1134; *see* CA-283(¶26).

By March 2009, Anthem resolved to seek at least $4 billion upfront, even though this would lead to "a pretty significant reduction" in pricing discounts (that is, higher price terms). SA-1116; *see* CA-294(¶¶41-42). Anthem chose Express

8

Scripts' $4 billion offer to get more cash upfront, eschewing billions of more in savings it would have received under the $500 million offer. SA-1116; SA-309; SA-1053; *see also Doe v. Express Scripts, Inc.*, 837 F. App'x 44, 47 (2d Cir. 2020) ("Anthem chose the latter option.").

Shortly after, Anthem and Express Scripts reached agreement on the pricing terms and a $4.675 billion upfront payment. CA-301(¶54). In December 2009, the Transaction closed, and the parties executed the Agreement. CA-305-06(¶¶60-61). Exhibit A of the Agreement codified over 290 separate pricing terms for all 10 years, which the excerpt below shows in part:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXHIBIT A** | | | | | | | | | | | |
| **FEES AND PRICING** | | | | | | | | | | | |
| <u>Administrative Fees, Pharma Revenue Guarantees, Net Effective Discount Guarantees and Net Effective Dispensing Fee Guarantees</u> | | | | | | | | | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Retail | | | | | | | | | | | |
| Commercial Branded Discount | 12.61% | 13.65% | 13.65% | 13.65% | 13.65% | 14.17% | 14.17% | 14.69% | 14.69% | 15.21% | 15.21% |
| Commercial Generic Discount | 63.96% | 66.96% | 66.96% | 67.46% | 67.96% | 67.96% | 68.46% | 68.46% | 68.96% | 68.96% | 69.46% |
| Commercial Branded Dispensing Fee | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 | $ 1.44 |
| Commercial Generic Dispensing Fee | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 | $ 1.89 |
| Commercial Admin Fee per Paid Claim | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |

CA-510.

For years after the Transaction closed, Anthem personnel acknowledged that Anthem "knowingly traded discounts versus the one-time payment." SA-1153. For example, in September 2009, one Anthem vice president acknowledged that Anthem did not "have the best pricing in industry since we chose to take the deal as a package and wanted to protect the upfront." SA-1144. Similarly, Mr. Goulet wrote three

9

years later that "while the multi-year ESI contract did improve rates from the base of NextRx, they were still short of market competitiveness." SA-1153.

### C. Section 5.6 Of The Agreement And Its Drafting History

Section 5.6 of the Agreement governs periodic pricing reviews. It provides:

**5.6 Periodic Pricing Review**. Wellpoint or a third party consultant retained by Wellpoint will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that Wellpoint is receiving competitive benchmark pricing. In the event Wellpoint or its third party consultant determines that such pricing terms are not competitive, Wellpoint shall have the ability to propose renegotiated pricing terms to PBM and Wellpoint and PBM agrees to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.

SA-74. The parties spent months negotiating this clause.

Anthem first proposed this provision (originally Section 5.7) in February 2009. CA-311-12(¶¶71-72). Its initial draft empowered Anthem to "renegotiate the pricing terms of this Agreement" every three years if it or a consultant determined, based on a "market analysis," that the "pricing terms are not competitive":

**5.7 Periodic Pricing Review**. Wellpoint or a third party consultant retained by Wellpoint will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that Wellpoint is receiving a competitive benchmark pricing. In the event Wellpoint or its third party consultant determines that such pricing terms are not competitive, Wellpoint shall have the ability to renegotiate the pricing terms of this Agreement.

CA-312(¶72).

10

Express Scripts responded by deleting this provision, CA-315(¶81), because, as it told Anthem, changing pricing "every 3 years makes any pricing agreed to up-front short term and puts any return on up-front consideration [*i.e.*, the $4.675 billion payment] at risk."  CA-108; *see* CA-312-14(¶¶73-78).  One of Anthem's lead negotiators conceded that Express Scripts had a "valid point."  CA-313(¶75).

Anthem circulated a new draft that reinserted the provision, but replaced the language giving Anthem a right to "renegotiate the pricing terms" with language permitting Anthem only to "propose" new pricing terms, which the parties would "negotiate in good faith over."  CA-116-17.  It also provided, in a new third sentence, that "[n]otwithstanding the foregoing," "any new pricing terms" would be "effective" only if "mutually agreed to in writing by the parties."  CA-117.  Last, Anthem proposed a new paragraph (b) that allowed Anthem to "make a unilateral adjustment" to pricing terms, so long as it was "budget neutral to" Express Scripts.  SA-1112-13; CA-316-17(¶83).  Even if Express Scripts disagreed that a unilateral adjustment was "budget neutral," paragraph (b) mandated that Express Scripts "shall agree to the adjustment" and that "the relevant pricing terms of this Agreement shall be amended" if an independent auditor decided it was "budget neutral."  SA-1112-13.  Below is Anthem's redlined March 20 draft:

**5.7 Periodic Pricing Review.**

(a) WellPoint or a third party consultant retained by WellPoint will conduct a market analysis every three (3) years during the Term of this

11

Agreement to ensure that WellPoint is receiving a competitive benchmark pricing. In the event WellPoint or its third party consultant determines that such pricing terms are not competitive, WellPoint shall have the ability to ~~renegotiate the pricing terms of this Agreement~~ propose renegotiated pricing terms to PBM and WellPoint and PBM agree to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be mutually agreed to in writing by the parties.

(b) In addition to the market analysis provided for in Section 5.7(a), WellPoint shall have the right, from time to time, to make a unilateral adjustment to the retail, mail, and/or Specialty Drug discount guarantees set forth in Exhibit A in a manner that is budget neutral to the PBM. For this purpose, "budget neutral" shall mean that the adjustment will not reduce the aggregate dollar amount reasonably expected to be received by PBM with respect to retail, mail, and Specialty Drugs purchased under this Agreement. If the Parties cannot mutually agree upon whether an adjustment proposed by WellPoint is budget neutral, then the Parties will retain an independent third party auditor mutually acceptable to the Parties to determine whether the proposed adjustment is budget neutral. The cost of such independent third party auditor will be shared equally between the parties. If the third party auditor determines that the adjustment proposed by WellPoint is budget neutral, PBM shall agree to the adjustment and the relevant pricing terms of this Agreement shall be amended.

CA-116-17 (colors added).

Express Scripts struck this draft provision again. CA-317-18(¶84). Express Scripts' General Counsel explained to Anthem that the provision "needed to be changed so that it was Express Scripts that had the ultimate say-so on whether or not any new pricing would take effect." SA-368-69.

Anthem then sent a new draft that implemented Express Scripts' request by revising the first paragraph's final sentence:

12

> 5.6~~5.7~~ Periodic Pricing Review. (a) WellPoint or a third party consultant retained by WellPoint will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that WellPoint is receiving competitive benchmark pricing. In the event WellPoint or its third party consultant determines that such pricing terms are not competitive, WellPoint shall have the ability to propose renegotiated pricing terms to PBM and WellPoint and PBM agree to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be ~~mutually~~ agreed to by PBM in writing ~~by the parties~~.

SA-1120-21 (colors added). But Anthem's new draft kept paragraph (b), allowing the unilateral, budget-neutral adjustments. SA-1121.

The next day, Express Scripts accepted the first paragraph of Section 5.6 with Anthem's latest edits, but deleted paragraph (b). CA-321(¶88). That became the final version of Section 5.6 that the parties executed. CA-321-22(¶¶89-90).

Unlike Anthem's earlier drafts, the final text of Section 5.6 does not entitle Anthem to "renegotiate the pricing terms" or to make a "unilateral adjustment" to the pricing terms, nor does it mandate that Express Scripts "shall agree" to proposed pricing adjustments or that the "Agreement shall be amended" even if it does not agree. *Id.*

The final version of Section 5.6 refers to "competitive benchmark pricing." The Agreement does not define that term, and the parties disagree about its meaning. CA-381-82(¶¶191-93). But solely for purposes of summary judgment, Express Scripts did not dispute Anthem's contention that "competitive benchmark pricing"

means that Anthem was entitled to "the most favorable pricing, in the PBM marketplace." SPA-3 n.1 (citation omitted).

### D. The First Market Check

In mid-2012, Anthem's pricing consultants determined that the Agreement's pricing terms were not competitive in the market for large health plans. CA-343(¶¶119-21). They estimated that Anthem's pricing for 2012-2019 was billions of dollars higher than market pricing. *Id.*

In January 2013, Anthem commenced the first periodic pricing review under Section 5.6 (**First Market Check**). SA-1169. Anthem stated that it had "completed its contractual right to a 'market analysis'" under Section 5.6, set forth its consultants' analysis of "market competitive rates," and expressed "concern" that its Exhibit A commercial rates were "approximately 400-500 [basis points] less competitive than all other group comparisons." SA-1170; SA-1172. But Anthem did not ask Express Scripts to improve the commercial pricing to match the market, did not request "competitive benchmark pricing," and did not claim a right to receive such pricing. SA-448; SA-671-72. Instead, Anthem stated that Express Scripts could "meet its contractual obligation" by agreeing to continue providing "exception pricing" for its commercial business. SA-1172. "Exception pricing" was a process by which Anthem could request more favorable pricing from Express Scripts on a one-off basis for a particular client. CA-347(¶125).

Anthem's internal emails leading up to the market check recognized that Anthem had the right only to "try to negotiate a better deal but [Express Scripts] do[es] not have to accept that." SA-1150. Indeed, Anthem acknowledged that the parties might "disagree[] over what constitutes 'competitive benchmark pricing'"; that it was possible Express Scripts "negotiates in good faith (as required by the contract) but doesn't end up agreeing to anything"; and that Express Scripts might "insist[] on factoring in the $4.7B NextRx sale price" into the pricing negotiations. SA-1162.

Following negotiations, Express Scripts agreed in writing to provide Anthem exception pricing—not "competitive benchmark pricing," as Anthem defines that term. CA-351-52(¶¶134-36).

### E. The Second Market Check

In 2014, Anthem began preparing for Section 5.6's second periodic pricing review (**Second Market Check**). CA-352(¶137). Three new Anthem executives—President of Pharmacy Brian Griffin, COO of Pharmacy Deepti Jain, and General Counsel Thomas Zielinski—ran the Second Market Check for Anthem. CA-352-53(¶¶138-40); SA-927-29. None of them had been involved in the 2009 Transaction or the First Market Check. CA-354(¶¶143-44).

Anthem's new executives were dissatisfied with Section 5.6, which Mr. Griffin and others concluded had no "teeth." SA-1181. In 2014, Anthem's

consultant concluded that Section 5.6 had "[f]airly loose language that does not obligate [Express Scripts] to implement competitive pricing." SA-1231. Anthem prepared an internal "contractual wish list" that included as a "must have" a "market check with 'teeth' to be performed annually." SA-1191. In August 2014, Anthem pressed Express Scripts to amend Section 5.6 so that pricing negotiations under that provision would be "[b]ased on external validation not [Express Scripts'] approval." SA-1235.

Anthem also solicited a new market pricing analysis from its consultant, which concluded that the Agreement's pricing was "off the market" by about $800 million per year. SA-1184. In October 2014, Anthem prepared an internal "blueprint" of options it could take to obtain better pricing. SA-1301. Demanding or suing for "competitive benchmark pricing" under Section 5.6 was not one of the options. *See id.*

That same month, Anthem sent Express Scripts a proposal to amend Section 5.6 to give Anthem the right to terminate the Agreement if Express Scripts did not agree to modify the pricing "as [Anthem] determines necessary to make its terms market competitive":

| | C. | PERIODIC PRICING REVIEW (MARKET CHECK) |
|---|---|---|
| 3 | **Periodic Pricing Review (Market Check)** | Provision 5.6 of the Agreement will be revised to provide as follows:<br><br>• WLP may conduct a market check as frequently as annually by either (i) using a third party consultant or (ii) soliciting proposals from other entities for PBM and pharmacy services.<br><br>• WLP will have the right to terminate the Agreement on not less than six (6) months' notice to ESI if:<br><br>    ○ where a consultant is used, ESI does not agree to modify the terms of the Agreement as WLP determines necessary to make its terms market competitive; or<br><br>    ○ where third party proposals are solicited, WLP determines that the proposal from another entity is more advantageous to WLP than the terms of the Agreement, unless ESI agrees to modify the terms of the Agreement as WLP determines to be necessary to make the terms of the Agreement as advantageous to WLP as those proposed by such other entity.<br><br>• Unless ESI agrees to the foregoing market competitive terms within 30 days of WLP's notice specifying same, WLP may exercise the termination right. |

SA-1244 (highlights added). Two months later, Anthem sent a "prioritized" list of draft revisions to the Agreement. SA-1304. Its top priority ("Rank #1") was to amend Section 5.6. SA-1310. Express Scripts did not agree to Anthem's proposal. CA-364(¶¶163-64).

As for pricing terms, between October 2014 and March 2016, Anthem and Express Scripts exchanged several pricing proposals. CA-365-67(¶¶165-67). The proposals were billions of dollars apart. Express Scripts' proposals offered Anthem between $2 billion and $3.1 billion in price savings over the Agreement's remaining four years, plus an additional $3.1 to $4.8 billion in cost-savings programs and $4.2 billion in rebate guarantees. CA-157-58. Anthem rejected these proposals, insisting that it was "entitled" to $13 billion in price savings. CA-368-69(¶171).

In February 2015, as a precursor to further pricing negotiations, Anthem sent a letter asserting that Express Scripts purportedly failed to comply with certain operational provisions of the Agreement. CA-369(¶173). Six weeks later, Anthem sent a letter asserting that Express Scripts had not complied with Section 5.6. CA-370(¶174). To try to resolve their differences and negotiate new pricing terms under Section 5.6, Anthem and Express Scripts exchanged at least 24 letters and held at least 7 in-person meetings. CA-370-74(¶¶175-76). But the parties failed to reach agreement. CA-370(¶175).

The parties disagreed most sharply over the upfront payment. CA-374(§4.a). Express Scripts reiterated to Anthem that the $4.675 billion upfront payment was inextricably connected to the pricing terms. SA-1334. Anthem had knowingly accepted less favorable pricing for the Agreement's 10-year term in exchange for the $4.675 billion upfront payment, so that upfront payment had to be factored in when negotiating new pricing terms. CA-377-78(¶¶181-83, 185). Anthem now disagreed, stating that the upfront payment was "irrelevant" to Section 5.6. CA-378-80(¶¶184-89); SA-1380. Mr. Zielinski later testified that he "[did]n't care" if Express Scripts could earn a return on the $4.675 billion upfront payment, and that it was "not [his] problem" if Express Scripts lost money or even went bankrupt. SA-924-25.

18

The parties could not agree on many other issues too. Anthem and Express Scripts disagreed about: (i) the meaning of "competitive benchmark pricing"; (ii) the appropriate benchmarks and adjustments for any analysis of "competitive benchmark pricing"; (iii) the parties' obligations under Section 5.6, including whether Express Scripts had to capitulate to pricing demands that would cost it billions of dollars per year; and (iv) the timing of any market check, with Anthem demanding that new pricing take effect on January 1, 2015, eleven months before Express Scripts believed the market check should even begin. CA-381-82(¶¶191-94); SA-1374(¶3); SA-1203.

Compounding these impasses, Anthem's new leadership team argued that the First Market Check had been conducted in bad faith (despite the parties reaching agreement), and it rejected Express Scripts' view that the parties should proceed as they had done in the First Market Check. CA-384-85(¶¶197-98). For example, Express Scripts requested that Anthem share a copy of the market analysis supporting its pricing proposals, just as Anthem had done in the First Market Check, to facilitate the parties' negotiations. SA-1164; SA-1342. Anthem refused. SA-1365; CA-386(¶200); CA-388(¶202).

Another disagreement arose over the value of Express Scripts' offers during the Second Market Check. Express Scripts' proposals included savings from Anthem adopting cost-savings programs and higher rebate guarantees, which

Express Scripts valued at several billion dollars. CA-392-93(¶¶210-11). Anthem, however, insisted these programs and guarantees were worthless. CA-393(¶¶212-13).

Operational issues also divided the parties. Express Scripts disputed Anthem's contentions that it was not in compliance with the Agreement's operational provisions, and, as part of negotiating its pricing proposals, sought an assurance and release for any purported noncompliance. CA-396-400(¶¶223-36); CA-402(¶243). Anthem asserted that it was improper for Express Scripts to seek a release as part of its pricing proposal. *Id.*; CA-403-04(¶246).

The parties also clashed over potential revisions to non-pricing contractual terms. For example, Anthem initially stated it was "willing to entertain a reasonable extension" of the Agreement, SA-1297, but later asserted that Express Scripts acted in bad faith by proposing an extension. CA-404-05(¶¶248-50). Anthem, meanwhile, sought to renegotiate contract terms that it considered unsatisfactory, including Section 5.6. CA-363-65(¶¶160-64).

Finally, the draft proposals to amend the Agreement's pricing terms in Exhibit A contained hundreds of different price terms broken down by year, line of business, pharmacy network, prescription type, and distribution channel, each of which was subject to disagreement, CA-406(¶251), and to individual negotiation, as Anthem pressed for lower prices on virtually every single one, CA-407(¶252). Because of

how far apart the parties were on the many other commercial terms and deal points, the parties never had detailed discussions on the individual pricing terms. SA-841-43.

### F. This Case And The Summary Judgment Order Below

On March 21, 2016, just four days after Express Scripts sent its fifth pricing proposal in the Second Market Check, Anthem abruptly and unexpectedly ended the parties' ongoing negotiations by filing this lawsuit. CA-444-45(¶309). As relevant here, Count I of Anthem's complaint seeks $14.8 billion for alleged breach of Section 5.6, and Count II seeks a declaratory judgment that Section 5.6 obligated Express Scripts to provide "competitive benchmark pricing." A-92-95(¶¶89-107); A-99(¶¶A-C). The other Counts are not at issue in this appeal.

On March 31, 2022, the district court issued a 29-page order granting Express Scripts summary judgment on Counts I and II. SPA-1-29.

*First*, the court granted Express Scripts summary judgment on Count II because Section 5.6's plain text unambiguously does not obligate Express Scripts to provide competitive benchmark pricing to Anthem. SPA-11-15. "The first sentence" of Section 5.6 "sets forth the frequency and purpose of Anthem's market analyses." SPA-13. "The second sentence obligates Express Scripts to negotiate in good faith over Anthem's proposed new pricing terms in the event that the market analysis shows that pricing is not competitive." *Id.* "Lastly, the third sentence

requires that new pricing terms be agreed to in writing by Express Scripts to take effect." *Id.* Thus, "Express Scripts' only obligation under this section is to negotiate in good faith over any new pricing terms Anthem may propose after it conducts a market analysis." *Id.*

The court rejected Anthem's argument that, because Section 5.6 used the word "ensure," Express Scripts was required to "guarantee" competitive benchmark pricing. SPA-13-14. "[T]he word ensure can mean 'check' instead of guarantee," the court held, and this was the only conceivable meaning of "ensure" as used in Section 5.6. SPA-14. That is because "the sentence in which the word is used applies only to Anthem." *Id.* "If the contract read 'Express Scripts shall ensure competitive benchmark pricing,' Anthem's arguments might have substantial force, but a plain four-corners reading does not support its interpretation." *Id.*

The court added that it "need not consider extrinsic evidence" because "Section 5.6 is not ambiguous," but it noted that it "would reach the same conclusion" had it done so. *Id.* "The circumstances of the bid solicitation process, statements from Anthem's executives, rejected draft language for this section, and the parties' course of conduct regarding the first market check in 2012, all demonstrate that the provision at issue was not a requirement to provide competitive benchmark pricing." SPA-14-15 (footnotes omitted).

*Second*, the court rejected Count I because Anthem could not recover expectation damages (*i.e.*, the profits it would have earned under a new agreement) based on a purported breach of a duty to negotiate in good faith. SPA-15-21. Citing numerous controlling cases, including *Goodstein*, 80 N.Y.2d 366; *L-7 Designs*, 647 F.3d 419; and *IDT*, 23 N.Y.3d 497; the court ruled "that where the breach is for failure to negotiate in good faith, expectancy damages are not available unless the ultimate agreement that would have been reached at the end of those negotiations is reasonably discernable." SPA-21. (The court took no position on whether such damages were available if the ultimate agreement were reasonably discernible. SPA-18.)

Anthem had not put forward any triable question of fact on this issue. "[T]he parties disagreed on many complex and fundamental issues and were billions of dollars apart when negotiations ended due to Anthem's initiation of this lawsuit." SPA-19. "In particular, the parties could not agree on whether the $4.675 billion Express Scripts paid up front as part of the initial agreement could be considered in negotiating its new pricing terms." *Id.* Nor could they "agree on the meaning of 'competitive benchmark pricing,' whether Express Scripts was required to accept unprofitable pricing demands in order to grant Anthem competitive benchmark pricing, the relevance of the first pricing review, and more." *Id.* (footnote omitted).

Finally, the court rejected Anthem's argument "that it is entitled to restitution damages" (*i.e.*, damages unwinding the transaction and restoring both parties to the pre-Agreement status quo) to the extent that it could not recover expectation damages. SPA-20. Such a claim was "procedurally barred, as Anthem has not plead[ed] a claim for restitution damages nor mentioned restitution throughout discovery, either in response to interrogatories requesting its bases for damages nor in its expert reports and other disclosures." *Id.* It would thus be "prejudicial to Express Scripts for the Court to allow Anthem to seek a new theory of damages after five years of litigation." *Id.*

## SUMMARY OF ARGUMENT

I.     The district court correctly ruled that Section 5.6 does not obligate Express Scripts to guarantee competitive benchmark pricing. Section 5.6's plain text makes clear that Express Scripts' only obligation was to negotiate in good faith over new pricing terms proposed by Anthem. This does not entail an obligation to guarantee competitive benchmark pricing or to capitulate to Anthem's demands. Good-faith negotiations can rightly culminate in impasse. *IDT*, 23 N.Y.3d at 503.

Anthem bases its contrary position on the word "ensure" in Section 5.6's first sentence, which, it claims, obligates Express Scripts to "guarantee" competitive benchmark pricing. This argument fails for three reasons. *First*, Express Scripts is not mentioned in that sentence, so the word "ensure" in that sentence does not

impose obligations on Express Scripts.  *Second*, in the context of Section 5.6, the word "ensure" means "check," not "guarantee."  As a matter of plain English, when "ensure" refers to matters outside a party's control, it means "check," not "guarantee."  Here, "ensure" is part of a condition set by the first sentence of Section 5.6:  Anthem *checks* whether it is receiving competitive benchmark pricing and, if it believes it is not, then the condition is met and the second sentence of Section 5.6 entitles Anthem to propose new pricing terms to Express Scripts, at which point the parties must negotiate in good faith.  *Third*, the third sentence of Section 5.6 provides that "notwithstanding" the first two sentences, no pricing will go into effect absent written agreement from Express Scripts.  This clause would be negated and superfluous under Anthem's reading.

Even if Section 5.6 were ambiguous (it is not), the undisputed extrinsic evidence confirms that Section 5.6 does not obligate Express Scripts to guarantee competitive benchmark pricing.  That is clear from the 2009 transaction's structure—especially Anthem's agreement to trade less favorable pricing over the Agreement's 10-year term in exchange for $4.675 billion upfront—as well as from Section 5.6's drafting history, contemporaneous statements from Anthem's executives, and the parties' course of conduct.  Anthem's extrinsic evidence, by contrast, consists of self-serving deposition testimony from its own witnesses a decade later as to what they wished the purpose of Section 5.6 was.

25

II.     The district court also correctly ruled that Anthem could not prove damages for a purported breach of Section 5.6.  The Agreement is governed by New York law, which bars Anthem from recovering damages that it "assertedly would have realized" under a non-existent contract that the parties hypothetically would have agreed to had they negotiated in good faith.  *Goodstein*, 80 N.Y.2d at 372; *L-7 Designs*, 647 F.3d at 431.  Such damages are impermissibly speculative as a matter of law and would anomalously hold Express Scripts responsible for pricing terms it never agreed to.

*Goodstein*'s holding is especially applicable here because the parties "disagreed on many complex and fundamental issues and were billions of dollars apart when negotiations ended due to Anthem's initiation of this lawsuit."  SPA-19.  That leaves no reasonably discernible basis for a fact-finder to deduce what a contract negotiated in good faith would have specified.

Anthem's appellate brief offers no persuasive response.  It ignores *Goodstein* altogether, failing to even mention it in its brief.  Instead, Anthem cites a Delaware case applying Delaware law that expressly rejected *Goodstein* and New York law.

Finally, the district court correctly ruled that Anthem cannot recover restitution damages restoring both parties to the pre-Agreement status quo because it did not preserve any such damages theory below, and grave prejudice would result from allowing Anthem suddenly to conjure, after years of litigation and exhaustive

discovery, an entirely new damages theory, predicated on unwinding a ten-year, multi-billion-dollar transaction. In any event, under New York law, a plaintiff claiming breach of a duty to negotiate in good faith is limited to reliance damages— its out-of-pocket expenses on the costs of negotiation—and Anthem sought no such damages.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it might affect the outcome of the suit under the governing law, and a fact issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Red Tree Invs., LLC v. Petroleos de Venez., S.A.*, 82 F.4th 161, 170 (2d Cir. 2023) (cleaned up).

This Court "review[s] *de novo* the grant … of a motion for summary judgment, drawing all reasonable factual inferences in favor of the party against which summary judgment is sought." *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010). The *de novo* review includes "both the district court's determination of whether a contract is ambiguous" and "as to an unambiguous contract, the district court's interpretation of its terms." *Id.*

**ARGUMENT**

## I.   THE DISTRICT COURT CORRECTLY RULED THAT EXPRESS SCRIPTS WAS NOT REQUIRED TO PROVIDE COMPETITIVE BENCHMARK PRICING UNDER SECTION 5.6.

Count II of Anthem's complaint seeks a declaratory judgment that, under Section 5.6, Express Scripts was "required to provide competitive benchmark pricing to Anthem through the term of the Agreement." A-99(¶B, part ii). The district court correctly granted summary judgment to Express Scripts based on the plain text of Section 5.6. SPA-12-14.

Under New York law, which governs the Agreement, SA-106(§16.2), "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). "[W]hether the contract is ambiguous" is "a question of law." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Id.* (citation omitted). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion," *id.* (citation omitted), even if the parties "urg[e] conflicting interpretations," *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (citation omitted).

28

**A.      Section 5.6's Plain Text Unambiguously Required Express Scripts Only To Negotiate In Good Faith.**

The district court correctly ruled that Section 5.6 is unambiguous that the only contractual obligation it imposed on Express Scripts was to negotiate in good faith over pricing terms proposed by Anthem, not to guarantee that Anthem received competitive benchmark pricing.  SPA-12-15; *see also In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 n.38 (S.D.N.Y. 2018) (Ramos, J.) ("Paragraph 5.6 of the PBM Agreement … requir[es] … that Anthem and ESI negotiate in good faith over proposed new pricing.").[2]  Section 5.6 provides:

> **5.6      Periodic Pricing Review.**  [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.  In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agrees to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [Express Scripts] in writing.

SA-74.  Nothing in Section 5.6 obligated Express Scripts to accept Anthem's proposed pricing terms, to provide Anthem with "competitive benchmark pricing,"

---

[2] This interpretation matches one voiced by Judge Pooler at oral argument in a related case: "As I read the contract,… if Anthem felt that they weren't meeting this benchmark price, they could begin negotiations, but Express Scripts … had no duty to change their pricing based on the negotiation, is that correct?"  Oral Arg. Tr. at 7:30–7:58, *Doe v. Express Scripts, Inc.*, No. 18-346 (2d Cir. Oct. 19, 2018), *available at* https://tinyurl.com/bdeucd6p.

29

or to otherwise alter the pricing terms. The district court's sentence-by-sentence analysis of Section 5.6 establishes as much. SPA-13.

The first sentence of Section 5.6 "sets forth the frequency and purpose of Anthem's market analyses." *Id.* It authorized Anthem to conduct a market analysis every three years to check if Anthem was receiving competitive benchmark pricing. This sentence does not even mention Express Scripts, let alone impose obligations on it.

The second sentence provides that, if a certain condition is met—*i.e.*, if Anthem determined from the market analysis that Anthem was not receiving competitive benchmark pricing—Anthem had the right to "*propose* renegotiated pricing terms." SA-74 (emphasis added). "The second sentence [then] obligates Express Scripts to negotiate in good faith over Anthem's proposed new pricing terms." SPA-13. So the sole obligation the second sentence imposes on Express Scripts is to negotiate in good faith. Nothing more, nothing less.

"Lastly, the third sentence requires that new pricing terms be agreed to in writing by Express Scripts to take effect." *Id.* Such an "in writing" clause precludes courts from imposing a contract by "judicial fiat" without any written agreement—especially when, as here, the contracting parties are "sophisticated corporate" entities. *Jordan Panel Sys., Corp. v. Turner Constr. Co.*, 45 A.D.3d 165, 169, 173-74 (1st Dep't 2007); *see R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74-75

(2d Cir. 1984) (collecting cases). This third sentence also states that the "in writing" condition applies "*notwithstanding*" any other language in Section 5.6, meaning that this sentence "'controls over any contrary language.'" *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 112 A.D.3d 78, 83 (1st Dep't 2013) (citations omitted); *see Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (collecting cases).

In sum, by Section 5.6's plain "terms, Express Scripts' only obligation under this section is to negotiate in good faith over any new pricing terms Anthem may propose after it conducts a market analysis." SPA-13. Section 5.6 "does not require Express Scripts to guarantee competitive benchmark pricing." SPA-14.

An obligation to negotiate in good faith cannot be mistaken for an obligation to accept Anthem's proposed pricing terms, to provide Anthem with "competitive benchmark pricing," or to otherwise amend the Agreement's pricing terms. "[A]n agreement to negotiate in good faith" over contract terms is "not an enforceable commitment obligating the defendant to effectuate" such terms. *Fairchild Corp. v. New York*, 169 A.D.3d 643, 645 (2d Dep't 2019); *accord, e.g.*, *L-7 Designs*, 647 F.3d at 430 (duty to negotiate in good faith does "not commit the parties to reach their ultimate contractual objective"); *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). And an obligation to negotiate in good faith "can come to an end without a breach by either party. There is such a thing as a good

faith impasse; not every good faith negotiation bears fruit." *IDT*, 23 N.Y.3d at 503. The district court relied on these cases, including *IDT*, SPA-21, which Anthem does not distinguish or even mention.

Express Scripts was thus not required to "capitulate[] to" Anthem, *L-7 Designs*, 647 F.3d at 430 (citation omitted), or to guarantee Anthem "competitive benchmark pricing." Anthem incorrectly suggests (Br. 49) that *L-7 Designs* and *Adjustrite* held that "[g]ood faith negotiations … are governed by an objective." But these cases actually hold that the duty to negotiate in good faith requires a party to make only "a good faith, honest, articulation of interests, positions, or understandings" in an "*attempt* to reach the ... objective," *L-7 Designs*, 647 F.3d at 430 (emphasis added) (citation omitted), leaving both parties free to "abandon the transaction," *Adjustrite*, 145 F.3d at 548.

This line of precedent in turn disposes of Anthem's argument (Br. 58) that the district "court's interpretation of Section 5.6 … renders the provision superfluous" or "[un]reasonable." As the district court ruled (SPA-13), agreements to negotiate in good faith are valuable because they provide "assurance that their investments in time and money and effort will not be wiped out by the other party's foot-dragging or change of heart or taking advantage of a vulnerable position created in the negotiation." *L-7 Designs*, 647 F.3d at 431 (citation omitted). They also "protect" parties who do "not wish to be bound" to specific terms. *P.A. Bergner & Co. v.*

32

*Martinez*, 823 F. Supp. 151, 156 (S.D.N.Y. 1993) (quoting *Teachers Ins. & Annuity Assn. of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (Leval, J.)). The case Anthem cites (Br. 59)—*Endurance America Specialty Insurance v. Century Sur. Co.*, 46 F. Supp. 3d 398, 420-21 (S.D.N.Y. 2014), *rev'd*, 630 F. App'x 6 (2d Cir. 2015)—did not involve a contract to negotiate in good faith and is therefore inapposite. Anthem also omits that this case was reversed.[3]

### B. Anthem's Reading Of Section 5.6's Text Is Plainly Incorrect.

Anthem's attack on the district court's straightforward reading of Section 5.6, confined to the very end of its brief (Br. 45-52), hinges on a single word in Section 5.6's first sentence—"ensure." Based on this one word, Anthem argues that Express Scripts was obligated to "guarantee" (Br. 46-49) that Anthem received competitive benchmark pricing. Anthem's interpretation defies Section 5.6's plain text, for at least three reasons.

*First*, Express Scripts is not even mentioned in Section 5.6's first sentence, the only place "ensure" appears. Had the parties intended for "ensure" to obligate Express Scripts to provide competitive benchmark pricing, then the sentence would have named Express Scripts and said something like: "Express Scripts shall ensure

---

[3] Anthem also derived immense value from Section 5.6, gaining concessions from Express Scripts during the First Market Check (*e.g.*, exception pricing), *supra*, pp.14-15, and, had it accepted Express Scripts' offers, would have received at least "$3 billion" in additional benefits during the Second Market Check. SA-1432.

competitive benchmark pricing." SPA-14. Instead, the first sentence names only Anthem and specifies that Anthem may conduct a market analysis to "ensure" that Anthem is receiving competitive benchmark pricing. Anthem's exposition of the word "ensure" (Br. 46-49) is thus irrelevant: Whatever its meaning, "the [Agreement's] plain language does not require *Express Scripts* to [ensure] competitive benchmark pricing." SPA-14 (emphasis added).

Instead, the first sentence sets a condition for Anthem. The parties had to negotiate in good faith (under the second sentence) only after Anthem conducted the triennial market analysis to check if it was receiving competitive benchmark pricing, determined the pricing was not competitive, and proposed new pricing terms. As such, the district court could not have "require[d] [Express Scripts] to provide competitive benchmark pricing" (Br. 45) without rewriting the Agreement to "impose obligations on [Express Scripts] that are not mandated by [its] unambiguous terms." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 606 (2d Cir. 2020) (citation omitted).

*Second,* in Section 5.6, "ensure" means "check," *not* "guarantee." True, "ensure" can mean "guarantee" in some contexts (*see* Br. 46-47), but "the word 'ensure' is susceptible to several other meanings." *High Point SARL v. Sprint Nextel Corp.*, 2012 WL 3202696, at *10 (D. Kan. Aug. 3, 2012); *accord, e.g., In re AmTrust Fin. Corp.*, 694 F.3d 741, 752 (6th Cir. 2012) ("ensure" did not mean "guarantee").

Anthem does not challenge (*see* Br. 48) the district court's ruling that "ensure" can also "mean 'check instead of guarantee.'" SPA-14.

When, as here, the subject of a sentence acts to "ensure" an objective outside its control, the word "ensure" frequently means to "check" rather than to "guarantee." *See, e.g.*, *FBI v. Fikre*, 601 U.S. 234, 244 (2024) ("[A] federal court's duty to *ensure* itself of Article III jurisdiction … persists ….") (emphasis added); *United States v. Massey*, 2024 WL 1266347, at *2 (2d Cir. Mar. 26, 2024) (summary order) ("[T]he district court asked a series of questions to *ensure* that Reese's waiver of his right to a revocation hearing was voluntary and knowing.") (emphasis added). Take the sentence: "Allison looked at the airport display board to *ensure* that her flight was on time." In this example, Allison is checking that her flight is on time, not guaranteeing that there will be no delay. It makes zero sense for a subject to guarantee the status of an objective outside its control—Allison cannot control her flight's timeliness; and a federal court cannot guarantee its own jurisdiction or that a defendant's waiver of right is voluntary—but it does make sense to check that status.

So too here. It would make no sense to say that Anthem conducts a market analysis to *guarantee* Anthem is receiving competitive benchmark pricing, as that is outside the control of Anthem. Such a nonsensical interpretation is "disfavored." *Futuresource L.L.C. v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) (Posner,

J.) (citing, *e.g.*, *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 254 N.Y. 179, 183 (1930) (Cardozo, C.J.)). The word "ensure" in the first sentence of Section 5.6 must mean "check," based on the context in which it is used.

By contrast, Anthem's cases that use the word "ensure" did so when the party charged with ensuring something had the power to guarantee it. *See Springwood Assocs. v. Lumpkin*, 606 N.E.2d 733, 740 (Ill. Ct. App. 1992) (nursing home required to "ensure [that its] water temperatures do not exceed 110 degrees"); *Potelco, Inc. v. Washington State Dep't of Lab. & Indus.*, 2018 WL 332972, at *8 (Wash. App. 2018) (statute requiring "master electrician or administrator" to "[e]nsure that all electrical work complies with the electrical installation laws").

Express Scripts' interpretation of "ensure" also matches the title of Section 5.6: "Periodic Pricing Review." Section 5.6 is a "pricing review" provision—or, as the parties have consistently called it (*e.g.*, Br. 1-2, 6-8), a market *check* provision—not a "pricing guarantee" provision. The second sentence of Section 5.6 also provides that if Anthem "determines that such pricing terms are not competitive," then Anthem can "propose renegotiated pricing terms." This presumes that the market analysis in the first sentence may determine that pricing is not competitive. The first sentence is not about *guaranteeing* that pricing is competitive; it is about *checking* whether pricing is competitive to see if the second sentence is triggered. Anthem ignores this explanation in its "semantics" analysis (Br. 47).

Anthem's response (Br. 46) that other parts of the Agreement use the word "ensure" to mean "make certain of" or "guarantee," is unpersuasive. "In law as in life … the same words, placed in different contexts, sometimes mean different things." *Am. Food & Vending Corp. v. Amazon.com, Inc.*, 214 A.D.3d 1153, 1156 (3d Dep't 2023) (citation omitted). The canon of consistent usage is "often disregarded" and "is particularly defeasible by context." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 145 (2012) (*cited* Br. 46).

Nor does the fact that "ensure" can sometimes mean "guarantee" make Section 5.6 ambiguous (*see* Br. 49). For text "to be ambiguous, alternative dictionary definitions of a word must each make sense within the language and structure of" a document. *Prot. & Advoc. For Persons With Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 125 (2d Cir. 2006) (Sotomayor, J.).

*Third*, Anthem's argument would negate the third sentence of Section 5.6. If, as Anthem contends, the first sentence obligated Express Scripts to provide "competitive benchmark pricing," then Express Scripts' bargained-for right to have new pricing terms take effect only if it agreed "in writing," "notwithstanding" the other parts of Section 5.6, would be nullified. And as Anthem admits (Br. 58), courts must "safeguard against adopting an interpretation that would render any individual provision superfluous." *L. Debenture*, 595 F.3d at 468 (citation omitted).

Anthem unpersuasively tries to evade these plain-text incompatibilities with its argument by asserting (Br. 47) "that the purpose of a market check is to reduce pricing," citing deposition testimony from its own witnesses and a third-party's email. But when, as here, "a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence …." *Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 149 (2d Cir. 2005) (citation omitted).

Even if the contract's text supported Anthem's "purpose" argument, statements in a contract as to contracting parties' "purposes and motives" "cannot create any right beyond those arising from the operative terms." *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (Sotomayor, J.) (citation omitted). This rule also disposes of the truism that "contract provisions must be harmonized and read as a whole" (Br. 51). Courts may not rewrite contracts to effectuate the contract's purposes because "specific terms and exact terms are given greater weight than general language." *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (citation omitted). Cases cited by Anthem (Br. 50-51) harmonized conflicting operative provisions to make sense of them, *Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69-70 (2d Cir. 2002), to avoid making three operative "paragraphs" "superfluous," *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992), or to

38

give effect to another operative clause, *Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines Co.*, 2013 WL 3326662, at \*5-6 (S.D.N.Y. June 27, 2013). They did not impose new obligations on a party so as to effectuate a clause's (supposed) general purpose.

Accordingly, the district court correctly rejected Anthem's reading of Section 5.6 based on the plain text alone.

### C. Even If Section 5.6 Were Ambiguous (It Is Not), The Extrinsic Evidence Proves Express Scripts' Reading As A Matter Of Law.

Anthem pretends (Br. 3) that the primary issue in this appeal is the district court's passing statement that, "even if the extrinsic evidence were to be considered, [it] would reach the same conclusion" as to the meaning of Section 5.6. SPA-14. The district court actually ruled that "Section 5.6 is not ambiguous," and thus the court "need not consider extrinsic evidence." *Id.* Regardless, Anthem errs in asserting (Br. 52) that "[c]ourts are not allowed to weigh extrinsic evidence to resolve genuine issues of material fact on summary judgment against the non-movant." Even when a contract "is ambiguous …, summary judgment is still proper," on *de novo* review, "when 'the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation,'" *SCS Comms., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (citation omitted).

This Court need not reach the extrinsic evidence because, as explained above in Parts I.A-B, the district court correctly ruled that Section 5.6 is unambiguous. If

this Court disagrees and looks beyond the plain text, however, it should affirm the district court's ruling, which was based solely on undisputed facts, not "contested issues of fact reserved for a jury" (Br. 4).

*First*, uncontested facts about the Transaction's structure prove Express Scripts' reading of Section 5.6. SPA-14. "Express Scripts [] paid Anthem $4.675 billion upfront," an unusually "large … payment," in exchange for "Anthem agree[ing] to prescription pricing terms that were … 'short of market competitiveness.'" SPA-3 (quoting SA-1153); *see supra*, pp.6-10. Express Scripts required sufficient certainty about the pricing terms over the Agreement's 10-year term to model its expected return on its large upfront payment. CA-283-85(¶¶27-28); CA-312-14(¶¶73-79); SA-981. Anthem's interpretation of Section 5.6, requiring Express Scripts to alter the pricing terms every three years in ways it could not predict at the Transaction's outset, flouts this structure.

Anthem cannot deny (Br. 18) that it traded away better pricing for the upfront payment. When accepting this deal, Anthem's then-Vice President for Sales and Marketing wrote in 2009, "Anthem … 'knowingly[]' 'trad[ed] discounts versus the one-time payment.'" SPA-3 (quoting SA-1153); *see* SPA-14 n.5; *supra*, pp.6-10. Anthem "[a]dmitted" the accuracy of this quotation in its Rule 56.1 statement. CA-311(¶66). Anthem is thus bound by this admission for purposes of summary judgment, and the district court did not, as Anthem claims (Br. 16-21), improperly

resolve factual disputes against it. *See, e.g.*, *Villetti v. Guidepoint Glob. LLC*, 2022 WL 2525662, at *1 n.1 (2d Cir. July 7, 2022) (summary order).

Anthem denied these statements only to the extent that they suggested that "pricing was 'below market competitiveness'" in 2009." *E.g.*, CA-309(¶66). But it is undisputed that Anthem did not receive "competitive benchmark pricing" as Anthem *now* defines that term—*i.e.*, "the most favorable pricing"—for the largest clients. CA-351-52(¶135); *see* CA-307(¶63) (admitting Anthem knew it did not receive the "best pricing" or "best rates" in 2009 because it chose the $4.675 billion upfront payment). Whether or not Anthem received pricing that was arguably market competitive in 2009 (*see* Br. 18-21, 52-53), it does not dispute the existence of this bottom-line tradeoff.

*Second*, Section 5.6's drafting history shows that Express Scripts undisputedly would not agree to a contract that allowed Anthem to dictate new pricing terms. SPA-14; *supra*, pp.10-14. "[A]n earlier version of the section stated that '[Anthem] shall have the ability to renegotiate the pricing terms of this Agreement,'" giving it a stronger right than the present right to propose terms that Express Scripts was free to reject. *Id.* n.6 (citation omitted). "Express Scripts objected to this language because '[m]arket checks every 3 years makes any pricing agreed to up-front short term and puts any return on up-front consideration at risk.'" *Id.* (quoting CA-312(¶73)). "Express Scripts further 'strongly objected' to the draft, stating that it

'could not model or price with any certainty,' to which Anthem responded that this was a 'valid point.'" *Id.* (quoting CA-313(¶75)). Again, Anthem "[a]dmitted" these facts. CA-312-13.

Anthem responds (Br. 53-54) that the market-check provision in Section 5.6 was included over Express Scripts' objection. But, as it concedes (Br. 54 n.6), Anthem met Express Scripts' objections by requiring Express Scripts only to "negotiate in good faith" and by dropping a proposed paragraph (b) that would have allowed Anthem to dictate price changes unilaterally. *Supra*, pp.12-13; *see* CA-116-17; CA-317-18(¶84); CA-321(¶88). When "sophisticated" parties "to a contract omit terms[]…[]the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Products Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (citation omitted).

Anthem's other arguments (Br. 54-55), that it "rejected" Express Scripts' proposals to guarantee Anthem "Most Favored Pricing" among comparable clients and included a "clawback" provision, pertain to different clauses in the Agreement, and have nothing to do with Express Scripts' Section 5.6 obligations.

*Third*, "the parties' course of conduct" shows that Section 5.6 did not require Express Scripts to agree to Anthem's pricing proposals. SPA-14-15. Between 2009 and 2013, Anthem personnel consistently acknowledged that Section 5.6 did not obligate Express Scripts to agree to revised pricing. *Supra*, pp.14-15. Anthem's

Vice President of Sales and Marketing wrote in 2011 that, under Section 5.6, Anthem expects it will propose new pricing terms "to [Express Scripts] and will try to negotiate a better deal but they do not have to accept that."  SA-1150 (emphasis added).  Anthem's Chief Pharmacy Officer wrote in 2012 that a permissible outcome under Section 5.6 is that Express Scripts "negotiates in good faith (as required by the contract) but doesn't end up agreeing to anything."  SA-1162 (emphasis added).  During the 2012-2013 First Market Check, Anthem never claimed it was entitled to receive "competitive benchmark pricing," nor did it ever ask for or receive such pricing.  *Supra*, pp.14-15.  Anthem concluded that "the pricing terms were not competitive" but stated that "Express Scripts could satisfy its contractual obligations by agreeing to continue to provide 'exception pricing' for its commercial business."  SPA-15 n.7 (quoting SA-1172).  All this is undisputed.  Even now, Anthem concedes (Br. 55) that it "did not press its [purported] right" to competitive benchmark pricing in 2012.

Anthem's internal records also undermine its argument.  After Anthem hired new executives who had neither negotiated the Agreement nor participated in the First Market Check, Anthem concluded that Section 5.6 had no "teeth."  SA-1181.  Anthem's consultant concluded that Section 5.6 "does not obligate [Express Scripts] to implement competitive pricing."  SA-1231.  And, in October 2014, Anthem proposed drastic revisions to Section 5.6, including seeking a right to terminate the

Agreement if Express Scripts did not agree to modify the pricing terms to be what Anthem considered "market competitive." SA-1244. If Section 5.6 already entitled Anthem to "competitive benchmark pricing," it never would have made such a proposal. The deposition testimony and fragmentary emails Anthem cites (Br. 55-57) either concede that Anthem did not make "an explicit push" for competitive benchmark pricing during the First Market Check, CA-768-69, or refer only to a general "obligation under the [m]arket check for market competitive rates," CA-772, without suggesting that Express Scripts had to accept Anthem's proposed pricing, *see* CA-776; CA-782; CA-789; CA-803; CA-812.

Anthem's suggestion (Br. 57) that course-of-conduct evidence always poses a "disputed question of fact" is incorrect. *See Reilly v. Reem Contracting Corp.*, 380 F. App'x 16, 18 (2d Cir. 2010) (summary order) (affirming summary judgment based partly on "course of conduct"). Anthem's cases do not support this contention. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98-99 (2d Cir. 2007) (addressing "duty of good faith and fair dealing"); *Mgmt. Recruiters of Boulder v. Nat'l Econ. Rsch. Assocs., Inc.*, 2005 WL 77059, at *3 (S.D.N.Y. Jan. 13, 2005) (addressing "contract formation," not contract interpretation).

Moreover, Anthem waived its contention (Br. 57) that "a single exercise" of contract performance "does not qualify as a course of conduct," because Anthem did not so argue below. *See* SA-1412-22. Regardless, the above course-of-conduct

evidence spans discussions from 2009 through 2014, not a one-off event. *Supra*, pp.42-44.

Anthem's extrinsic evidence, by contrast, is unpersuasive as a matter of law. To start, Anthem betrays desperation by citing (Br. 48-49) an email from Cigna's CFO stating, after Anthem sued, that he thought Anthem's argument had force. *See* A-612. Anthem omits that at the time, Cigna was not aligned with Express Scripts, but had executed a merger agreement *with Anthem*. *See In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *21 (Del. Ch. Aug. 31, 2020). This self-serving "opinion of a non-party witness as to the meaning of the terms of a contract is" unpersuasive hearsay and "not admissible." *La Chemise Lacoste v. Alligator Co.*, 59 F.R.D. 332, 333 (D. Del. 1973) (citation omitted); *see* Fed. R. Civ. P. 56(c)(2) (allowing objections to inadmissible evidence at summary judgment).

Anthem then argues (Br. 48) that Express Scripts' "CFO testified that 'ensure' means 'to make sure'" (quoting CA-735). But the CFO was offering only one possible definition; he did not testify that this was the meaning of "ensure" as used in Section 5.6. *See* CA-735.

Finally, Anthem cites (Br. 50) deposition testimony showing that *its own officer* believed that "the whole agreement assumes that [Anthem] is going to get competitive pricing." CA-725. But a plaintiff cannot "rely on [its] own 'self-serving testimony' at [its] deposition[s] to rebut [Express Scripts'] prima facie showing of

45

entitlement to summary judgment." *Sewkarran v. DeBellis*, 11 A.D.3d 446, 446 (2d Dep't 2004) (citation omitted); *see, e.g.*, *F.D.I.C. v. Nat'l Union Fire Ins. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000) ("unsubstantiated, self-serving testimony … does not place [an] issue in genuine dispute").

The district court therefore had multiple bases for granting Express Scripts summary judgment on Count II of Anthem's complaint.

## II. THE DISTRICT COURT CORRECTLY RULED THAT ANTHEM COULD NOT PROVE DAMAGES.

Count I of Anthem's complaint alleges that Express Scripts breached Section 5.6 "by failing to agree in writing to new pricing terms" and "by failing to provide competitive benchmark pricing." A-92-93(¶94). As explained *supra* Part I, Section 5.6 obligated Express Scripts only to negotiate in good faith. So the only viable basis for Anthem's claim is its assertion that Express Scripts "refus[ed] to negotiate in good faith." A-92(¶94).

Under New York law, "to recover from a defendant for breach of contract, a plaintiff must prove," among other things, "damages to the plaintiff caused by that defendant's breach." *Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The district court rightly concluded that, because Anthem cannot prove this element, Express Scripts is entitled to summary judgment on Count I. SPA-15-21.

### A.    Anthem Cannot Recover Expectation Damages.

For Count I, Anthem seeks $14.8 billion, which it claims is "the difference between [Express Scripts'] pricing and competitive benchmark pricing."  A-99(¶¶A-B).  These damages are, as Anthem conceded below, "expectation damages":  what it purportedly would have received had the parties entered into a hypothetical deal amending the Agreement's pricing terms to provide Anthem with what it believes to be "competitive benchmark pricing."  SA-1422-23.  New York law forecloses such damages.

### 1.    Expectation Damages Are Categorically Unavailable For A Breach Of A Duty To Negotiate In Good Faith.

When two parties negotiating new contract terms do not reach a deal due to a lack of good-faith negotiations, New York law bars expectation damages.  Such damages require undue speculation as to what the contract terms might have been under a nonexistent contract reached through hypothetical good-faith negotiations.

The New York Court of Appeals has squarely held that a plaintiff cannot recover damages that "it assertedly would have realized" had the defendant "act[ed] in good faith" pursuant to an obligation to negotiate in good faith over contract terms.  *Goodstein*, 80 N.Y.2d at 372.  In that case, Goodstein sued the City of New York for failing to agree to a new contract in good faith and claimed damages based on the value it expected it would have received under such a contract.  *See id.* at 368-69.  There, as here, "the City's sole obligation … was to negotiate in good faith."  *Id.* at

373. The court held that Goodstein could not recover expectation damages: "To allow the profits that plaintiff might have made under the prospective [contract] as the damages for breach ... would be basing damages ... on the prospective terms of a nonexistent contract which the [defendant] was fully at liberty to reject. It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself." *Id.* This is impermissibly speculative, even if "expectation damages … are the standard measure of recovery[]" (Br. 24). "[E]ven with the best faith on both sides the deal might not have been closed and attributing plaintiff's lost profits to defendant's bad faith may be speculative at best." 80 N.Y.2d at 373 (cleaned up). "[A]n 'award based on the expectation interest would give the injured party the 'benefit of the bargain' that was not reached. But if no agreement was reached and it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation.'" *Id.* at 374 (citation omitted) (cleaned up).

This Court has applied *Goodstein* to hold that when, as here, parties have only a contractual obligation to negotiate in good faith, the "lost profits" resulting from a failure to reach an agreement "are not available" as a matter of law. *L-7 Designs*, 647 F.3d at 431.

This does not mean, as Anthem puts it (Br. 3), that "Anthem could not recover damages resulting from" Express Scripts' alleged breach. As the court ruled (SPA-19-20), and Anthem ignores, a plaintiff's monetary remedy for a breach of a duty to

48

negotiate new contract terms in good faith is its "out-of-pocket costs incurred in the course of good faith partial performance," *L-7 Designs*, 647 F.3d at 431 (citation omitted), *i.e.*, "reliance damages," *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 210 (2d Cir. 2002) (Sotomayor, J.). *See Goodstein*, 80 N.Y.2d at 373 (plaintiff could recover "reliance damages," not "the loss of its expectancy … assuming that the negotiations had progressed to agreement"); *180 Water St. Assocs., L.P. v. Lehman Bros. Holdings, Inc.*, 7 A.D.3d 316, 317 (1st Dep't 2004) ("plaintiff's measure of damages is out-of-pocket loss").

In other words, even if Anthem could establish a lack of good faith during the Second Market Check—and Express Scripts disputes this—then any monetary recovery by Anthem would need to be pegged to the costs it incurred to conduct those negotiations, such as phone and travel expenses. SPA-18-19. Anthem has not sought its out-of-pocket costs as a remedy here. SPA-15.

Expectation damages equal to the difference between Anthem's proposed pricing terms and the actuals are unavailable here for the same reason they were unavailable in *Goodstein*: They were not "fairly within the contemplation of the parties to the contract at the time it was made." 80 N.Y.2d at 374 (citation omitted). Allowing such damages would subvert the parties' expectations by allowing Anthem to enforce its proposed pricing terms, despite Section 5.6's third sentence giving Express Scripts the right to *reject* those pricing terms. *Supra*, pp.37-38. In

49

*Goodstein*'s words, "to allow" Anthem to recover its "loss of anticipated profits of some [$14.8 billion], based on the hypothesized successful completion of" negotiations with Express Scripts "would have the anomalous effect of holding [Express Scripts] responsible as guarantor, under a proposed [pricing scheme] to which neither party had agreed, for the profits from projected [price reductions] which [Anthem]" would be able to impose unilaterally. 80 N.Y.2d at 374.

*Goodstein* also forecloses Anthem's arguments (Br. 29-30) that the district court overlooked that "[t]he claim and evidence here is not that there were good faith negotiations and a good faith impasse, but rather that [Express Scripts] breached its obligation to negotiate in good faith." Bad faith cannot be "a but-for cause of" plaintiff's damages "since even with the best faith on both sides the deal might not have been closed [and] attributing [plaintiff's] lost profits to [defendant's] bad faith may be speculative at best." *Goodstein*, 80 N.Y.2d at 373 (citation omitted). Case in point: A reasonable party in Express Scripts' shoes could have, for example, sought to set prices sufficiently high to recover its upfront payment, as Express Scripts sought during the Second Market Check. *Supra*, p.18. Anthem can only speculate as to how a good-faith negotiation over that issue would have played out. So too with the myriad, entrenched disagreements that divided the parties. Anthem faults (Br. 29) the district court for "relying on an alleged potential for impasse" (capitalization altered), ignoring that *Goodstein* required it to do so.

50

Anthem offers four responses, none persuasive.

*First*, without mentioning *Goodstein* by name, Anthem questions whether *Goodstein* remains good law. It states (Br. 28, 30) that "expectation damages are available based on a showing 'that the parties would have reached an agreement but for the defendant's bad faith negotiations,'" and that "[it] is for a jury to determine whether an agreement would have been reached." This contradicts *Goodstein* and *L-7 Designs*, *supra*, pp.47-50. For support, Anthem relies on *SIGA Technologies, Inc. v. Pharmathene, Inc.*, 67 A.3d 330 (Del. 2013). But *SIGA* "appl[ied] Delaware law," *id.* at 349—*not*, as Anthem claims (Br. 28), "New York law"—and Delaware law is "out of step with" "New York" law on this issue. *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1138 (Del. 2015); *see also Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 417 (S.D.N.Y. 2023) (recognizing that Delaware law diverges from New York law on this issue).

*Second*, Anthem wrongly contends (Br. 25) that *Goodstein*'s rule applies only to so-called "Type II" letters of intent, and not to "Type I" "fully executed and binding" agreements, like the Agreement here. Not so. As *SIGA* found, *Goodstein* "established that New York law limits a plaintiff to reliance damages"—*i.e.*, the cost of negotiations—"for breach of an agreement to negotiate, without distinguishing between Type I and Type II agreements." 67 A.3d at 349. *L-7 Designs* makes no such distinction either; it actually disproves this purported distinction, because the

contract there at issue was a "binding" agreement to negotiate a license agreement in good faith. 647 F.3d at 430-31. The one New York law case Anthem cites, *Tractebel*, 487 F.3d 89, does not supply the cited rule. In a footnote that does not mention recoverable damages, *Tractebel* ruled that the contract at issue was, unlike Section 5.6, a "complete agreement … on all the issues perceived to require negotiation," not an agreement "to negotiate the open issues in good faith." *Id.* at 98 n.4; *see supra*, Part I; SPA-20.

*Third*, Anthem responds (Br. 27) that, unlike the myriad cases rejecting expectation damages under *Goodstein*, *see* SPA-18-19 (collecting cases), Anthem is "seeking overcharges from a breach of a binding contract"; Anthem reasons that it and Express Scripts were still "party to a fully enforceable contract" absent agreement on new contract terms. But it is "impossible to assess any damages" when a party purportedly failed to negotiate "a renewal contract" in "good faith" because "it is altogether too conjectural that the parties would have agreed and on what terms." *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (Marshall, J.). Indeed, *Goodstein* ruled as it did because expectation damages place a non-breaching party in the same place it would have been had the contract been performed, but when the defendant's "sole obligation … was to negotiate in good faith," the defendant "was neither bound to agree to an [agreement]

nor to continue the negotiating process." 80 N.Y.2d at 373. This logic applies equally to parties that already had a contractual relationship.

*Fourth*, Anthem tries to evade *Goodstein* by mischaracterizing the parties' position on damages. It incorrectly states (Br. 23) that it "sought to recover … out-of-pocket damages." Yet "out-of-pocket expenses" in this context refers to costs that a plaintiff incurred when "rel[ying] on that promise." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73-74 (2d Cir. 1989). It does not refer to "benefit-of-the-bargain damages" for a bargain that was not reached. *Id.* at 73; *see supra*, pp.51-52.[4] Anthem then quotes a discovery hearing out of context when it says (Br. 24) that Express Scripts' "counsel admitted to the district court that the appropriate damages measure is [Express Scripts] overcharges," and that "Anthem could recover" these overcharges. Express Scripts' counsel opened the argument by stating that the parties "disagree about what [Section 5.6] means" and that he was "not going to get into all these merits position[s]" in a discovery dispute. A-619.

## 2. At Minimum, Expectation Damages Were Impermissibly Speculative Here.

While ruling that *Goodstein* precludes the recovery of expectation damages here, the district court left open whether there may be an exception "if it can be

---

[4] Anthem's contention (Br. 27 n.4) that the district court wrongly referred to "lost profits" is misleading. *Goodstein* used the term "lost profits" to refer to "expectation" damages—hypothetical profits had agreement been reached. 80 N.Y.2d at 373-74; *see also Cambridge Capital*, 675 F. Supp. 3d at 417.

discerned what agreement would have been reached" in a hypothetical good-faith negotiation. SPA-19 (citation omitted); *see* SPA-21. Express Scripts respectfully submits that *Goodstein* and *L-7 Designs* leave no such opening: "New York law categorically prohibits expectation damages in the absence of an agreement on all material terms," *Cambridge Cap.*, 675 F. Supp. 3d at 417, no appellate decision is to the contrary, and no further analysis is required to decide this case under New York law.

Nevertheless, Anthem suggests that there is an exception to *Goodstein* and expectation damages should be available when the terms resulting from the hypothetical good-faith negotiation "are reasonably discernible" from "'objective criteria … found in the agreement itself.'" Br. 42-43 (quoting *Fairbrook Leasing, Inc. v. Mesabi Aviation, Inc.*, 519 F.3d 421, 429 (8th Cir. 2008)). Not so. While *Fairbrook* did apply "New York law," 519 F.3d at 425, it was "uncertain" whether *Goodstein*'s bar on expectation damages applies "categorically," *id.* at 429, and did not resolve the issue because any such purported exception was not met. For the reasons explained above, *Goodstein*'s bar is categorical, and if there were any doubt, *L-7 Designs* removed it.

But, even if there were an exception to *Goodstein* when "it can be discerned what agreement would have been reached," SPA-19 (citation omitted), just as in *Fairbrook* that exception would not apply here, and this Court should still affirm.

The undisputed evidence establishes that no fact-finder can discern what (if any) agreement would have been reached, rendering Anthem's expectation damages impermissibly speculative as a matter of law.

As the district court recognized, the parties here were at an impasse:  They "disagreed on many complex and fundamental issues and were billions of dollars apart when negotiations ended." SPA-19.  Although Anthem disputes it now (Br. 38-39), its response to Express Scripts' Rule 56.1 statement "[a]dmitted that "[t]he parties [] fundamentally disagreed (and still disagree) over the meaning of 'competitive benchmark pricing'—a term which is not defined in the [] Agreement." CA-381(¶191).  And Anthem "[a]dmitted" that "[t]he parties' proposals were billions of dollars apart with respect to the pricing terms." CA-367(¶168).  Express Scripts also maintained throughout negotiations "that the $4.675 billion upfront payment had to be taken into account during the Second Market Check," CA-377(¶181) ("Admitted"), while Anthem "explicitly rejected [this] idea," CA-378(¶184) ("Admitted").

Nor were these the only sources of impasse. *See supra*, pp.19-21.  The parties also undisputedly disagreed over whether (i) Anthem was "entitled to new pricing every three years, irrespective of what impact it [would have] on [Express Scripts," CA-380(¶189); *see* SA-1334; SA-924-25; CA-378-80(¶¶184-89); (ii) the course of conduct in the 2012 market check would be followed, CA-384-85(¶¶197-98);

(iii) Express Scripts should remedy purported operational deficiencies, CA-396-400(¶¶223-36); CA-402-04(¶¶243, 246); and (iv) the Agreement would be extended, SA-1297; CA-404-05(¶¶248-50). These unresolved disputes take this case well outside the province of the jury, as *Goodstein*, *L-7 Designs*, and their progeny hold, because they stood to stymie any good-faith negotiation—even if, as Anthem asserts (Br. 41-43), there was bad faith here.

In short, this was not a case where the parties had agreed on all the terms of a deal and then, once everything was finalized, Express Scripts "refused to sign the final agreement" in bad faith. *Fairbrook*, 519 F.3d at 429. The "terms" of a future agreement between Express Scripts and Anthem, under good faith negotiation, were not "reasonably discernible" based on "objective criteria … found in the agreement itself." *Id.*

Nor does impasse constitute, as Anthem claims (Br. 36), "repudiation" that "establishes the breach." That incorrectly assumes that Express Scripts was required to pay competitive benchmark pricing, when it was not. *Supra*, Part I. Regardless of whether Express Scripts negotiated in bad faith, Anthem cannot possibly prove that a complete, precise agreement was destined to be reached in a massively complex, multi-billion-dollar, multi-year, fiercely-contested contract negotiation over hundreds of pricing terms but for the alleged bad-faith. *See Goodstein*, 80 N.Y.2d at 373 (citation omitted). Anthem's efforts to relitigate whether Express

Scripts "breached" are thus legally irrelevant for present purposes—quite different from "effectively dispositive" (Br. 16).[5]

In any case, Anthem fails to "set forth specific facts showing that there is a genuine issue for trial" as to whether the final terms of an agreement could be discerned based on objective criteria. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

*First*, Anthem claims (Br. 34) that "third party offers … for pricing to Anthem" show what the terms would have been in a good-faith negotiation. But it cites neither evidence suggesting that Express Scripts would have agreed to those terms in a good-faith negotiation nor cases holding that the court was required to presume that Express Scripts would so agree.

*Second*, Anthem's post-hoc expert reports (Br. 34-35) are even less persuasive, as that analysis was not available during the negotiations.

*Third*, Anthem's suggestion (Br. 35) that Express Scripts' "proposals" for pricing could provide a "floor[] for pricing terms" is unavailing. The issue is not whether Anthem *could* have agreed to Express Scripts' proposals (it did not), but whether "an agreement ultimately *would* have been reached." SPA-21 (emphasis

---

[5] That does not mean, however, that "[t]here was no dispute … that [Express Scripts] breached the Agreement and overcharged Anthem" (Br. 12). Express Scripts very much contests that charge, while recognizing it need not be resolved before arriving at summary judgment.

added). Moreover, Anthem is cherry-picking certain pricing terms from Express Scripts' offers while ignoring other terms that were integral to Express Scripts' offers—such as an extension of the Agreement, *see* CA-405(¶249)—and it is wildly farfetched for Anthem to posit that the parties would have agreed to pricing terms decoupled from the rest of a proposal that Anthem indisputably rejected. Besides, none of these proposed "criteria" for assessing expectation damages are "found in the agreement itself," rendering them irrelevant. *Fairbrook*, 519 F.3d at 429. That also distinguishes *Tractebel*, 487 F.3d 89 (*cited* Br. 25-26), where the breached contract was "comprehensive and incorporate[d] all material terms." *Id.* at 98 n.4 (citation omitted). The same cannot be said for *future* pricing agreements subject to *negotiation* under Section 5.6.

*Last*, Anthem's statement (Br. 31) that "the *amount* of damages" is often a jury question is inapposite (emphasis added, citation omitted). Damages must still "be '*capable of measurement* based upon known reliable factors without undue speculation.'" *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (emphasis added, citation omitted).

### B. Anthem Cannot Recover Restitution Damages.

Finally, the district court properly rejected Anthem's contention that it is "entitled to restitution" damages (Br. 43). Anthem waived any claim to restitution damages because it never "plead[ed]" it or "mentioned restitution throughout

58

discovery, either in response to interrogatories … nor in its expert reports and other disclosures." SPA-20; *see* Fed. R. Civ. P. 37(c)(1) (authorizing court to bar belatedly disclosed information).

"This Court reviews the district court's exclusion of [information] under Rule 37(c)(1) for abuse of discretion." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). This analysis turns on "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* These factors support affirmance.

*First*, Anthem offered no explanation for its failure to disclose that it would seek restitution damages until its brief opposing summary judgment. That is "too late" to "seek damages based on theories or calculations that have not previously been raised and were not subject to discovery." *Northern Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301, 337 (S.D.N.Y. 2014) (collecting cases). Anthem contends (Br. 43-44) that the court eliminated the requirement to disclose in Anthem's *initial* disclosures that it sought restitution damages. But Anthem does not—and cannot—explain why its answers to Express Scripts' interrogatories seeking Anthem's damages theories never disclosed this category of damages, *see*

SA-8-10, even though Rule 26(e) required Anthem to supplement its interrogatory answers to identify any damages theory it planned to rely on.

*Second*, Anthem's case hinges on whether it has a viable damages theory (it does not). But the importance of a belated damages theory does not justify overturning its exclusion when, as here, the failure to disclose was not substantially justified and was not harmless. *See Design Strategy, Inc. v. Davis*, 469 F. 3d 284, 296-97 (2d Cir. 2006).

*Third*, Anthem does not dispute that "it would be prejudicial to Express Scripts for the Court to allow Anthem to seek a new theory of damages after five years of litigation." SPA-20. When "a party in a contract dispute fails to raise a new theory of damages until after the close of discovery, the prejudice that results to the adversary can be sufficient to preclude that theory from presentation at trial." *Summit Properties Int'l, LLC v. Ladies Pro. Golf Ass'n*, 2010 WL 4983179, at *3 (S.D.N.Y. Dec. 6, 2010) (*cited* SPA-20) (collecting cases); *Point Prods. A.G. v. Sony Music Ent., Inc.*, 2002 WL 31856951, at *5 (S.D.N.Y. Dec. 19, 2002) (*cited* SPA-20).

Anthem asserts (Br. 44) that "the court simply misunderstood Anthem's damages," and that its request for "the amount that [Express Scripts] overcharged it" amounts to "restitution damages," even if Anthem did not use that term. Not so. Expectation damages measure "the loss in the value to him of the other party's

60

performance," whereas restitution damages equal "the value of the benefit conferred to the other party." *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, 2006 WL 236818, at *4 (S.D.N.Y. Jan. 17, 2006) (Lynch, J.) (citation omitted). Because restitution damages restore an aggrieved party to the "pre-contract status quo," *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003) (citation omitted), Anthem must prove "the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by [Anthem]" under the Agreement. *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992) (citation omitted); *see* Restatement (Third) of Restitution and Unjust Enrichment § 38(1) & cmt. a (2011). Anthem has never calculated this sum, which would require unwinding a 10-year agreement covering extensive services, millions of prescriptions, and a $4.675 billion upfront payment.

Regardless, if Anthem were right that restitution damages equate to expectation damages, then the same uncertainty and speculation problems would likewise preclude restitution damages. *Supra*, Part II.A. Anthem cannot evade *Goodstein* and *L-7 Designs* by repackaging the forbidden damages under a different label.

Finally, as noted above, New York law allows a plaintiff alleging breach of a duty to negotiate in good faith to obtain only reliance damages—"out-of-pocket

costs incurred in the course of good faith partial performance." *L-7 Designs*, 647 F.3d at 431; *supra*, pp.48-49 (collecting cases). No court has suggested that restitution damages would be available too. This Court should not be the first, especially after Anthem plainly failed to preserve the issue.

## <u>CONCLUSION</u>

The district court's summary judgment order should be affirmed.

Dated:  July 24, 2024        Respectfully submitted,

*/s/ Derek L. Shaffer*

| | |
|---|---|
| Ellison Ward Merkel | Derek L. Shaffer |
| QUINN EMANUEL URQUHART | Jonathan G. Cooper |
|   & SULLIVAN, LLP | Michael J. Lyle |
| 51 Madison Ave 22nd floor | QUINN EMANUEL URQUHART |
| New York, NY 10010 |   & SULLIVAN, LLP |
| (212) 849-7000 | 1300 I St NW #900 |
| ellisonmerkel@quinnemanuel.com | Washington, DC 20005 |
| | (202) 538 8000 |
| Alex H. Loomis | derekshaffer@quinnemanuel.com |
| QUINN EMANUEL URQUHART | jonathancooper@quinnemanuel.com |
|   & SULLIVAN, LLP | mikelyle@quinnemanuel.com |
| 111 Huntington Ave, Suite 520 | |
| Boston, MA  02199 | |
| (617) 712-7100 | |
| alexloomis@quinnemanuel.com | |

*Counsel for Defendant-Appellee Express Scripts, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, the above brief is in 14-point, proportionally spaced Times New Roman type and contains 13,986 words, excluding the items exempted by Fed. R. App. P. 32(f).

Dated:  July 24, 2024          */s/ Derek L. Shaffer*
Derek L. Shaffer